```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------------x
      UNITED STATES OF AMERICA,
 3
                          Plaintiff,         Docket No.:
 4                                           17 CR 434 (ARR)
               versus
 5
      JOSE MIGUEL MELENDEZ-ROJAS, et al.,    U.S. Courthouse
 6                                           225 Cadman Plaza East
                          Defendant.         Brooklyn, NY 11201
 7    ------------------------------------x
                                             March 13, 2020
 8                                           9:30 a.m.

 9              Transcript of Criminal Cause for Trial

10    Before:   HONORABLE ALLYNE R. ROSS,
                              District Court Senior Judge
11              (and a jury.)

12                          APPEARANCES

13    For the Government:         RICHARD P. DONOGHUE, ESQ.
                                  United States Attorney
14                                Eastern District of New York
                                  271 Cadman Plaza East
15                                Brooklyn, New York 11201
                                  BY:  ERIN ARGO, ESQ.,
16                                     TANYA HAJJAR, ESQ.,
                                       GILLIAN KASSNER, ESQ.,
17                                     Assistant U.S. Attorneys

18    For J.M. Melendez-Rojas:    SUSAN KELLMAN, ESQ.

19    For J.O. Melendez-Rojas:    MITCHELL GOLUB, ESQ.

20    For R. Melendez-Rojas:      THOMAS DUNN, ESQ.

21    For F. Melendez-Perez:      MICHAEL GOLD, ESQ.

22    For A. Romero-Melendez:     MICHAEL O. HUESTON, ESQ.
                                  JACQUELINE CISTARO, ESQ.
23
      Official Court Reporter:    MICHELE NARDONE, CSR
24                                Email:  Mishrpr@aol.com
      Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.
```

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1    (In open court.)

2    (Defendants present.)

3    (Through the interpreter.)

4    THE COURT:  Mr. Gold, you have the microphone, right?

5    MR. GOLD:  I'm sorry.

6    THE COURT:  You have the microphone?

7    MR. GOLD:  Oh, no, I don't.

8    (Pause.)

9    THE CLERK:  All rise.

10   (Jury enters.)

11   THE COURT:  Please be seated.  Mr. Gold.

12   MR. GOLD:  Thank you, Your Honor.

13   Good morning.  It's been a long two weeks, I know; and

14   you guys have been terrific coming.  We all thank you.  Let me

15   just join in.

16   I know the temptation is to go to sleep.  It certainly

17   is mine.  But obviously there is a lot at stake here for the

18   government, for the defendants certainly.  So even though I'm

19   going to repeat some things -- I will try not to, as much as I

20   can -- that have already been said by the other three defense

21   lawyers, and for Ms. Argo too for that matter, but it's going

22   to happen.

23   And if I can maybe entice you a little bit to pay even

24   extra attention, let me throw this in.  I guarantee you that by

25   the time I sit down the entire underpinning and theory of the

MICHELE NARDONE, CSR -- Official Court Reporter

Summation - Gold

1    government's case against Francisco Melendez-Perez will be

2    obliterated.  Teaser.  So stick with me, please.

3           You have heard about the presumption of innocence and

4    the burden of proof, and it all always rests behind me at the

5    government table; and that's the way it should be.  So if I'm

6    wrong about what I just said, which I don't think I am, if you

7    will make that decision and if I am, that still doesn't mean

8    you convict.  That still doesn't change the dynamic of who has

9    got to prove what.  I don't have to prove anything.  We didn't

10   call witnesses.  We didn't even have to question witnesses,

11   which I'm sure you wish we hadn't in some regards.

12          But that's the law.  The burden of proof rests

13   exclusively and solely at the government table.  But again, by

14   the time I sit down, I guarantee you, the theory of the

15   government's case will be obliterated.

16          There is one thing Ms. Argo said at the very

17   beginning.  I said it in my openings, as I recall, and,

18   frankly, I couldn't agree more.  The women that testified here

19   before you led lives -- whether by force, by choice, or by

20   circumstance, as life often gets in the way -- it was horrific.

21   There aren't -- at least I don't have a thesaurus in front of

22   me, and, if I did, it wouldn't have enough words to describe

23   the horror of their lives.

24          But you can't let their misery become your vengeance.

25   That's not your job.  And it's not going to make their lives

MICHELE NARDONE, CSR -- Official Court Reporter

1  any better.  Their stories are compelling, they are tragic; but

2  compelling doesn't equal credible, and tragic isn't

3  transparent.  That's what you need to focus on when you are

4  watching -- rather, now when you are considering what you saw

5  and what you heard from that witness stand from each and every

6  one of the witnesses.

7          So there is the conundrum:  How do you set aside your

8  revulsion at what you heard and follow the law?  How do you

9  turn off your heart and listen to your head?  It's a question

10 each of you must ask yourself.  I don't have an answer.  But

11 you must find that answer because not only did you swear to it

12 in your oath, not only did everybody in this courtroom rely

13 upon that oath and that promise, you owe it to the generations

14 before us who fought for the right of a fair trial, fought for

15 your ability to sit here and died for your ability to sit here

16 and review this and so many other cases.

17         Let it be your legacy that on this day, 12 strangers

18 came together and without fear or prejudice, bias or sympathy

19 towards none, you delivered a fair and proper verdict based on

20 the evidence and just the evidence.

21         We have all heard and read about people getting off on

22 technicalities.  Oh, this guy got off on a technicality, and

23 the TV goes ballistic and newspapers sell headlines and sell

24 their papers on headlines.  It always sounds shocking.  How

25 could that happen?  How could that guy get off?

MICHELE NARDONE, CSR -- Official Court Reporter

Summation – Gold

1    In this building there are no technicalities.  There

2  is the law.  In this building no one gets off with something.

3  It's the constitution.  It guarantees us opportunity and

4  fairness and the right for a female judge to preside over a

5  case prosecuted by three women Assistant United States

6  attorneys against foreign nationals represented by black and

7  white men and women defense attorneys.  That's not a

8  technicality.  That is the fabric of our society.  It's what

9  makes us distinct and unique.

10    And it's all predicated on you, and it falls apart

11  without you.  It's rough.  I tell you, I wouldn't want to

12  switch seats with you.  It ain't easy.  I get it.  Do your job.

13  This is what you have to do.  I'm begging you.

14    Listen to your heart, but then set it aside.  Say,

15  okay, I get it.  This is horrible.  Now, what have they proved?

16  What are the elements?  What has the government established

17  beyond a reasonable doubt?  And then and only then do you reach

18  your verdict.

19    Now, you heard my some of my colleagues spend an awful

20  lot of time talking about Delia and my cross-examination of her

21  and the hundred whatever times it was she answered that she

22  couldn't remember one of my questions and the pictures that I

23  showed her and all the questions I asked on that.  I get it.

24    I'm trying not to repeat everything that was said, but

25  I said to you in my opening that Delia was the primary witness

MICHELE NARDONE, CSR –– Official Court Reporter

Summation - Gold

1    against my client.  I was wrong.  As the evidence has shown, I

2    learned too, she is the sole witness against him.  And I will

3    go through each and every one of the other ones to make exactly

4    that point.  But the centrality of her testimony against my

5    client, against Francisco, requires me to delve into the

6    absolute depths of her testimony.

7            So let's start by looking at what the other witnesses,

8    the other women who testified, said about Francisco and see how

9    they add or not to any of the specific charges that have been

10   brought against him.

11           Diana, one of the last witnesses that testified.  She

12   never even mentioned his name.  She never mentioned his name.

13   That's fact.  So, obviously she adds nothing.  There is nothing

14   to weigh, nothing to argue.

15           Daisy, the very first witness in the case -- I think

16   she was the first witness.  She said very truly nothing about

17   Francisco, but let me just go through her briefly.  I know some

18   of my colleagues did as well.  But let me just, if I can,

19   briefly run through it, because it's really emblematic of some

20   of the patterns that developed during the course of this trial.

21   It's kind of representative of it.

22           You know, we have all seen movies, TV shows with, you

23   know, in the very beginning, under the title, "Based on a true

24   story."  Then it proceeds to make up 90 percent of it, to

25   sensationalize and make it contemptible for you, the audience,

Summation - Gold

1  but it's based upon a true story and they just kind of

2  embellish from there.  I submit to you, in large degree, that's

3  what happened here.

4         The true story is that these women were prostitutes.

5  The true story is that they lead horrific lives.  It's up to

6  you to separate the made-for-TV part from the true story part.

7         Let's just go through Daisy as an example of how those

8  two were melded together, and initially it sounds good.  It

9  sounds like it was all based on the true story, but, when you

10 break it down a little bit, all of a sudden you begin to see

11 the made-for-TV part.

12        So what does she say?  She says she is very close with

13 her mother.  I think she said she had never been out of

14 whatever town she had lived in.  Very close with her mother.

15 Made that point, I believe, several times.  Led a sheltered

16 life before she met Fabian, obviously who is not here.  And

17 after a very brief courtship, she moves in with him and,

18 according to her, immediately refuses to allow her to speak

19 with her mother, separates her, and prevents her from

20 contacting her mother, with whom she has lived her whole life,

21 with whom she is extraordinarily close, and with whom -- you

22 would imagine -- she would need to say, here I am, I'm okay,

23 don't worry about me.

24        But no.  Instead, after not being permitted to see or

25 speak with her mother, she is asked to go to America with

MICHELE NARDONE, CSR -- Official Court Reporter

Summation - Gold

1    Fabian and, of course, she says yes.  Never tells her mother.

2    Leaving the country for the first time.  She never left her

3    town before, and now she is leaving her country and she never

4    tells -- never tells her mother.

5         They get rebuffed at the border, comes back; and, all

6    of a sudden, he says, okay, we are out of money, you have to

7    work as a prostitute to get money.  She refuses.  He hits her,

8    and she agrees to do it for a week for them to raise sufficient

9    money to eat and leave.  Of course, at the end of the week,

10   what happens?  She has to continue working and does so for the

11   next year.

12        I asked her, What caused you to continue to work?  Did

13   you suffer any further beatings or anything?

14        No, I only saw him two more times over the next year.

15        Why do you continue working as a prostitute if you

16   didn't even see this man?  What compels you at this point,

17   since you obviously didn't want to do this, why did you stick

18   to it for a year?

19        And the basic answer she gave was that he threatened

20   to tell her mother -- I believe Ms. Argo referenced this -- and

21   she was ashamed.  Again, on the face of it, okay, I get that.

22        But think about that for a second.  Think about your

23   child being the victim of a monster who forces you to be a

24   prostitute and who comes to you and tells you, ma, dad, this is

25   what this person made me do.  Is the mother going to, or the

MICHELE NARDONE, CSR -- Official Court Reporter

Summation - Gold

1  father, Oh, ooh ooh, you are a piece of dirt?  Or is that

2  person going to say, Oh, my God, you poor child.  How did this

3  happen to you?  Let's go to the police.  What do we have to do

4  to track this person down?  No.  She is too ashamed to tell;

5  but, again, I get that as an initial reaction.

6        But the next step is, Wait a second.  I didn't do

7  anything wrong.  This guy did something wrong, not me.  My

8  mother is going to forgive me, if there is anything to forgive.

9  She will accept me if there is anything to accept.  It's her

10 daughter.  Of course she will embrace her.  Of course she will

11 tell her, My God, you poor child.  How could such a thing

12 happen to my baby?

13       But no, she is too ashamed to have her mother find out

14 that she was acting as a prostitute.  So what does she do?  She

15 acts as a prostitute for the next year.

16       Too ashamed to admit she was a prostitute and her

17 solution is to be a prostitute.  It just -- it makes no sense.

18       So what happens after that?  Being a prostitute for a

19 year, again, miserable against her will, et cetera, et cetera,

20 having not seen Fabian for this year or thereabouts -- and,

21 again, I'm speaking.

22       Obviously you can go back and check any of the facts,

23 my dates.  If it was nine months, whatever it is, obviously,

24 check it out.  Whatever the record is it is.  If I'm wrong, I'm

25 wrong.  I don't think so, but feel free to check it out.

MICHELE NARDONE, CSR -- Official Court Reporter

Summation – Gold

1    So after a year of being a prostitute against her

2  will, what?  She decides, as any logical person would, I'm

3  going to get pregnant by this guy.  Where did that come from?

4  What kind of a -- how does that fit?

5    We haven't gotten to the good part yet.  This isn't

6  part of the teaser.  Okay.

7    But how does this fit with the concept of I'm a

8  victim, I'm forced, this is terrible, this is what he did to

9  me?  I'm going to get pregnant, try to go to America, it

10  doesn't work, get sent back, and she is forced to have an

11  abortion.  You heard the gruesome testimony on that.

12    Again, Francisco had nothing to do with any of this.

13  The only reason I'm talking about it, even though she adds

14  nothing to the case as to Francisco, is, again, the mind-set

15  and the pattern of testimony that you have to learn to

16  separate -- what is it? -- the weed from the chaff.  That's

17  what this is about.  Okay.

18    What she is testifying to, it just doesn't fit with

19  logic, with common sense, with how human beings react under

20  circumstances that they are confronted with.  So she comes

21  back, she is forced to have an abortion.  Horrible experience.

22  She is miserable.  It destroyed her.

23    So what happens next?  He asks her to go to America

24  again; and, she says sure, why not.  How does that fit?  How

25  does that make you a victim?  Forced prostitution for a year,

MICHELE NARDONE, CSR -- Official Court Reporter

Summation - Gold

1    when the guy is nowhere to be found, gets pregnant by the same

2    guy, forced to have an abortion.  Okay.  I'm going to be good

3    now, come with me to America.  Absolutely.  Of course I believe

4    you.  When do we go?

5           And does it change the horror of her life?  Did those

6    things actually happen?  Was she forced to work a year in

7    prostitution?  Did she have a forced abortion by this man?

8    Yeah, probably.

9           But there obviously is something else going on there.

10   There obviously is more, and until you can understand what the

11   more is, you cannot accept that as a complete story.  You

12   cannot take it at face value, because it's not.  It makes no

13   sense, and it's emblematic of so much of what you heard.

14          Where the fundamental story of these women's lives is

15   true, it's horrible; but it doesn't fit the package of criminal

16   charges that have been brought to bear against Francisco, and

17   that's what you are here to decide, not whether you like him

18   not whether he is a good guy, not whether this is someone you

19   want your daughter, your son, or you, or whomever, to date or

20   to have anything to do with.  No.

21          It's did he commit these specific charges as outlined

22   by the government.  They had it on that PowerPoint, and, you

23   know, it was all neatly categorized.  That's what you have got

24   to do.

25          What I'm suggesting to you is that the totality of the

MICHELE NARDONE, CSR -- Official Court Reporter

Summation - Gold

1    evidence, as compared to reality and what a normal, everyday,

2    common person would do in reaction to those circumstances,

3    doesn't fit.

4              So next we have -- oh.  The common theme -- and this

5    is something you heard a million times -- where when she gets

6    here and is told you have got to be a prostitute and if you go

7    to the police, don't even think about going to the police

8    because they are not going to believe you.  So what does she

9    do?  Of course she believes him.  She believes that if she goes

10   to the police, for which she had God knows how many

11   opportunities, if she goes to the police they won't believe

12   her.  Why?  Well, because this fine, upstanding chap who has

13   raped her and forced her to have abortions and lied to her and

14   made her be a prostitute and is just and all around good guy,

15   he told her.  They are not going to believe you.

16             So, of course, why bother?  Why would you do that?  It

17   sounds, when we first hear it, yeah, okay, he is threatening.

18   He is going to tell my mother if I don't keep working.  Oh, my

19   God, I don't want my mother find out.  Well, yeah.  You don't

20   want your mother to find out.  Who the hell wants their mother

21   to find out you are living your life as a prostitute or any

22   other criminal activity for the last however many period of

23   time.

24             But if you are a victim, your mother is the first

25   person you want to know.  She is the first person you want to

MICHELE NARDONE, CSR -- Official Court Reporter

Summation - Gold

1  know, so she can hug you.  So she can tell you, it's okay, we

2  will get through this, and we are going to get that son of a

3  gun.  Mark my words, we will get him.  But no.  She believes

4  Mr. Good Guy and doesn't go to the cops.

5       What about Maria?  I think she came after Daisy.

6  Again, I'm not up to the good part yet.

7       She testified that she introduced Delia to Francisco.

8  And she continued to have her relationship -- as, you know,

9  Mr. Golub went over, and I'm not getting on that; no interest

10  in going over all that.  But as to Francisco, what does Maria

11  add as to alien smuggling, sex trafficking?  Because he is

12  charged with smuggling her in and with sex trafficking her.

13       What does she say?  She never spoke to him about

14  coming to the country illegally.  She didn't find out that

15  Francisco was even going to be crossing at the same time she

16  did, until they all arrived at the same time at the same place

17  in the same group.  That, like Francisco, she took instructions

18  from this Guadalupe, who was, I guess, orchestrating the show

19  and telling everyone what they had to say and what they had to

20  do.

21       Francisco was no more or no less of a passenger and as

22  a co-traveler as Delia was, as Maria was.  And, you know, she

23  said so.  She never talked to him about it.  He never

24  threatened her to go, he never forced her to go, he never

25  tricked her to go, he never promised her anything to go.

Summation – Gold

1    Nothing.  Nothing.

2         And once she got here, again, he is charged with sex

3    trafficking her.  Once she got here, she told you, I never

4    spoke to him about prostitution, he never made my commit

5    prostitution, I never gave him money, he never gave me

6    instructions.  Nothing.  Absolutely nothing.  Go back to the

7    testimony.  Just look at my cross.  It will take you five

8    minutes.  So she adds nothing to that charge.

9         She did say there was one time -- I believe it was

10   her.  She said there was one time she saw Francisco and Delia,

11   who she said was a couple.  They were boyfriend and girlfriend,

12   no question in her mind about that.

13        And she recalls seeing one time where he had hit her.

14   I asked her if she remembered Delia hitting Francisco, and she

15   said no.  Okay.  That's fair.  That doesn't mean that whatever

16   that incident was -- and I'm not going to dispute it -- he hit

17   her once.  It has nothing to do -- it doesn't make it have

18   anything to do with sex trafficking, and it certainly makes --

19   it has absolutely nothing to do with Maria's sex trafficking as

20   to Francisco.

21        Because, again, that's, you know, I think I said it at

22   the beginning.  If I didn't, I should have.  There are five

23   defendants that are here, and obviously you are rendering a

24   verdict, and we heard testimony against everybody during the

25   course of the two weeks; but you have got five separate trials.

MICHELE NARDONE, CSR -- Official Court Reporter

Summation – Gold

1  You have got take that evidence that you have heard and not

2  just, well, oh, yeah, you know, as Ms. Argo did -- believe me,

3  she was not doing anything wrong.  I have nothing but the

4  highest regard for the people behind me.  So I'm not suggesting

5  there is any, you know, sort of nefarious anything going on,

6  because there wasn't.

7        But many times she said, and they would have meetings

8  and they would discuss who has the youngest girl working for

9  them, and they and they and they.  And you hear that, and you

10  figure, okay, it's got to be everybody.  Right?  But then she

11  showed you the testimony, which she wasn't going to

12  misrepresent anything.  She showed you the testimony.

13        All of those "theys," all these park meetings, all of

14  these business meetings, all of these whose got the youngest

15  girl meetings, was Francisco at any of them?  When it was

16  described, who was there?  Well, this one was there, this one

17  was there, that one was there, that one was there.  If you look

18  at any one of the transcripts she showed you yesterday, he

19  wasn't there.

20        So, bear that in mind when you are thinking of this as

21  five separate trials.  You can conclude that Francisco is

22  guilty as to count whatever and Osvaldo is not guilty.  You can

23  conclude that Jose Miguel is guilty of count whatever and

24  Miguel -- and Francisco is not guilty.

25        Whatever you decide the evidence supports against each

MICHELE NARDONE, CSR -- Official Court Reporter

Summation - Gold

1   of them individually is what you have got to do.  There is no

2   they.  There is no they.  There is him, and has the government

3   satisfied the burden of proof against him?

4        Now, Fabiola was discussed by Mr. Dunn -- and again,

5   I'm not here to repeat everything that was said, but even,

6   again, as to her, she is told after she has just been tricked

7   into coming here by what she thought was her lover, you can't

8   go to the police because they are not going to believe you.

9   Okay.  So she doesn't go to the police.

10        Just like Daisy before her, just like Delia, and just

11   like all of them.  You're fundamentally kidnapped and tortured

12   and instead of going to what any normal person under the

13   circumstances would want, would be to go to the police, you

14   believe them, your kidnapper and your torturer and your rapist.

15   You believe them when they tell you, no, they are not going to

16   believe you so don't go.

17        But what does she say about Francisco?  Well, she said

18   Delia was her -- was his partner, his life partner.  We are

19   close to what I'm teasing about, but not yet.  Remember that

20   part.  Life partner.  Not her keeper, not her evil slave

21   driver.  Her partner.

22        Francisco had nothing to do with her in Mexico.

23   Nothing.  Took no money, gave no instructions.  But here, as to

24   Francisco, here is where her testimony gets interesting; and,

25   before I say that, I just want to go back to one thing that I

MICHELE NARDONE, CSR -- Official Court Reporter

Summation - Gold

1    forgot to say about Maria.  I think the sole testimony and the

2    sole argument that Ms. Argo made about Francisco's complicity

3    and guilt in connection with Maria, was that while she was at

4    the house -- and forgive me if I have the wrong person, but I

5    think I don't -- but when she was at the house he watched over

6    her.

7            Now, I have no idea what that means, but that was the

8    testimony, that he watched over her.  Does that mean he made

9    sure she had enough to eat, that she had clothes, that -- I

10   have no idea what it means; but it certainly doesn't mean that

11   he enabled, forced, encouraged, induced her to commit any crime

12   from illegally crossing the border to committing prostitution.

13           Let me get back to Fabiola.  She lived with Delia for

14   about two years, as I recall.  Delia described her as her

15   friend.  Remember that?  She said that Delia -- sorry --

16   Fabiola and Veronica were her friends.  I think Ms. Argo showed

17   you that transcript yesterday.  That's fine.

18           What she said -- and here is where it gets a little

19   interesting, as to, certainly as to Francisco -- is that a

20   month before she finally left, which would have been in April

21   of 2014.  So a month before then -- figure somewhere in March,

22   maybe February -- one morning Delia got up and left.  This is

23   what Fabiola told you.  She just got up and said that's it, I'm

24   out of here, and she left; and she told you at the end of the

25   day, she came back, changed her mind.

MICHELE NARDONE, CSR -- Official Court Reporter

1    Well, was it a lover's quarrel?  Was it –– I have no

2    idea.  What we do know, that a month before she finally left

3    Delia had done the same thing and voluntarily returned.  When I

4    asked Delia about that –– among the 130-whatever it was times

5    when she couldn't remember –– and I asked her, before you

6    finally left, like Fabiola said, did you leave once before?  I

7    don't remember.  Did Francisco beat the living daylights out of

8    you for not working that day?  Because we have all heard so

9    many times that even on her birthday she had to work.

10    Here it is.  She skipped a day, that's for sure, at

11    least one shift.  Was there testimony from Fabiola that

12    Francisco went ballistic, that he was beating on her?  Did

13    Delia say anything like that?  No.  She left.  They obviously

14    fought about something, she calmed down, and came back.

15    Why she didn't admit that, that's for you to

16    determine.  I suggest to you she didn't admit to it because it

17    shows exactly what the truth was, that at any time from October

18    of 2010 until April of 2014 she could have walked out whenever

19    she wanted, and she chose not to.

20    And to admit that she had done it once was to admit

21    she could have done it any time she wanted to; and that doesn't

22    fit the narrative.  That doesn't fit what you are being asked

23    to believe.

24    Now, what about Veronica?  She testified, once again,

25    Francisco had nothing to do with her coming to America.

MICHELE NARDONE, CSR –– Official Court Reporter

Summation – Gold

1          Hang in there, my friend.  I'm doing the best I can.

2          She had nothing do with him coming to America.

3     Nothing.  I think it was -- I forgot the year -- 2007 or

4     something like that.  Francisco would have been 13.  So

5     obviously he had nothing to do with this.  Never instructed her

6     about anything, never took money from her, never threatened

7     her, never hit her.

8          But what does she add to the value -- what's the value

9     of her testimony vis-a-vis Francisco?  And again, I'm looking

10    at these witnesses solely through the eyes of how do they

11    support, if at all, the charges that the government is asking

12    you to believe beyond a reasonable doubt that they have proven?

13         So that's why I'm going over this as to witnesses who

14    obviously had nothing to do with Francisco.  The fact that they

15    had nothing to do with Francisco is important.  You are being

16    asked to convict him, and the testimony that says we have

17    nothing to do with him is at least as important as the

18    testimony that says he is the man.  You can't listen with one

19    ear and not the other.

20         What does Delia -- what does Veronica say about Delia

21    that really sheds some light on this case?  Well, first of all,

22    she didn't know her name was Delia.  Remember that?  She called

23    her Katrina.  Yeah, she did.  Look it up.  She never knew her

24    name was Delia.  This is somebody who Delia said was her

25    friend.  Why in God's name does she tell her friend a phoney

MICHELE NARDONE, CSR -- Official Court Reporter

1    name?

2         Instead of saying, I'm 14 years old, get me the hell

3    out of here, do whatever you can, please, help me, my friend.

4    No.  I'm Katrina, I'm a grown up hooker too.  Look up the

5    testimony, Katrina.  She never used her true name.  Never.

6         If they were co-conspirators in this massive

7    prostitution ring, why would she conceal her true name from

8    Veronica?  I don't know.  I have no answer for it.  I can tell

9    you, it makes no darn sense.  That's for sure.

10        I think she didn't tell her her real name is the same

11   reason why she didn't ask her for any help, that she didn't beg

12   her for assistance to get away, because she was doing exactly

13   what she chose to do and she didn't need help.  Now, was it a

14   good choice?  Was it a smart choice?  Obviously not.  But it

15   was hers nevertheless.

16        All right.  We are getting to the good part.  Just

17   before we do, so we have seen a lot of these women have a lot

18   in common, with them not going to the police, why, because they

19   believed these monstrous rapists and kidnappers and torturers

20   and -- fill in the blank at your pleasure, in description.

21   They chose to -- oh, no, we can't go to the police, Mr. Rapist

22   told me not a good idea.  Okay.

23        What else do they have in common, after all the

24   threats, all the fear, all the atrocities, all the torture?

25   They finally each up and left.  They all left, including Delia,

MICHELE NARDONE, CSR -- Official Court Reporter

Summation – Gold

1    of course.

2         But there is one thing that Delia did that's different

3    when she left.  When she left, she left with her computer, she

4    left with some clothes, but what else did she leave with?  It's

5    in evidence.  I forgot the numbers.  Ms. Argo showed it to you

6    yesterday.  It's her ledgers, her book of drivers, her book of

7    accounting.

8         Now, I ask asked her, when you left did you intend to

9    go to the police?  No.  Did you intend to keep working as a

10   prostitute?  No.

11        You are running away for your life.  Fabiola has just

12   told you, I'm giving you two minutes and then I'm calling one

13   of the boys to let him know that you ran away.  What does she

14   do?  She packs her drivers' books.

15        Now, there are only two reasons to do that.  Either

16   she is going to continue to be a prostitute, which she says she

17   is not, or she was planning on going to the police.  Which was

18   it?  I don't know.  But it's sure as heck an odd thing to walk

19   out when you are fleeing for your life to make sure you bring

20   anything.

21        All right.  Here is where we are.  Show time.  She

22   came here with the clothes on her back and nothing more.  She

23   did not come here with any thought or idea of being a

24   prostitute.

25        Francisco came here with her as her partner, as her

MICHELE NARDONE, CSR -- Official Court Reporter

Summation - Gold

1    boyfriend, with no plan, thought, inducement, recruitment --

2    all those words -- for her to be a prostitute.  How do we know

3    that?  How do you know for sure?

4           This is one of those times now, folks.  I'm out there.

5    Here is where the government's theory falls apart.

6           How do we know?  Step one.  Virtually from the very

7    first question to her about how and under what circumstances

8    she became a prostitute, she said she gets -- remember the

9    story -- she gets here, she thinks she is working in

10   restaurants, they are going to live happily ever after,

11   everything is going to be great.  She is 14.  She is a baby.

12   He is 16.  He is a baby.  They come here out of love.

13          Because, of course, love doesn't pay rent.  Love

14   doesn't put food on the table or clothes on your back, but

15   that's how they came.  And she gets here and what happens?

16   Within three days, she is working as a prostitute because

17   Francisco threatens her, tells her she's got no choice, and

18   threatens her.

19          And here is reason number one.  She says he told me I

20   can't go to the police because if I do they will deport me.

21   Okay.  Think about this.  You are 14, you are in a foreign

22   country, you don't know anyone, you don't speak the language.

23   This man you thought was your lover is a monster, and he says

24   don't go to the police -- here is where that different little

25   wrinkle -- not because they are not going to believe you, but

MICHELE NARDONE, CSR -- Official Court Reporter

1    they are going to deport you.

2         So when I'm finished, Ms. Hajjar is going to stand up

3    here at some point later in the day and make sure -- she is a

4    terrific lawyer -- if there is an answer, she is going to give

5    it to you.  It's going to come from the record, but she is

6    going to have to come up with this answer, and make sure she

7    gives it to you.

8         Why is don't go to the police because they are going

9    to deport you a threat instead of salvation?

10        (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court.)

2    MR. GOLD:  That's exactly what she wants to happen.

3  Get me the hell out of here.  Send me back.  Police, this

4  monster threatened my family.  Contact Mexican police to

5  protect them.  Let me go back.  I want -- where do I sign up?

6  Get me out of here tonight.  That's not a threat.  That's

7  salvation.

8    And when I asked her, "Did you want to be deported?"

9  No.  So you'd rather say here, forcibly working as a prostitute

10  under threat of death to your family and yourself than go back

11  home?  Number one, she's here doing what she wanted to do.  She

12  came here to do what she wanted to do.  She wanted to stay

13  here, working illegally because that's what she wanted to do.

14  So she did not want to be deported.  Not a threat.  Salvation.

15  And how do you know?  This is a big one.  Okay?  How do you

16  know for sure -- for sure that three days after coming here,

17  she didn't become a prostitute.

18    And remember, the whole premise of the Government's

19  case is that Francisco -- and again, I'm not speaking of anyone

20  else.  Everyone else has separate counsel.  For the trial

21  against Francisco, they have got to prove -- and their theory

22  of the case is -- I told you from beginning to end, that while

23  in Mexico, the plan was to trick Delia, 14-year-old Delia, into

24  coming to the United States with promises of love, of making

25  money here, sending it back to buy land and a house, and for

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation - Gold

1   them to come back two, three, four years later, whenever it was

2   going to be and live happily ever after.

3           But all of that was a lie because Francisco had it in

4   his head from the day he met her and invited her to his home,

5   from that very day, he had it in his head to trick her into

6   coming here.  So three days after her arrival, she is working

7   double shifts as a prostitute, as a 14-year-old prostitute

8   against her will.  That's the premise.  All right?  I'm not

9   telling you anything you haven't heard before.  That's what

10  they're claiming.

11          Okay.  So how do we know we know that that's not true?

12  We know as she said, no fancy cars.  All the money that was

13  raised, shipped back to -- sent back to Mexico.  You have seen

14  the houses.  These aren't fancy houses.  Everything went back

15  to Mexico.  That's the premise of the Government's case.

16          So what did she say?  She arrives in October, begins

17  working double shifts, working -- getting roughly $250 a shift.

18  Okay.  Mid-October 2010 to January first, 2011 is roughly ten

19  weeks -- and I may as well say the middle of October, if we've

20  got to pick an arbitrary time.  Say it's the middle of October.

21  That's ten weeks.  Okay?  At $250 a shift, seven days a weeks,

22  as she said she did.  She said double shifts.

23          Let's go on the rough side for a minute.  $250 a day,

24  she's clearing.  That's $1,250 a week.  I'm not doing this in

25  my head now.  But it comes out to $1,250 a week, which after

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation – Gold

1    ten weeks, is $12,500.  Now if she's working double shifts, as

2    she claims she did, that's roughly $25,000.

3            Can I get the Elmo, please?

4            Now, you were shown a series of charts.

5            (Exhibit published.)

6            MR. GOLD:  Thank you.

7            A series of charts reflecting money that was sent back

8    from here to Mexico, and broke it down, a number of people to

9    whom it was sent.  How many times, et cetera, et cetera.  Okay?

10   They worked on these.  Did a great job putting all of this

11   together, so you could see it in black and white. Went back to

12   2005.

13           Now, for example, in 2008, we have –– okay.  There you

14   go.  2008, just look Veronica, who can't read or write.  Said

15   she was just giving money to whoever she gave it to.  Even she

16   was wire transferring in 2008.

17           If you flip the page, Fabiola, if you recall, said she

18   came in 2009 and she gave money to whomever she's testified,

19   and she also personally sent –– in this case –– $2,750.

20           And in 2010, if you recall, Maria said she arrived at

21   the end of December.  And even she, giving money to whomever

22   because she was working right away, as all of them are.  They

23   get here.  The work.  Two days later, 20 minutes later, double

24   shift, misery, torture, pain threat.  Am I right?  That's what

25   each of them said.

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation - Gold

1        (Ms. Argo confers with Mr. Gold.)

2        MR. GOLD:  Okay.  I'm sorry.  I was showing unredacted

3   copies.  I didn't mean to.

4        But the numbers that I'm saying are accurate, and the

5   fact that their names are on here are accurate.  These people

6   did, in fact, send it back, as we said.

7        Now, in 2010 -- actually, I'm sorry.  (Confers with

8   Ms. Argo.)  It's 4-13-07.  Thank you.

9        (Ms. Cistaro hands document to Mr. Gold.)  Thank you.

10  I've got it.  I have an unredacted copy.  Sorry about that

11  before.

12       2010, okay?  In 2010, we have got Fabiola, firmly

13  entrenched, wiring all this money.  Got the other people who

14  are on the list.  You have got Maria.  Even Maria, who arrived,

15  as said before, at the end of December.  They have got her

16  working.  They have got her wiring.  Immediately.  Right?

17  Okay.  Go to the end of the page to see how much Delia sent

18  that year.

19       Oh, let's see.  (Peruses document.)  Wait.  That is

20  the end of the page.  Where's Delia's name?  Where's

21  Francisco's name?  $25,000, every penny, as Ms. Argo told us,

22  is going back to Mexico.  Every penny to support the

23  conspiracy, to recruit more women to do whatever it's doing --

24  but it's going back to Mexico.  Where's the $25,000?  Why if

25  she was working as a prostitute, if she was working for

LISA SCHMID, CCR, RMR
Official Court Reporter

1659

Summation - Gold

1    Francisco, if she was working as part of a conspiracy, ask Ms.

2    Hajjar, where's the $25,000?  And why the heck didn't it go to

3    Mexico?

4         And I submit to you the answer is obvious.  She wasn't

5    working at that time.  She never sent money to Mexico because

6    she never made money for Mexico.  It's the only logical

7    assumption because everybody else, you know, in all of the

8    charts and all of the connections and this one made nine

9    hundred calls and sent money 16,000 times.  All that.  Great.

10   Great.  $25,000, and we ain't talking chump change.  Why isn't

11   it on the chart?

12        Ms. Hajjar is a terrific lawyer.  If there's an

13   answer, she'll find it and she'll give it to you.  Make sure

14   it's in the record.  Make sure it makes sense.  But before you

15   deliver a verdict that relies on Delia's testimony saying that

16   three days after she arrived here -- because Francisco and all

17   of his monstrous machinations had determined she was going --

18   I'm going to get her here, so she could work for me under

19   threat of death to her, to her 12-year-old sister.  He's going

20   to force her to work, too.  All these threats.

21        Before you believe that testimony, make sure Ms.

22   Hajjar answers that question.  If that's true, okay.  I accept

23   that testimony.  I'm brought here -- she was brought here for

24   that purpose.  She was brought here to send money back, to be a

25   money machine and be a piece of garbage and a piece of chattel

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation - Gold

1   and all the other things that they said.  And they put her to

2   work right away.  Where's the money?

3        What I submit to you happened was as a 14 year old,

4   who knows nobody, who's illegal, who came here with her

5   16-year-old baby boyfriend and all of a sudden, the reality

6   sets in.  They don't have a dime.  They've got to pay rent.

7        She's there.  She's seeing prostitutes coming and

8   going.  She knows about prostitution existing in Mexico.  It's

9   legal there in her hometown.  The state runs a brothel, as you

10  recall me asking Daisy, the Zona Galactica in her home state.

11  Delia's state, Chiapas.  So she knows about it.  And what does

12  she do?  This is what she decides to do.

13       And nothing is getting sent back.  Nothing is being

14  forced.  No one is threatening her for two and-a-half solid

15  months and perhaps longer or whatever.  I don't know.  But

16  certainly, for those first two and-a-half months she was here,

17  she was not working for Francisco, under any circumstance for

18  any reason.  Getting deported is not a threat.  It's salvation.

19  If you're part of a forced prostitution ring, you're sending

20  money back, day one, certainly $25,000.  Where is it?

21       Now, let's talk at the beginning.  I won't get nuts

22  over it.  But what did she say?  What did Delia say about her

23  relationship with Francisco and her life, heart-wrenching --

24  and again, to May, this is the absolute truth.  No question

25  about it.  She's raped by her father, by her uncle.  And I

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation - Gold

1    forgot how old she said he was.  It was horrible, no question

2    about it.

3           And then she meets Francisco, who promises to take

4    care of her.  She thinks he's a good guy.  And so she decides

5    to move in with him.  Okay.  To get -- and I think she said it,

6    to get away from this home life which was going to destroy her.

7    How could anyone be expected to live in that type of situation?

8    She -- in fact, she told you, she ran away and the police

9    brought her back.  She ran away from her father and her uncle.

10          So then the meets Francisco.  She moves in with him.

11   She thinks he's great.  This is the love of her life with her.

12   What happens the very first night they're intimate?  He rapes

13   her.  He rapes her.  Forced her to have anal sex.  She still

14   remembers the blood on the sheets.  It was painful she hated

15   it.  He raped her.

16          (Ms. Cistaro removes document.)  Thank you.

17          Her Savior raped her.  So what does she do?  Does she

18   cry out in the middle of the night, "Oh, my God.  Another one."

19   Does she tell his mom, "Your son just raped me."  Does she run

20   into the street, to neighbors, "Help me, help me, help me.

21   Someone call the police.  Look what this animal did to me."

22   No.  Nothing.  Not a word.  She continues to live there.  She

23   works.  I don't know what she said in the field or in house

24   cleaning -- Whatever she's doing, life was going on.

25   Everything is grand.

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation – Gold

1    That's the made-for-TV part that's not true.  The

2  based on the true story, this ain't.  There is no way he rapes

3  her and then everything goes on and a month later or whatever

4  the heck it was, he says, "Let's go to America."  Sure,

5  Mr. Rapist.  Why the hell not?  She runs away from her father,

6  she runs away from her uncle and she runs to America with that

7  animal.  Does that makes sense?  No, it does not.

8    When that happens, what do you do?  You go to the

9  police.  You ask for help.  That is not a threat.  That is your

10  salvation.  And she does nothing.

11    According to her, the very foundation of their

12  relationship, which continues for the next three and-a-half

13  years, the very foundation of it, is rape.  And that's just not

14  true.  It makes no sense.  No more so than she earned $25,000 a

15  year in this giant conspiracy, that Francisco brought her into

16  and forced her to participate in, never saw a dime, that

17  Francisco never saw a dime.

18    In my opening, I asked you to keep in mind a simple

19  question when listening in particular to Delia, but I guess it

20  applies to everyone.  Again, you have heard that prostitution

21  is legal in Mexico.  You have heard how in Chiapas in

22  particular.  You had this Zona Galactica.  Diana worked there.

23    Why?  My question to is you and my opening and my

24  question to you again, why?  With all of those prostitutes to

25  choose from, with all the hundreds, thousands, I don't know

LISA SCHMID, CCR, RMR
Official Court Reporter

1    however many are working there legally, voluntarily, willfully,

2    why don't you go to one of them?  I said, hey, you know what?

3    You're doing good here.  You're making some nice bread.  You

4    want to come to America?  Then we'll clean up.  Want to come?

5           They couldn't find anybody?  He couldn't -- he

6    couldn't ask any of these women who are out there every day?

7    Instead, he's got a trick a 14 year old -- a 14 year old, and

8    he's 16.  He's got to not only think to do it, he's got to

9    perfect it.  He's got to execute the plan -- 16 years old,

10   mastermind?  Yeah.  Right.

11          Instead, he's got to go.  He goes to a 14 year old

12   who's never done this before, never conceived of doing this

13   before, who is a homebody in the sense of never having left her

14   town before, I think she said.  And you're going to sneak her

15   across the border.  And when she gets there, you're going to

16   tell her, "Ha, ha, ha, ha, ha, ha.  Guess what?  Now you're a

17   prostitute.  Now I own you.  You have no choice.  You can't go

18   to the police.  They'll deport you." Salvation.  "But you

19   can't go.  You're going to work for me.  I'm going to kill your

20   family.  I'm going to kill you.  I'm going to kill anyone you

21   ever met."

22          Why run the risk that this 14 year old, as any 14 year

23   old, would freak out, and say, "I can't do this," and run and

24   scream, and fight and at every opportunity, puts him at risk.

25   Because if the thought ever occurred to her that the police

Summation - Gold

1  were her salvation, that these people are her salvation --

2  which they turned out to be in another way -- but if she had

3  thought for a minute to go to the police, what happens?  Fran's

4  cooked.  Francisco, it's over.

5       Why?  Why not go to someone you know, who's going to

6  come with you, is on the same page?  You're going to work

7  together.  Isn't going to go to the police and say, I'm

8  threatening her.  It's a business.  Why take the chance with a

9  14 year old?  Immaturity alone would cause her or could cause

10 her to ignore any threats that he might have given to get her

11 to work.

12      It doesn't fit.  It sounds good.  Oh, he tricked me

13 and oh, my God, I had to do all of this and it was horrible.

14 Good in a sense of superficially, it sounds believable.  Think

15 about it.  It's not.  It doesn't make sense.  No one would act

16 that way.  Certainly, when you have the choice that apparently

17 Francisco had in Mexico of anyone of God knows how many people

18 who theoretically would have been willing to come.

19      And not only does he have to go through all the

20 trouble of executing this nefarious plan as a 16 year old, to

21 trick this 14 year old and seduce her and all of that.  Now,

22 you also -- he also is going to have to live with her as man

23 and wife for the next three and-a-half years, having raped her,

24 having tricked her, having forced her into working seven days a

25 week, 18 hours a day, whatever it was she said.

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation - Gold

1    Why go through that?  Hey, Miss.  Here's my plan.

2    What do you think?  You want to come?  Yeah.  Sure.  Why not.

3    America.  Okay.  No risk.  No danger.  He doesn't have to live

4    with her for three and-a-half years as man and wife, pretend to

5    be a couple.  Presumably, I guess that's their theory.  It

6    wasn't real.  Look how much simpler life would be.

7    In fact, I submit to you that he loved her, that he

8    didn't live with her for three and-a-half years because he

9    tricked her into coming and working as a prostitute.  He lived

10   with her for three and-a-half years because he loved her, as

11   she loved him.

12   And at a certain point, probably in 2011, sure as heck

13   wasn't three days after.  It sure as heck wasn't in 2010.  We

14   saw that.  She became a prostitute.  That's what she saw.

15   That's unfortunately how she thought she needed to make money.

16   And so she did.

17   She was a businesswoman, not a victim.  This was a was

18   a choice, an incredibly bad one, but it was a choice.

19   Businesswoman.  That's why she took the books when she left.

20   Why?  You never know.  May come in handy.  You have two minutes

21   to get out.  "Okay.  Hold on.  I just to have get the driver's

22   records."  Seriously?  Is that a victim or is that someone

23   who's smart.  She's smart.  She taught herself, what three --

24   two languages.  She's no dummy.

25   And she takes those books because you never know.

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation - Gold

1   They may come in handy.  She intended to be a prostitute?  I

2   don't know.  She intended to go to the police?  I don't know.

3   Kind of ace in the hole.  It's a little -- I'll hold onto it.

4   You never know.  And of course as you saw, she turned those

5   books and her story into a T visa and legal status, because she

6   used them to become a victim.  She used them to claim Francisco

7   was her slave driver.  She was smart.  She pulled it off.

8          Now, I just want to touch on this briefly, just

9   because it's something you should think about and you'll decide

10  what you decide.  Many people lie about their age for a variety

11  of reasons.  It happens and normally means nothing.  Who cares?

12  In this case, it does.

13         She claims to have been a minor and the Government has

14  to prove she was a minor when this happened.  She gave two

15  false birthdates on immigration records, both of them showing

16  she was a minor, but false nevertheless.  On her passport,

17  which -- oh, it's my passport.  It's got my birthday.  Of

18  course.  It shows what her real birthday is.

19         What else does it show?  A phony town -- not a phony

20  town.  I take that back.  The wrong place of her birth, which

21  she knew.  Remember, she told you.  In 2014, 11 days after she

22  left and all of a sudden, she's here illegally.  She's applied

23  for this T visa and all of her troubles have gone away.

24         In connection with that, she told the authorities, you

25  know what?  I said I was from this town, but it turns out I

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation - Gold

1    really wasn't because my mother gave birth to me in our home,

2    but realized at some point later on, you had to have the name

3    of a town in the birth certificate in order to get school

4    records, whatever the explanation was.  I'm sure it's true.

5    And so we put down Tecamachalco, I think it was, as her place

6    of birth when it wasn't.  Okay.  But she clarified that in her

7    application to the United States in 2014.

8           In 2018, she applies for a passport.  And what does

9    the passport say?  Tecamachalco.  Wrong.  Yeah.  This is a big

10   deal?  Do I care?  No.  But it shows you that what's on

11   official documents, of course you could believe.  This is her

12   age.  Everyone knows her age.  Veronica sure didn't.  She told

13   you, she didn't even know her birthday.  But you could believe

14   Delia's because it says so on her passport, the same passport

15   that misrepresents where she was born.

16          So do you know her birthday?  As you sit here, can you

17   really say for certain, yeah, I can trust that her birthday is

18   what is reflected on the passport?  I don't think you can.

19   Obviously, that's up to you.  But just bear in mind, the fact

20   that it on her passport which you would think should be enough.

21   I mean, who lies on their passport, right?  Why would someone

22   lie on their passport for their date of birth?  I don't know.

23   Why would they lie as to their place of birth?  But lie, she

24   did.

25          Now, it's only natural that with the passage of time,

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation - Gold

1  memories fade, things you might have remembered with total

2  clarity five years ago when you are reflecting back on that

3  same incident or time period five years later, hum, maybe it's

4  not as clear and you can't remember some things or you get some

5  things wrong.  Human nature.  Perfectly natural, makes perfect

6  sense.  But there are some things that no matter how much time

7  has expired, you're going to remember, like you would think

8  your birthday being one of them.

9           I'm told it was 137 times, she couldn't recall.  When

10  I asked her questions, 137 times.

11          Like when I asked if while she and Francisco were here

12  living as man and wife one Christmas, her parents went to visit

13  his parents, like one set of in-laws visiting another set of

14  in-laws.  She couldn't remember.  And I asked whether at one

15  point during this visit, her mother got sick and had to be

16  taken to the hospital.  I don't remember.

17          And whether she told the agents these stories.  I

18  don't remember.  Did she tell -- remember telling the agent

19  that not only did she get sick and get operated on, but after

20  the operation, she went back to Francisco's parents and stayed

21  there while she recuperated?  I don't remember.  Seriously?

22  You don't remember your mother getting operated on?

23          I think that's something that when someone says they

24  don't recall, you've got to look twice and say, ah, no.  That's

25  something you should recall.  I'm sorry.  Your mother who you

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation – Gold

1   love?  I mean no.

2           Or when I asked her if she remember telling the agents

3   that while Francisco was in Mexico from December of 2011 until

4   May of 2012, whether she told them she was only sending over

5   $400 a week of her earnings back to Mexico, when he was

6   threatening her on a daily basis, you'll recall, and this is

7   when –– excuse me.  She's talking about how he's threatened to

8   kidnap her 12-year-old sister and force her into his business

9   as well.  She told the agents $400.  Do you remember that?  No.

10          Or when she told the agents that despite all these

11  threats and all this fear, she turned off her phone so drivers

12  couldn't even call her.  Do you remember telling the agents

13  that?  No.  Do you remember whether you celebrated Halloween or

14  New Years with Francisco?  No.  Do you remember telling the

15  agents?  No.

16          You remember telling the Government you overheard a

17  conversation shortly before you left for good, where Francisco

18  said to somebody, "You know what?  This isn't working out.  I'm

19  sending her back home to her parents.  I'm sending Delia back.

20  We're done."  Do you recall telling the agents that?  I don't

21  remember.

22          Do you recall telling the agents that, again, at some

23  point shortly before you left, you overheard a conversation in

24  the delivery car in which you and several other prostitutes

25  were sitting there, and somebody was talking about Carla,

LISA SCHMID, CCR, RMR
Official Court Reporter

1    another prostitute, telling the story where Carla told -- went

2    and told the police that her pimp was making her be a victim of

3    child sex trafficking.  And what happened?  She filled out some

4    forms.  She got legal status here.  And in fact, continued

5    being a prostitute.  Do you remember telling the agents

6    anything like that?  Uh, no.

7              And when I asked her if she recalled telling the

8    agents whether she spoke to some friend one evening after she

9    overheard Francisco saying he was sending her back, whether she

10   recalled telling a friend how upset she was by this and that

11   rather than wait for Francisco to send her back to Mexico, she

12   was going to leave.  She needed to leave.  She wanted to stay

13   here.  No, I don't recall.

14             And when I asked her if Francisco confronted her about

15   that conversation with this friend the following day, and if

16   she told -- if she recalls telling the agents that she would --

17   that Francisco confronted her the following day.  "What do you

18   mean?  Where are you going?  What's going on here?"  She denies

19   it.  They got into a huge argument and she hit him.

20             Do you recall telling the agents that shortly before

21   you left.  No.  And you recall that he didn't hit you back?  He

22   didn't tell.  He didn't threaten you, didn't do any of the

23   other things.  He walked away and just didn't talk to you for

24   three days.  No.  I don't recall.

25             Do you remember telling the agents you ran away?  Do

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation - Gold

1   you remember telling Fabiola that Fabiola said that you ran

2   away a month or so before you finally went?  No, I don't

3   remember that.

4        And when I asked if she remembered telling the agents

5   whether -- and you remember this -- Fabiola said, I'm giving

6   you two minutes and then I'm telling whomever that you left?

7   You remember telling the agents that 15 minutes after you left,

8   you received the text from Francisco in which he asked, "Why

9   did you leave, Love?  Did you take the keys?" Remember telling

10  the agents that?  No.

11       But she did remember taking his sneakers.  You're

12  running for your life.  You have got two minutes to escape

13  this -- this animal, this subhuman -- two minutes.  You take

14  his sneakers.  You take the books of your drivers.  You take

15  your computer.  Seriously?  Everyone else just walked out.

16       I submit to you, ladies and gentlemen -- and actually,

17  I started to say this again, I said it before.  I said again, I

18  think people behind me.  And they did a great job putting

19  everything together.  Not for one second do I think that they

20  told Delia or any other witness what to say, how to answer,

21  what to, you know, how to finesse something.  No.  They did

22  none of that.  I don't believe that for a second.  If they told

23  me that they did, I wouldn't believe it.

24       She's a smart cookie.  She figures out on her own very

25  quickly and very easily.  Okay.  I left.  And miraculously, 11

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation – Gold

1    days after I left, after fighting with Francisco for three

2    and-a-half years about her documents and heard this threat.  I

3    always asked him for my documents.  I needed my documents.

4            Why?  I don't know, but I would assume what they're

5    fighting about and where the theory of the Government's case as

6    to this is, this was his way of exercising control over her,

7    and if he's holding onto her documents, she's impotent, and

8    cannot function in any way that would legally permit her to do

9    anything to escape him.  I guess that's the theory.

10           And so for three and-a-half years, they fight.  They

11   argue.  And she runs away and what happens?  Eleven days later,

12   after meeting this total stranger who convinces her to go to

13   the police.  She walks into the police, tells them her story,

14   and 11 days later is filing the T visa application, and

15   attached to the T visa application which claims she's a child

16   victim of prostitution and is entitled to legal status here.

17   So please, America, don't deport me.  Let me stay.

18           Attached to that application -- wait for it -- her

19   birth certificate.  Three and-a-half years, all my

20   documents, my birth certificate, I always ask him.  Three

21   and-a-half years.  Eleven days after she's gone.  Boom, there

22   it is.

23           Now, I asked her where it came from.  Oh, my mother

24   got a duplicate, in 11 years.  Okay.  That's one explanation,

25   that if it's true -- and I'm sure it certainly is capable of

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation - Gold

1  being true.  Why are you fighting for three and-a-half years

2  when at any given point in time, you walk in the Mexican

3  Consulate or wherever else, whatever her mother did and get

4  yourself a duplicate, and that's the end of it.

5      Big deal.  People lose their birth certificates all

6  the time, their passports all the time, driver's license,

7  whatever.  You lose it.  You replace it.  You get a duplicate.

8  No big deal.

9      Either that or it was exactly where she knew it was,

10 in the apartment.  And when she so desperately ran out with two

11 minutes to escape, she took it with her and incorporated it in

12 her application.

13     I submit to you, ladies and gentlemen, after filing

14 the application, after coming here and being here under the

15 circumstances that she did, where she voluntarily chose to be a

16 prostitute, and then when she realizes that her relationship

17 with Francisco is ending, she's not going to get the house that

18 her -- going to get things he was asking her.

19     Did you remember telling the agents how you spoke with

20 Francisco's father back in Mexico and he promised you this

21 house for you and Francisco to live in after I guess he passed

22 away.  No, I don't remember asking that.

23     And do you remember asking Francisco to buy the

24 adjacent land with the money that was being sent back from

25 America to Mexico, with that, can you buy some adjacent land

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation – Gold

1    and build a house for my parents to live next to your parents

2    and presumably next to her and Francisco.  Do you recall

3    telling me?  No, I don't remember that.

4              (Continued on the next page.)

LISA SCHMID, CCR, RMR
Official Court Reporter

Summation – Gold

1    (In open court.)

2    MR. GOLD:   I think what happened here is clear.   She

3    and her 16-year-old baby lover, came here.   It didn't work out

4    and the three and a half years, he was walking away from her --

5    or sending -- even worse, he would send her back to Mexico.

6    She said, No, I am not doing that, and so she grabs the

7    material.   She goes to the police.   She makes up this story

8    about Francisco, because now he's her ticket -- he's her green

9    card.   He's her get-out-of-jail-free card.   And one time she

10   said that story, she was locked into it, because she walked in

11   here and she couldn't very well contradict anything she said to

12   the Mexican Consulate, to the U.S. Government or whatever it

13   was.   And again, did the Government make a deal with her?   Did

14   they ever promise her that they're not going to prosecute her

15   for her money laundering when she sent back money on her own?

16   Are they going to prosecute her for that -- or rather, do they

17   have an agreement for that?   No.   In her mind are they going to

18   prosecute her for illegally coming here?   No.

19       She thought, Well, if I continue with this story and

20   say what I said before however many times, then I'm home free

21   because I've said it all those time before, nothing happened to

22   me.   So if I continue saying it, nothing will happen to me

23   going forward.   And what happened was on cross-examination for

24   137 times I charged that, and for 137 times she couldn't reply

25   because she told the agent these things.   She knew she told the

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Summation – Gold

1    agents these things.  They're sitting there, she couldn't very

2    well deny it.  But what she could do is say, I don't remember

3    as a shield against further inquiry.  And these things, ladies

4    and gentlemen, I'm submitting to you every time she said, I

5    don't remember, what's tantamount to saying, it's true.  And

6    I'm just not giving it up because it contradicts the position

7    I'm trying to advance.

8          Okay –– sorry.

9          You heard her say that from December 11th –– or I'm

10   sorry, December of 2011 until May of 2012, she spoke every day

11   with Francisco while he was in Mexico and threatened her, et

12   cetera, et cetera, and he's going to get her 12-year-old

13   sister, bearing in mind that among the many other things that

14   she denied remembering telling the agents, although I think

15   other witnesses said this, there were times drivers refused to

16   take her because she looked too young.  But never the less,

17   which is money out of Francisco's pocket, right?  Because if

18   she's giving him all of her money and drivers are refusing to

19   take her because she looks too young, that's money out of his

20   pocket, okay.  And so what he threatens her with, as she says,

21   is that her younger sister, who presumably even looks even

22   younger than she does, he's going to turn into a prostitute,

23   too.

24         Now, I think on its face its makes no sense and I'm

25   not saying anything more about it.

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Summation - Gold

1    But what I will say is this:  These folks behind me

2    did a hell of a job.  They put together all these documents.

3    You had all these arrows, all these charts going all different

4    ways showing who sent what to who and how much and when and all

5    of that.  And if you remember, they couched all of the

6    questions to, I think it was Ms. Martinez, what's her name --

7    if I remember the name I will -- the woman who put together all

8    of these charts.  And what she told us was that all of these --

9    that she got all of this evidence, subpoenaed documents from

10   the agents, and then she compiled all this based on that

11   information.

12       What they did, as they should and they did a great

13   job, they got every person that they believe was a party to

14   this conspiracy, was a party to this sex trafficking, they gave

15   every name to every Western Union and all the other places that

16   they said to trace any and every wire transfer of money that

17   any of those named people made, so this way you can track how

18   much each person sent, how much it totaled, it said who sent

19   what to who.  It makes perfect sense and the remaining charts

20   to that effect.  And they would frames the questions to

21   Ms. Martinez I believe her name was, over and over, and this --

22   the amount that -- this was sent in this year from this peer

23   person to this person was at least X amount.  It was at a

24   minimum was Y amount of money.

25       God, I wish I could borrow that from you.

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Summation – Gold

1         (Pause in proceedings.)

2         MR. GOLD:   Okay.  At least at minimum the suggestion

3    being -- and I'm not saying they did anything wrong -- but the

4    suggestion, though, being there's more out there and we just

5    couldn't find it.  Okay.  I accept that.  Is there twice as

6    much?  Is it -- did they miss a few out there?  Yeah, probably.

7    But they spent years investigating giving the names, getting

8    the name, speaking to these witnesses, When did you send?  What

9    name did you use?  What date of birth did you use?  Where did

10   you go?  I mean, these people aren't stupid, okay?  They did

11   their job and you saw it.

12        They didn't miss very much.  So the numbers that are

13   here on those charts are the numbers that they can prove, and

14   that's it.  And that's all you are to consider.  No speculation

15   of -- Oh, there's more out there.  You can't, because it's

16   unknowable.  Anything is possible.  But in your deliberations,

17   you've got to rely on those numbers.  And so they were updated

18   yearly.  Ms. Martinez said, Yeah, I'd regularly get more, more

19   information, more subpoenaed documents, more records.

20        Can I get the Elmo again, please.

21        Thank you.

22        And I would like to now show you what's I think is in

23   evidence as Government Exhibit 419-R.  And this particular

24   document -- let me see if I can't get everything -- no.  Okay.

25   This document, if you look at it, okay, these are the amounts

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Summation - Gold

1    of money that after years of investigation they have traced to

2    Delia.  Okay?  And all the different people, and you heard her

3    mention these names:  Isabel Rojas-Torres, Isabel Rojas -- Jose

4    Osvaldo Melendez-Perez -- Melendez-Rojas, Ma Ana Perez-Rojas,

5    Magdaleno Melendez-Rojas, Maribel Melendez-Rojas.

6            Did I miss any?

7            And at the end of the document it shows that her years

8    what they worked out, what they traced was $18,000 that she

9    sent.  And you heard the testimony that of the $18,000, as is

10   reflected on the chart, $7,310 of that 18 went to what they

11   described as other recipients.  Other recipients, meaning

12   people having nothing to do with this case.  Every day she's

13   threatened.  Every day, You better give me all of your money.

14   Every day, I'm going to kill your family.  Every day, I'm going

15   to steal your sister, and 40 percent of what she wired she sent

16   to God knows who.  Who these people were, what their

17   relationships were to her, we don't know.  But we know one

18   thing for damn sure, they had nothing to do with this case, 40

19   percent.

20           Okay.  Now, if you look at some of these entries, and

21   you'll see of the Ma Ana Perez-Rojas a series of dates and

22   amounts, and the same thing for Magdaleno, going from 2011 to

23   2013.  Okay?  Now, you can compare this on your own, but what I

24   have done was taken those entries for December of 2011 when he

25   went to Mexico until May of 2000 -- oh, nope.  Actually I'm

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Summation – Gold

1    sorry -- yes, until May 12th of 2012 when he thereabouts

2    returned.  Do you remember, she said he returned in May?  These

3    are all the transfers that in all of the investigations --

4    oops, I'm sorry -- in all of the years that they worked on it,

5    this is the amount, this is what she sent.

6          And what does it show?  It shows that for Ma Ana

7    Perez-Rojas for that six-month period, $5,150; to Magdaleno

8    Melendez-Rojas, another 500; and to Maribel Melendez-Perez

9    another 40 for a total of $5,690.  Okay?  500, 600 -- or

10   $5,690.

11         Now, remember I asked her, How much did you earn?

12   Didn't you tell the agents during this time period because you

13   weren't taking calls, you turned off your phone?  You weren't

14   doing anything.  You certainly weren't working seven days a

15   week anymore, which I think she actually did admit?  Didn't you

16   tell them you were earning -- No, I don't remember that.  Okay?

17   Again, I have to take numbers somewhere, and I took a couple.

18         Do you remember she said there were times she said she

19   earned as much as a thousand dollar a day?  Out of a total of

20   $5,690, if she earned a thousand dollars a day, that means

21   between December of 2011 and May 2012 she worked 5.69 days

22   total.  Threatened every day, stealing your sister, killing

23   your family, I'm at your mother's house now, I could do

24   whatever I want, I'm a monster, remember me?  At a thousand

25   dollar she worked 5.69 days.

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Summation - Gold

1    At 500 a day -- oh, God, I hope I wrote this down --

2    well, you get the point.  At 500 a day, it doubled.  She worked

3    11 days, 12 days.

4    At 400 a day, as she told the agents, although she

5    didn't tell the agents because she didn't remember, at 400 a

6    day, she worked 14.225 days.  And again, out of that 18,000, 40

7    percent of it, who knows who she decided to send it to?  But it

8    wasn't anyone here.  It had nothing to do with anyone here.  So

9    with all the threats, with all the fear, she sent -- she worked

10   14 days at most out of five months.  Does that make sense?

11   Now, at a minimum, so the agents might have missed

12   something.  In all the years, how much could they have missed?

13   I mean, seriously?  If it wasn't 5,690?  Was it 7500?  Was it

14   10,000?  Was it double?  So instead of working 14 days, she

15   worked 28.  Was it triple?  Instead of 14 -- instead of 28

16   maybe, it was 56?  Where do you stop?  How far off are their

17   numbers before you finally sit back and say, You know what?

18   This makes no damn sense.  She couldn't have been threatened

19   with her sister's life.  She couldn't have been threatened with

20   her mother's life.  She couldn't have been threatened with her

21   own life and believed it and turn around and work five day or

22   ten days or 20 days or whatever the math on whatever particular

23   number you want the choose.

24   Ask -- expect, Ms. Hajjar to answer that.  She's a

25   terrific lawyer.  If anyone can answer from what's on the

David R. Roy, RPR, CSR, CCR
Official Court Reporter

1   record, she will.  But don't let her tell you, and I don't

2   think she will, that, Well, yeah, it says 5,690, and I'm not

3   making up numbers, that's what they were.  But really it could

4   have been 50,000.  It could have been a million.  Right?

5   Seriously?  Is that the kind of evidence that you could rely on

6   beyond a reasonable doubt to convict him, to label him the

7   monster they're making him out to be?  What might have been?

8   No.  These are their numbers.  I didn't make them.  I didn't

9   make those charts.  These are their numbers.  This is what

10  they've come to you with.  This is what you have to use to

11  decide, period.  And those numbers completely destroy their

12  case.

13      It undermines the entirety of this idea, again,

14  tricked to come here, forced to work.  I'm 14, I don't know

15  anything.  I had no choice.  Yes, you did, and you made it.

16  You stopped taking calls.  You stopped working.  You worked ten

17  days, all for whatever it is.  That's not what you do when

18  you're worried that your sister's going to become a prostitute.

19  You're 12 year old -- I mean, come on?  Made for TV.

20      Does she have a sister?  Yeah.  Not the sister, but

21  was she, Delia a prostitute?  Absolutely.  Was she threatened?

22  That's the consumptible part.  That's the audience teaser that

23  they throw out, that she throws out there to get you to bite.

24  But if you bite, you're going break your teeth.  It doesn't

25  make sense.  It doesn't add up.  Math.  It's not an argument.

1  This isn't an opinion.  Math.  Do it.

2          Here's the third thing that completely undermines any

3  ideas that Francisco forced Delia to live the life she led for

4  three and a half years.  It is my position, and I think the

5  evidence is overwhelmingly clear, they lived together.  They

6  slept together.  They shared a home together.  They were a

7  couple.  He had parties for her, birthday parties.  She made

8  lobster dinners when he comes home just after five months of

9  being away.  They were a couple.  They loved each over.

10         Yesterday, Veronica said something, couldn't have said

11 it better -- I'm sorry.  Would you -- Ms. Kassner, did you do

12 her --

13         MS. KASSNER:   (Nodding head affirmatively.)

14         MR. GOLD:   I'm sorry.

15         When Ms. Kassner asked her, after she tells this story

16 of being forced into work.  What was your relationship with

17 him?  And she wasn't shy, that's for sure.  And she looks at

18 Ms. Kassner, frankly, like she's nuts.  What was my

19 relationship?  How do you have a relationship with a pimp?

20 There is no relationship.  You don't have a relationship with

21 someone that forces you to work as a prostitute.  You don't

22 have a relationship with someone who hits you.  You don't have

23 a relationship with someone who threatens you and your family.

24 That's not a relationship.  That's a pimp and his employee and

25 his piece garbage; his chattel; his trash to do with what he

1    will.  That's the relationship.

2              Can I have the Elmo, please?

3              And so I ask you:

4              (Mr. Gold produces photograph on the Elmo.)

5              MR. GOLD:  Is that a pimp and a slave?

6              (Mr. Gold produces photograph on the Elmo.)

7              MR. GOLD:  Is that fear and duress?

8              (Mr. Gold produces photograph on the Elmo.)

9              MR. GOLD:  Is that a threat to steal your sister?

10             (Mr. Gold produces photograph on the Elmo.)

11             MR. GOLD:  Is this, My God, what can I do to escape?

12             (Mr. Gold produces photograph on the Elmo.)

13             MR. GOLD:  Is this a nervous smile?

14             (Mr. Gold produces photograph on the Elmo.)

15             MR. GOLD:  Is that her pimp or her lover?

16             (Mr. Gold produces photograph on the Elmo.)

17             MR. GOLD:  Oops -- I'm sorry.

18             Is that a party or is that pressure?

19             (Mr. Gold produces photograph on the Elmo.)

20             MR. GOLD:  Is that a celebration or a wake?

21             (Mr. Gold produces photograph on the Elmo.)

22             MR. GOLD:  Is that champagne or is it water?

23             (Mr. Gold produces photograph on the Elmo.)

24             MR. GOLD:  Is this a victim of sex trafficking?

25             (Mr. Gold produces photograph on the Elmo.)

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Summation - Gold

1    MR. GOLD:  Your turn.  You ask the question.  I'm

2    getting tired up here.

3         (Mr. Gold produces photograph on the Elmo.)

4    MR. GOLD:  Is he holding her up from drowning?  Is she

5    holding him up?

6         (Mr. Gold produces photograph on the Elmo.)

7    MR. GOLD:  Look at the fear.  Look at the pressure.

8    Look at the terror.

9         (Mr. Gold produces photograph on the Elmo.)

10   MR. GOLD:  Any moment now, he's going to beat her.

11   Where are the marks by the way?  Do you remember -- this is

12   oops -- I'm sorry.

13        This was around the time she's getting beaten in the

14   face.  She couldn't open her mouth the next day.

15        Now, obviously, I'm not saying this is the same day.

16   But this is a woman wearing a bikini.  It doesn't look -- I

17   don't see any marks or bruises.  If you remember at some point,

18   because I asked about these photos on cross-examination, and on

19   redirect it was -- there was some question, Okay.  She asked

20   you if you had any bruises on your face, and of course, there

21   aren't any.  And instead of as she said on her direct, on the

22   original testimony, Yeah, he punched me in the -- Well, he

23   would punch me but not leave marks in places where no one can

24   see.

25        Do you see any marks anywhere?  Forced?  Seriously?

1   This a couple at the beach.  The only thing at Coney Island

2   missing is a hotdog from Nathan's.  They're having fun.  No

3   harm.

4           (Mr. Gold produces photograph on the Elmo.)

5           MR. GOLD:   They're posing for each other for camera

6   picture so they have the memory.  So she has a permanent memory

7   of having gone there.

8           Remember, she gave these pictures to the Government.

9   These aren't my pictures.  They're hers.  She kept them for all

10  these years.  Why?  Because this is her lover.  That's why

11  these pictures were taken.  It's not her pimp.  It's not some

12  monster.  This is the man she hugged every night, that she

13  thought she was going to be spending the rest of her life with.

14          (Mr. Gold produces photograph on the Elmo.)

15          MR. GOLD:   And, My God, don't tell me she's nervous.

16          And you know what?  Yeah, two things:  One, I've got a

17  big mouth.  But on top of that, I've been talking a lot about

18  Delia.  And you know what?  I've got news for you, I don't

19  think she's a bad person.  I'm not standing up here telling

20  her -- telling you, What a piece of crap she is.  How dare she?

21  Because in all honesty if I had her life, I can't sit here and

22  tell you I wouldn't take the stand and lie either.  I would

23  like to think I wouldn't.  We'd all like to think that, but the

24  reality is until you've walked in someone else's shoes.  Right?

25  I don't know what would happen.  Thank God I've never had to

Summation - Gold

1  find out.  Thank God none of you ever will.

2          She came from a horrific circumstance, and she's here

3  and she made a horrible choice, and then it was all blowing up.

4  Her dream of being with Francisco for life, over.  Her dream of

5  building a house that they sent money back to Mexico for to

6  live next to her parents and to try and create a life and a

7  family with him, which is all what she thought in her head, she

8  told you, gone.  She overhears Francisco saying, It's over.

9  I'm going to send her back.

10         She learns about Carla.  Huh?  How did she get -- she

11  heard about Carla and knew, Well, wait a second here.  Carla

12  didn't want to go back.  Carla didn't have legal status here.

13  What did she do?  How did she figure this way out to get to

14  stay here?  Well, she turned in her pimp.  Claimed she was a

15  victim of child sex trafficking, got herself a visa.  She

16  continued working as a prostitute.  That's what she told the

17  agent that she, of course, didn't remember.  I submit to you

18  she did say that, and so she knew.  And she's no dummy because

19  she's a businesswoman, not a victim, and she figured out

20  Francisco is my ticket.  He was going to screw me, send me

21  back, and he knows I don't want -- I desperately don't want to

22  go back.  And you know she doesn't want to go back because she

23  hasn't gone back.  Here it is since 2014 or thereabouts, she's

24  had legal status.  Has she ever gone back?  No.  No.  So you

25  know she didn't want to go back.

David R. Roy, RPR, CSR, CCR
Official Court Reporter

1       And so what does she do?  She files a visa

2  application.  She goes to the police, probably thinks that's

3  going to be the end of it because maybe she did believe no

4  one's ever going to believe her, even she walked out about two

5  minutes before her life ended with the delivery books.  But

6  then, and what do you know?  It came in handy.  She turned him

7  in, didn't get to see him so many years later.

8       And do you want to know what?  I honestly can't say I

9  wouldn't have done the same thing.  I can't.  I'm not standing

10  here saying it makes her a bad person.  But it doesn't make her

11  somebody that warrants convicting and labeling Francisco for

12  the rest of his life.  You may not like him.  You may think he

13  did some terrible things, some nasty things that he shouldn't

14  have.  Okay, I respect that.  That doesn't make him guilty of

15  the crimes for which he has been charged.

16       And I remind you, that in so many instances, and I

17  think I referred it earlier, where the Government was talking

18  about these business meeting that they attended, and Francisco

19  was in none of them.  And do you know why?  Because he was a

20  baby.  He was 16 years old.  I'm sorry.  They're not going to

21  listen to him.  He's not part of any venture, any business.  So

22  she's not a bad person.  She said so herself, and I respect

23  that.  And let her, I don't want to see her deported.  But her

24  saving herself is not an excuse to sink him.

25       Look at the evidence.  Weigh the evidence.  Look at

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Summation - Gold

1  her story critically, because when you do, I submit to you it

2  doesn't stand up any better than I'm standing up right now,

3  okay.  It doesn't fit.  And of course, I believe the arguments

4  that I've made to you.  I think they're persuasive.  I think

5  they're based on fact, and I really hope that Ms. Hajjar stands

6  up and answers the questions that I've asked you, because if

7  she doesn't, if we don't hear an answer to why she didn't want

8  to be deported from why no money was sent in all of 2010,

9  $25,000 to support the conspiracy, if she doesn't explain to

10 you why Veronica was wrong, you do have a relationship with

11 your pimp; you do go to beach with the man who's torturing you;

12 you do celebrate New Year's and put cake on your face and laugh

13 and have Halloween parties with champagne and have fun with the

14 monster who's destroyed your life?  Wait for her to answer

15 those questions.  And think of those questions before you

16 return your verdict, because I submit to you when you do, you

17 will find that yeah, you hate Francisco, you hate his family,

18 you hate everything about him, okay, but they haven't proven

19 the case that those charts that Ms. Argo referred to yesterday

20 represent.

21       So your verdict will be guilty or not guilty, proven

22 or not proven beyond a reasonable doubt.  I'm not asking you to

23 give the man a medal.  I'm asking you to do your job.  They

24 haven't proven the case.  And regardless of anything and

25 everything, in this building that's how it works.  We could all

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Summation - Gold

1    go back to our lives and look at the newspapers and this guy

2    should have got this -- oh, I can't believe this.  Not here.

3    Not today.  Not in this building.  That's why you were chosen,

4    because we know you're going to do your job.

5            Okay.  Don't all cheer at once, but I'm just about

6    finished.  I'm about to sit down, and Mr. Hueston will get to

7    go, and he's probably ready to put a knife in my back for

8    taking so long, and I don't blame him.  And then Ms. Hajjar

9    will get to speak to you one more time because the Government

10   does have the burden of proof, so they get the extra chance to

11   speak to you.  And I just ask you when you go back into the

12   jury room and when you're listening to what Ms. Hajjar tells

13   you, and I'm looking forward to it, she's a terrific lawyer and

14   I'm interested to hear how she responds.  But ask yourself,

15   because I'm not going to be able to:  What would Gold say?  Not

16   in two and a half hours, but you could limit to, What would

17   Gold say in ten seconds in response to anything she says?

18           What argument did I raise that maybe you agree with or

19   that you disagreed with?  Or more importantly, what argument --

20   or what thoughts did you come up with that I didn't?  What

21   possible explanations that would make any of this make sense

22   have you come up with?  And that's fair.  That's your job.  But

23   try and remember, at least, to think -- stop and think for a

24   minute when she stands up and after you go and retire and when

25   the Judge gives you the legal instructions, of course, what

Summation – Gold

1    would Gold say?  Would she answer that?  And I trust and I hope

2    and I expect that after weighing and reviewing the evidence,

3    after disregarding the nightmare, accepting that it was true

4    and that you cannot change it regardless of what you do, just

5    don't make a new one.  Don't turn Delia's misery into

6    Francisco's nightmare.  And I trust you'll upon doing so solely

7    on the evidence, without fear or bias towards none, you will

8    return a verdict of not guilty.

9              Thank you.

10             I'm sorry I took so long.

11             THE COURT:  I think it's about time for a break,

12   ladies and gentlemen.

13             THE COURTROOM DEPUTY:   All rise.

14             (Jury exits the courtroom.)

15             (The following matters occurred outside the presence

16   of the jury.)

17             THE COURT:  Mr. Hueston, about how long do you think

18   you might be?

19             MR. HUESTON:  I think an hour.  I'm going to try to

20   make it shorter, but that's -- that I think is realistic,

21   Judge.

22             THE COURT:  Maybe we will do the rebuttal after lunch?

23             MR. HUESTON:  I'm going to be as fast as I possibly

24   can, Judge.  It's just --

25             THE COURT:  No, no, I understand that.  But I'm just

1692

USA v. Melendez-Rojas, et al.

 1    trying to figure out how to do that --

 2              MR. HUESTON:  Oh, sure.

 3              THE COURT:  -- so we don't break anybody in the

 4    middle.

 5              (Pause in proceedings.)

 6              MR. HUESTON:  Yeah, I think that's going to happen,

 7    Judge.

 8              Yeah, but I do think that's about an hour, maybe a

 9    little shorter.  I think that's realistic.

10              THE COURT:  Okay.

11              (Recess taken.)

12              THE COURT:  Everybody's here, correct, with the

13    exception of the defendants?

14              MS. KELLMAN:  Judge, they're right there.

15              THE COURT:  Okay.  Why don't we bring in the

16    defendants.

17              (Continued on the next page.)

18

19

20

21

22

23

24

25

David R. Roy, RPR, CSR, CCR
Official Court Reporter

USA v. Melendez-Rojas, et al.

1      (In open court.)

2      (Defendants enter the courtroom.)

3      COURTROOM DEPUTY:  All rise.

4      (Jury enters courtroom.)

5      THE COURT:  Please be seated.  Mr. Hueston.

6      MR. HUESTON:  Thank you, your Honor.  Good afternoon.

7           Two weeks ago, I stood before you and I talked to you

8   about what I thought this case was going to be about and I used

9   a couple of terms.  I used the term "resistance."  I talked

10   about war.

11          And if we can go to the first slide I want to start

12   there.

13          Now, I really believe in this precept and this

14   thought, and why these are things from Clausewitz.  He talks

15   about all action takes place so to speak in a kind of kind of

16   twilight which is like a fog or moonlight often tends to thing

17   seem grotesque and larger than they really are.  Two qualities

18   are indispensable.  First, an intellect that, even in the

19   darkest hour retain some glimmering of the inner light which

20   leads to the truth.  And second, the courage to follow this

21   faint light wherever it may lead and everything in war is very

22   simple but the simplest thing is difficult.

23          Now, we're going to go through that and you've been

24   seeing this process, right?  This back and forth, you know,

25   this struggle where you sort of get hit with this emotional

Summation − Hueston

1    impact of the witnesses.  And then we do cross−examination and

2    it begins to change.  It changes the narrative that the

3    Government's put forward.

4            If we can go to the second slide.

5            So the conceptual framework I want to work with you

6    today.  So one, and the other lawyers have mentioned this,

7    would you trust this witness in a matter of personal concern to

8    you?  I mean, the key of this case really is about credibility,

9    right?  And so, it's an obvious first thought.  And then

10   second, I want you to think about this.  Able Romero−Melendez

11   is not charged in Counts 15 and 16.  That's the money

12   laundering and the distribution of illegal proceeds.

13           Now, it's sort of like the elephant in the room

14   because if you really think about it, if he's part of this

15   conspiracy, why is he not part of the money because there's a

16   problem with the Government's case.  It's the first sort of

17   obvious thing.  But I want that to stay in your mind as I'm

18   talking to you and addressing you today.

19           The next one is, you know, what does proof beyond a

20   reasonable doubt look like?  I'll tell you.  Count 18.  Did I

21   ask any questions of anybody except to say have a safe trip on

22   this issue?  Because there's nothing to prove, they proved it.

23   Mr. Able Romero−Melendez is sitting right there.  He doesn't

24   have permission.  You understand there's no reasonable doubt

25   about that issue.  So that is what reasonable doubt looks like.

Summation - Hueston

1      Now, there's different degrees but it's clear that

2  they don't have an issue with Count 18, right?  So I want that

3  to stay in your mind.  And the next thing is I know this must

4  be in your minds, wouldn't you have expected to hear from

5  Cristina Sanchez-Sanchez and Lisbeth Castellano-Batista about

6  Abel.

7      Now, the judge is going to charge you.  We both have

8  subpoena power.  We both can call witnesses.  But if one

9  difference between the Government and a defender, they have the

10 burden.  Every single one of the defendants here has faced

11 their accuser.

12     You know we have Diana and I'm going to talk about

13 Diana, okay?  What we have instead is sort of this idea about

14 these women but we don't have their testimony.  We don't know

15 how they got to the country because there's no testimony about

16 border crossings, enticement, luring, meeting the parents,

17 giving the tequila, nothing.  Zero.  And wouldn't you have

18 expected to hear from them?  So I want that to really stay in

19 your mind.  Because they do come up but it's always through,

20 well, I heard about this or I saw this.  And they want you more

21 or less take the sort of nightmares you heard and then attach

22 it to this enigma, to this phantom, and say this must have

23 happened to these women but we'll see.

24     First of all, it's not sufficient but there's actually

25 serious problems with the Government's proof and I talked about

Summation - Hueston

1  warfare being surprise.  I think you noticed when I do my

2  cross-examinations how we would go about prosecuting the

3  defendants that we were really precise and focus on what we

4  needed to get from a witness.  So now I'm going to put that

5  together.  So let's talk about the first, I'll call it the

6  gambit, okay, so if we can change it the next slide.

7       The Government's first failed gambit.  And this really

8  is Daisy; right?  And they use this witness to bring up

9  Cristina and mentioned that Alicia Romero-Melendez wired the

10 money for Abel, that's the point the case to put Cristina in

11 there.  But, again, Abel is not charged with money laundering

12 or distributing proceeds of sex trafficking.  So what's the

13 point of the wiring?  He's not charged with it because there's

14 something -- they have to explain it.  I don't, but I have to

15 point it out to you because I'm a defender.

16      Now, next, he's not charged in any substantive count

17 with trafficking Cristina or Lisbeth.  You see it in different

18 counts.  The only count where there's a substance, a human

19 being that's listed is Diana.  They didn't indict him for those

20 two women.  Why?  Because there's simply a lack of evidence.

21      Now, what did our cross reveal?  And also, let's say

22 this.  He's not indicted for Daisy and I don't want to miss

23 that point.  So we have a couple of things.

24      The cross revealed the fact that my client Abel

25 Romero-Melendez didn't force you to do anything, is that fair?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Hueston

1   Yes, that is correct.  That's really the end of the analysis

2   with Daisy.

3           So let's go to the next slide.

4           Next, while you were living in Queens, you learned,

5   actually, that Fabian had a wife and a child in Mexico, true?

6   Yes, I found out.  Okay.  And, in fact, while his wife, his

7   wife is name is Dulce Olquin, correct?  I don't know.  Well,

8   she sent you a picture of her child's birthday party to your

9   cell phone, correct, from Mexico?  A picture of the girl, that

10  was it.

11          Next slide please.

12          And also the fact that your boyfriend -- you learned

13  that your boyfriend had a wife and a child in Mexico and that

14  you were really angry, correct?  Yes, I was very angry when I

15  found that out and that's why I decided not to live there

16  anymore.  I mean that contradicts the Government's theory on

17  its face.

18          Now, I want to bring it out because I want to show you

19  a pattern of the witnesses that the Government has brought

20  before you.  That's your real motivation.  I am jealous, how

21  dare you have another woman.  You want to mess with me, you'll

22  see how this is going to go.  And you see how it's going.  So I

23  left.  And she said, I was trying to leave that life behind me.

24  But she said, you know, I withstood but the scrub, the battle

25  of cross-examination, because that was that wasn't a prepared

Summation – Hueston

1    statement.   That came out of her mouth because we were

2    cross-examining her and she let out bit of the truth, her real

3    motivation.   So that's the Government's first failed gambit.

4          I like chess so that's why I talk about that.

5          Now, let's talk him about Maria Rosalba, Fabiola M.,

6    and Veronica.   He's basically absent.   He's not charged with

7    trafficking these women but we see a pattern.   Witnesses that

8    have little or nothing to say about Abel Romero-Melendez.   Now,

9    literally days in the trial like besides identifying him or

10   not, I was just sitting there really doing nothing.   And then I

11   started, we had some things to do with the agents, and I got up

12   and I had something to talk about.   But one thing I noticed

13   that Fabiola M. she was in Queens from 2009 to 2015, certainly,

14   a time when Mr. Abel Romero-Melendez was there and she has

15   nothing to say about him.   And that should strike you as, I

16   mean, she's here, she's going through this going to the houses,

17   but she's not seeing this person.   He's not beating people up.

18   I got no horror story for you.   I got nothing to tell you about

19   him.   It's a concession.   It's a weakness in their case.   And

20   keep that in mind their lack of evidence.

21         Now, the Government may say that this is really just a

22   matter of the pieces that are on the board, they have to more

23   or less deal with the witnesses they have.   But that statement

24   is really going to ring hollow once we get to Diana and we're

25   going to see how they really prosecute it, that piece in their

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Hueston

1    arsenal.

2         He's not charged with trafficking these women.  He's

3    not charged with laundering any money for these women.  There's

4    no connection.

5         So let's go to Delia.  The Government suffers another

6    reversal, another loss.

7         Now, again, very emotionally compelling what she did

8    and it's deployed expertly.  I mean, the tone was so quiet.

9    The effect was like it was literally overwhelming to sit there

10   and listen to her.  And it's like to get up and cross-examine

11   her, it's like why would I even want to do this?  But we're

12   defenders, it's our obligation to do the hard things.

13   Clausewitz, what we do is simple but it's very hard.  It's our

14   obligation.  And so, we crossed.

15        Now, again, he's not charged with trafficking her.

16   But, again, she was used, what, to bring up Cristina and

17   Lisbeth.  But she didn't remember Lisbeth's name and also

18   Alicia.  And I used here -- she said -- her cross was not just

19   about her lack of candor but her contempt for her obligation to

20   tell the truth.  And there is, like, I don't recall.  Can you

21   say it another way.

22        Now, the reason I really bring that out and, you know,

23   I don't want to belabor the point, but when you show no candor

24   it's like so lopsided it's almost there's a coercive presence

25   in this courtroom but it's not from the defense.  She does not

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Hueston

1   want to enter anything contrary to the Government's narrative.

2   And the way she decided to do it was, I do not recall; ask me

3   another way.  Over and over and over again because you can feel

4   her unwillingness to give an inch on that.  But when the people

5   who she needs assistance from, who are deciding her fate, asked

6   her questions, it came out very simply.  But, again, we had to

7   then go in and ask her these questions.

8           And if we can go to the next slide.  I'm sorry, this

9   one.

10          I'm just learning PowerPoint and it's not so easy to

11  read but I'll move over here.

12          Yesterday, you mentioned Alicia's sister told you or

13  gave you instructions about who you should be talking in terms

14  of Abel's girlfriends, Cristina and the other woman, do you

15  remember?  Yes.  Where were you?  I don't remember that.  Can

16  you give me a month?  I don't remember the month.  Can you give

17  me -- was it day or night?  I don't remember.  Was it

18  springtime?  I don't remember.  Who was there?  I was with

19  Alicia, Francisco.  Sometimes he takes me to where Alicia was

20  and also resided.

21          Now, let me stop there.  That's the script.  See, I

22  don't remember, I don't remember, I don't remember.  Now, I'm

23  going to repeat what I've been trained to say.  And I said, no,

24  I want to you answer my question.  So we went back.

25          My question is when she gave you the instructions, who

Summation – Hueston

1    was there?  I don't remember who else was there.  Do you recall

2    what apartment you're at?  I don't remember what apartment I

3    was in.  No details because it's not true.  Very simple.  I'm

4    just going to throw some innuendo, let it float in the air, and

5    I hope it just sticks in your mind but I can't even tell you

6    one thing about it.  It's not credible, it's not realistic, it

7    should be rejected.

8         Now, we continued because, again, it's not -- our job

9    isn't easy, you got to keep fighting.  So we go on.

10        So you identify people -- this is the -- it started in

11   the Mexican consulate.  Because we're precise, we had a reason

12   for asking these questions.  You did find people who were part

13   of this sex trafficking ring, correct?  Can you ask a question

14   using different words?  That was a bizarre response.  There was

15   nothing confusing about the question but she needed time to

16   deal with the question.  And that's her pushback because do you

17   know what the word identify means?  Yes.  Do you know what the

18   term sex trafficking means?  And she says no.  I mean,

19   literally, my head exploded.  And then she's like -- so I ask

20   her, Have you made an application to the United States saying

21   you were trafficked sexually?  Because I am a victim of sexual

22   trafficking.  And the Government objected and she had to answer

23   the question.  I didn't know it at the time what they meant.

24   And that's another trick.  So she's trapped and she's got to

25   sort of now move.  I didn't ask her about the time, I asked her

Summation – Hueston

1   if she knew what sex trafficking was, but she didn't know where

2   we were going.  That was the point.  She was in uncertain

3   territory and she's trying to figure me out.  But I'm serious

4   about my job.  And I was going to get to where I needed to.

5        And the judge asked me, well, we can go to the next

6   slide.  Now, I said I'm going to focus your attention on

7   March 2016.  Do you remember going to the Mexican consulate?  I

8   don't remember.  I don't remember what year I went.  But you

9   don't dispute that you went to the Mexican consulate, correct?

10  I did go to the Mexican consulate.  And you were there to give

11  a statement about what happened to you.  Now, in your

12  statement, you identify people who were involved in this sex

13  trafficking ring, isn't that a fact?

14       I'm asking a question because I know the answer and

15  I'm going to get to the truth.  Remember Clausewitz talks about

16  the fog, the uncertainty, you have to have the courage to keep

17  moving forward to get to where you need to get.

18       And I asked her and you never identified Abel

19  Romero-Melendez, did you?  I don't remember.  Her shield, her

20  default.

21       You signed a document detailing what happened to you,

22  do you remember that?  I don't remember that.  It was a long

23  time ago.  It was only four years ago, by the way.  But that's

24  the game.

25       And now we can go to the next page.

Summation - Hueston

1     And then we talk about the exhibit.  And now, Miss,

2   I'm going to show you first, and I'm not going to go through

3   all of this, because really I want to get to the Government's

4   concession because they give up at some point because they

5   must.  It says, does that help to refresh your recollection?  I

6   don't remember.  Did you sign the last page?  She see her

7   signatures, she has to say yes.  Does it help refresh your

8   recollection?  It was a long time ago.  And then we have an

9   objection, sidebar, and then what happened?

10     Next slide, please.

11     Concession.  The Government stipulates on the record

12   that this document, does not contain Abel Romero-Melendez's

13   name nor does it mention his sister Alicia.  I thought she was

14   there to talk about the ring and who how he was part of it but

15   he's not part of it.  She was put on the stand to say it to

16   you.  But I confronted her with an earlier statement that

17   showed her lie.  That's what a defender is.  So what have we

18   learned?  Resistance produces concessions.  It creates the

19   truth.  It gets to the truth.  And the pattern is being shown

20   at this point.  The Government's had witnesses who were

21   evasive, interested, and brazen and their disrespect for their

22   testimony to you.

23     Now, then we had some lesser skirmishes at this point.

24   It got heated and then things relaxed a little bit so we can go

25   to the next slide and we talked about the money.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

1    Now, again, he's not charged with money laundering.

2  He's not charged with distributing proceeds.  But these figures

3  are put in front of you right now.  They do have to show,

4  they're going to say, well, you know, I know there's going to

5  be an argument.  They have to say, okay, well, we know that he

6  was getting some money and not make sure he was involved with

7  Cristina or Lisbeth doing something wrong.  They can show a lot

8  more than just that.  But one thing I really wanted to point

9  out about this is that if we can go to the next slide.  Hold

10 on.  Can we just go back?  I'm sorry.

11    The reason we put up to the 2016 slide because the

12 Government made mention to say, oh, how much money did Lisbeth

13 Castellanos-Bautista send in 2016?  They literally asked that

14 question, right?  And I wanted to know more about that.

15    And then they also had this huge, I'll call it huge,

16 this big number from Cristina Sanchez-Sanchez.  Your eyes sort

17 of go, whoa, that's a lot of money.  She's like number two on

18 the list so I got to go into the weeds to figure this out and

19 help you understand it and I think I did.

20    So if we can go to the next page.

21    So, first, he's not charged.  I'll mention that.  Now,

22 the charts are misleading, okay?  Because remember we went

23 through I asked the analyst and first thing we did, let me go

24 in order, that 61,000 was sent to the other.  And I went

25 through all the different names, if you remember.  The

Summation - Hueston

1  Sanchez-Sanchez, everything like that.  She's sending money to

2  her family.

3        Now, that's the obvious inference.  They have the same

4  and similar surnames.  She did send money to Abel but he's not

5  charged with a substantive count for trafficking her.  So

6  there's a conflict, that's doubt.  Why wouldn't they charge him

7  with trafficking Cristina Sanchez-Sanchez like the other women

8  because that's not enough.  So he's not indicted for it but

9  they still want to have the innuendo floating around.

10       So then we had another concession, though, because I

11 was making my point.  I was going after them.  This name and

12 that name and this name and they got up and they said, We

13 stipulate.  We give up.  I won.  But the battle is not over

14 and, again, ultimately it's your position decision and I'm

15 trying to get you to trust that I am trying get you to see

16 what's really happening.  And there's good things and bad

17 things I got to point out but I'm going to do my best.

18       Next, we saw -- let me go to the next slide -- the

19 lease when Special Agent Davies came up.  That was pretty

20 understanding.  Let me grab some water for a second.

21       The Government put in this lease and they argued on

22 summation that it showed that Abel is in the United States

23 without permission.  But, again, we're not fighting that issue.

24 But the lease showed things that are very important, I thought,

25 because here's Special Agent Davies who has done, I think, 12

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation – Hueston

1 trafficking operations.  So I wanted him to point out a couple

2 of things.  Do you usually put the name of the person, the

3 victim, on the lease with you?  I mean it's a big document,

4 like, maybe a hundred-some-odd pages.  I turned to a couple

5 things of things I want to point out.  One of the things

6 they're trying to do throwing these guys under the bus they

7 don't work but he's got a letter from his employer in that, in

8 his lease.

9         Now, again they can take whatever objective or

10 investigative techniques they want but they got these records.

11 And so, it makes you wonder:  He's not indicted for the money

12 laundering, he's not indicted for the distribution of proceeds,

13 he's not indicted for any of the women except for Diana, he's

14 not indicted Cristina or Lisbeth, you really have a great deal

15 of doubt.  You have reasonable doubt already.  It's just

16 running all over the place and I'm not trying to overstate it.

17 So he's got a bank account and remember I asked a question

18 about a bank account and that was designed to make you think if

19 you have his bank records and you're looking at this massive

20 wire fraud, why aren't you subpoenaing his bank records.  I

21 mean, this seems like, you know, simple "Cop 101."  So Lisbeth

22 signs the lease.

23         If we can go to the next slide.

24         She gets her I.D., the traffickers give their I.D. to

25 people.  That's preposterous.  And when I asked Davies the

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation – Hueston

1  question he got nervous.  So I asked him.  And this is

2  Page 1100 to 1,119 in the record.  I said, Because people often

3  hide people, excuse me, because people often hide the people

4  they're trafficking, right?  He said, well, sorry about that.

5  Let me start.  Here, I said I was asking, Have you been part of

6  over a dozen trafficking investigations?  He says yes.  And in

7  another part of that, when you're doing an investigation,

8  you're trying to determine who was being trafficked.  He says,

9  that is correct.  Because people often hide the people that

10  they're trafficking.  And, you know, that was the thought that

11  he said yes but not always though.  He was like sometimes they

12  do it, sometimes they don't.  And that's fair for him to say

13  that because maybe it's true.  But it should cause you concern,

14  and since out of all the other witnesses you've seen here,

15  like, they've never been put on a leaser.  They've never given

16  any sort of ownership in their life, it's all been domineering.

17  But here's someone who had the same level of agency on the

18  lease.  She signed the lease as a copartner.  Again, she's not

19  indicted for trafficking her.  I think this speaks volumes

20  about really who you're being asked to evaluate.

21       Now, the next thing, and this was sort of interesting,

22  I like digging in the weeds on facts and cases.

23       So if we can go to the next slide.

24       The Government used these books to show all the

25  drivers, but if you take a good look at all them they have

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Hueston

1  recipes for food.  And I'm not -- I don't say that lightly, but

2  I want to sort of as you try to understand a culture and a case

3  and people you really don't know and understand their lives.

4  So here are these books with numbers for drivers.  But then

5  they also have, you know, I don't speak Spanish but I know

6  things like onion, I get it.  And if you go to the next page,

7  too, that's recipes.  So I figured if they can show the books

8  to show here are the drivers' numbers, I'm going to show you

9  that they showed recipes.  What does it say about the women,

10  about coercion and force?  I mean, think about that.  They

11  always try to make these books, books of horror, of

12  destitution, of enslavement, but there's cooking recipes in

13  some of them.  Not all of them, but some.

14       And what does that say about their state of mind?

15  What does that say about how they view themselves?  And it's

16  really little details where you can really begin to see things,

17  and that's why I like pointing them out.  I think you get the

18  point.

19       The next thing was the house.  Now, this is where they

20  arrested, where they stopped Cristina Sanchez-Sanchez.  I'm

21  going to keep saying it he's not charged with trafficking her

22  in a substantive way at all, she's just here.  But as you hear

23  about the house, you think that this must be the most ugly,

24  dirty horrible place to live.  But it's a home, not a prison.

25  You look at the picture, you see children's toys for babies.

Summation - Hueston

1  You know, this is a hard immigrant life and I can't explain,

2  you know, Polk invaded Mexico and took half their country and

3  we are living with the effects 120, 150 years later.  I don't

4  know how America would be if we lost half our country.  The

5  desperation it would create.  But they're trying to make a home

6  here, this isn't a prison.

7          You go to the next slide.

8          Wait, I'm going to grow flowers in my prison.

9  Obviously, you can.  But these are little things that show

10  really what's happening in people's lives.  You know you got

11  Kermit the Frog or whatever on the wall.

12          Let's go to the next one.

13          It's not a house of horrors, but that's the narrative

14  they wanted to put in your mind, and again, the defender, what

15  the defender pulls out the facts to show you.  Again, this is

16  Cristina Sanchez's bedroom.  Is it a place of captivity?

17          Next, I'm going to go to the border crossing and

18  charts.  I'm sorry, again, it's not the best PowerPoint.  They

19  put on the chart, again, I guess there's no hierarchy but, you

20  know, the illusion they create is somehow -- I didn't want to

21  you have this false impression -- that somehow it's just these

22  three people or these two people going across the border.  And

23  Mr. O'Dell seems straight up to me, you know, just sort of he's

24  not evasive.  That's how a person who is just trying to tell

25  the truth sounds like as opposed to the victims.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation – Hueston

1     So, you know, he says he wants to make it clearer.  So

2   because the Government was the first one to use the word

3   encounter, right, and I asked him what the meaning of the word

4   was, right?  And I want to make sure that the people there are

5   not the only people who were encountered.  He goes, no, that's

6   not what the chart represents at all.  I mean he sees his

7   responsibility to you.  He wants to make sure that you have a

8   clear understanding so it's not misleading and that's

9   congratulations to him, he's doing the right thing.  It

10   represents incidents a person was arrested that we found a

11   record of.  And I asked about how many people could be

12   encountered in an encounter and he goes, well, they range

13   anywhere from a few people all the way up to, I think, one of

14   them had 40 or so.  So that chart should be a whole bunch of

15   people, not this little isolated, creepy effect that they want

16   to present to you.

17     They brought in Officer Terez, and obviously, I had no

18   questions for him because you now Count 18, again, let's

19   compare it.  How are these other counts compared to Count 18

20   now, the illegal entry.  There's really no doubt in your mind

21   about that.  Mr. Abel Romero—Melendez came into the country

22   illegally.  How about the other counts?  A lot of questions,

23   that's what reasonable doubt feels like, that's what it is.

24     So let's going to the next chart.

25     Diana, really, I would say, "overreaching failure."

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation – Hueston

1    And I think that's a fair way of looking at her.  And things

2    got hot again in terms of what we had to do.  And here's the

3    main issue and I want you to sort of compare and contrast her

4    testimony because, really, they have to succeed with Diana.  I

5    mean, she is their last gambit, she is their last opportunity.

6    Like, so she says in 2006, shortly after I arrived, that's her

7    answer.  Then he goes, after the first night that you worked,

8    you talked to Miguel again.  And she talks about being raped

9    the first night.  I mean, that's her testimony under oath to

10   you.  Now, I'm a defender and I have an obligation.  I'm going

11   to carry out my obligation because she said something different

12   earlier in time.

13          So here's the testimony and they talked about everyone

14   being there.  So let's go to the next part when we challenge

15   her and then do you recall telling the Government that Abel

16   Romero-Melendez didn't arrive in the United States for three

17   months after you had arrived in the United States?  I mean, I

18   would be derelict in my responsibility to my client if I didn't

19   point that out to you.  Shame on me.

20          And what's so confounding about it is the Government

21   has these records.  I don't remember that.  And then she

22   finally sees it and she says it does refresh her recollection.

23          Now, we asked her about the meetings what she had

24   about eight either in person on the phone.  And, obviously,

25   they were taking notes.  Obviously, they are not incompetent.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation – Hueston

1   They would never say one day Abel got there the day of, day

2   after, and then they say, oh, no three months.  That's not even

3   remotely possible.  The fact that she said that three months

4   later, that's what she said.  To her credit, she admitted it

5   once she was confronted with it but it doesn't fit their

6   narrative because Abel has to be there when she's attacked and

7   raped because we have really nothing against Abel.  But we need

8   this inflammatory, this complete horrific encounter to stay in

9   your mind so you will convict him.  You must believe it.

10          We're going to get to a larger point.  These other

11  things she said.  So no you testified on direct that Abel

12  Romero helped you memorize your fake date of birth, do you

13  remember that?  Yes.  Do you remember you never told that to

14  the agent of the Government that Abel assisted you in trying to

15  memorize a fake birthday, do you remember that?  Yes.  So

16  you're seeing a pattern, right?  She gets on the stand and says

17  something damning against my client, then we confront her with

18  the statements taken by government agents and prosecutors that

19  completely contradict her.  You're seeing a pattern, okay?

20  This itself breaks apart the Diana gambit, the three months in

21  itself.  Now, we go on and talk about a number of people and

22  she says she agrees no one forced her to cross the border.

23          And if we go to the next slide.

24          Now, we asked about Carmen.  And Carmen is sort of

25  interesting in a way.  You know on direct she said she didn't

Summation - Hueston

1  know where Carmen went.  And then she admitted, oh, yeah she

2  went back to Veracruz.

3       Now, the reason we brought it up is these are the

4  monsters who were, like, pulling people in.  Once we got you,

5  you're trapped like you're just done.  But it shows, like,

6  evidently Carmen can go wherever she wants.  But also I was

7  curious about that, too.  Evidently, I don't know, we really

8  don't know anything about Carmen.  But she was there in make-up

9  and she had, like, that's all there really is to say about her.

10      I was curious as to why she's not in the border

11 records because he everybody was about to go cross the border.

12 She didn't make it, you will assume she was interdicted and

13 stopped and this makes me wonder, is there even a Carmen?

14 Because they encounter people they have all the fingerprints

15 and the numbers, you know, and Carmen is nowhere in this case.

16 She's just innuendo, a statement out there floating.

17      And if we can go to the next slide.

18      We talked about this whole issue about refreshing

19 recollection and everything like.  We're basically saying, Do

20 you think this is an important detail?  If you're raped, and

21 listen, I mean, that's hard but as long as law

22 enforcement officials, as agents, as responsible professionals,

23 you would probe a witness or a victim.  Who else was there in

24 this?  And you wouldn't do it horrible to them.  You're with

25 social workers and help them in the system in leading you to

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Hueston

1   the truth because you don't want perpetrators to be out there

2   to hurt people.  The fact is that it's completely absent should

3   make you think.  They're not derelict in their obligations, but

4   I do have a criticism.  Because they had a witness on the stand

5   and they had those reports at the same time.  And I thinks

6   that's a fair criticism.

7           Let's go to the next slide.

8           The whole thing of breaking up condoms on a kitchen

9   table.  You can see she never said that before.  Now, again, I

10  mentioned a minute ago about, like, in terms of he pressure you

11  felt and I'm going to go to this again is that there is a

12  pressure, but the pressure really is from the Government.  I

13  mean, the reality is they are here at the Government's

14  agreement.  That's a reality and it's uncomfortable, though,

15  that tension, but if they go off narrative, if they say things

16  that aren't going to help them for their asylum petition, then

17  they can't stay.

18          So let's go to how the Government tried to defend

19  itself on this point.  The next slide.  Thank you.

20          Now, Ms. Hajjar asked about being shown notes.  Do you

21  remember that?  Have you ever seen those before?  I don't know.

22  I don't remember.  Did you write those notes or those reports?

23  Do you know what the agents wrote down?  I don't know.  And did

24  you discuss topics?  Obviously, topics that made you upset.

25  Just one of the things in terms of, like, the practice, like,

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation — Hueston

1    if there's a witness on the stand who is coming to testify

2    witness, wouldn't you go over your notes with the witness?

3         (Continued on the next page.)

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

1       (In open court.)

2           MR. HUESTON:  I mean, that's the whole point of taking

3   notes, unless -- or else they are useless.  I mean that's why

4   you memorialize things, so you can use them in the future.

5   It's really simple.

6           So it sort of struck me as odd that that information

7   hadn't been discussed with her apparently or provided to her,

8   and it should make you uncomfortable; and it shows reasonable

9   doubt.

10          I mean, maybe they can answer the question.  I don't

11  think they can, but you should demand that they answer that

12  question.

13          So if we can go to the last page.  So I have talked

14  about some of them already, but, you know, I guess the last one

15  is do you think your memory gets better over time, and, of

16  course, it doesn't.

17          I'm sort of close to being finished.  But I want to

18  talk to you, I want to show you something that really, I think,

19  you know, destroys Diana.  I mean this is the narrative the

20  government is saying.

21          Diana got here in July or August, something,

22  July 2006.  Right.  And then Abel arrived, you know, we know

23  reality was three months later or something like that.  That's

24  what she said earlier.  I'm not saying reality, because that's

25  crediting her too much.  We know she said that before.

MICHELE NARDONE, CSR -- Official Court Reporter

Summation - Hueston

1   She says, oh, there was this time all the men were

2   bragging about who had the youngest girl and they are laughing

3   and they are drunk; and, it's funny, the government put in a

4   piece of evidence -- and, again, you've got to go into the

5   weeds to pull it out; that's what a defender does.  It was the

6   records for Cristina Sanchez Sanchez, when she got arrested for

7   prostitution, because we really don't know how old she is.  We

8   don't.  We never heard from her.  We know nothing about her.

9   So I'm trying to pull in pieces to help you think

10  about it.  So if we can turn on the ELMO, because, again, he is

11  bragging -- and I want to lay the foundation -- Abel is

12  bragging that she is 14 or 15.

13  Now, let's look at this document.  They put it in as

14  Government Exhibit 217.  Do you see -- now, if we can do the

15  math, this is from July 2012.  And you see the age.  What's

16  that age?  Twenty-four.  Now you can do the math.  2006, maybe

17  18 or 17 -- I don't know, something.  So we don't know exactly

18  when she ever came.  We don't know her birthday.  I don't know

19  if it's in January.  I don't know if it's in February.

20  You certainly don't know.  You can't make a decision

21  based on it.  But I point it out to you because obviously Diana

22  is lying again, or else, you know, yeah, you have identity this

23  girl she is not; and on the New York City Police Department,

24  well, we put down any date.  But I guess we really don't know,

25  but it's only the real guiding light you have.  Remember, it's

MICHELE NARDONE, CSR -- Official Court Reporter

1   the clouds, it's the mist of trying to understand what is going

2   on.  That's something that helps you understand.

3          So what I like about that, it's sort of here they are

4   using it as a weapon, and I have turned it against them, to

5   help you understand.

6          Because Ms. Argo said -- these are her words -- he

7   started making fun of them, saying I have the youngest one.

8   She is 14 or 15.  Then she says, I think that's how old

9   Estephanie was at the time.  Well, Ms. Argo, you have this

10  also.

11         I brought it out to you because that's what a defender

12  does.  They had the document.  Frankly, the argument shouldn't

13  have been made.

14         Just a couple other things I want to talk about as I

15  conclude.

16         There is one other thing that really, you know, I

17  really have to go after Diana because she is really their case.

18  I'm going to -- I want to show you something.  It's sort of --

19  it's a risk, but that's what this job is.

20         You know, if you look at the wires, there is a very

21  interesting wire, and it really -- you have to get your head

22  around it, because evidently there is wires.  If you look at

23  that report -- I think I can bring it up.

24         Okay.  If we can have the screen back on.  Thank you.

25  I hope I did it right.  This is what's -- this is why,

MICHELE NARDONE, CSR -- Official Court Reporter

Summation - Hueston

1    actually, I love being a lawyer.  This is like Sherlock Holmes

2    type of stuff, CSI.

3            (Published.)

4            MR. HUESTON:  If you look here at the date, if you see

5    the date there, February 20, 2006, for Cristina Sanchez Sanchez

6    wiring money from Queens to Mexico.  And, if you can toggle

7    over, to Abel Romero-Melendez -- keep going -- who is in

8    Mexico.

9            I mean, I have proven that Diana lied.  There is not

10   one doubt.  She made all that up, because Estephanie, Cristina

11   Sanchez Sanchez, was evidently wiring money from Queens in

12   February 2006.

13           Now, it's a risk that I'm telling you this, but the

14   risk is simply that they are going to say, oh, this shows

15   something.  We already know that she sent money to Abel.  But,

16   again, he is not indicted for money laundering or distributing

17   proceeds.

18           We don't know their relationship.  We don't know how

19   she arrived.  We don't know her age.  We know nothing about

20   her, except innuendo.  And, oh, you think about this, though.

21   Here they put on a witness who said, oh, no, she came in July

22   of 2006.  At the same time they have records that she was here

23   in February 2006.  Answer that question.  They can't.  And if

24   they can't, you must acquit my client.

25           Now, I'm going to mention this.  I don't know if you

Summation – Hueston

1  have read the book Les Miserables.  There is Javert.  Javert is

2  so focused, and that's why he is a great -- excuse me, not

3  Javert -- yes, Javert.  He is great because he is a villain but

4  he doesn't know it.  Because he lost sense of what he is

5  supposed to be doing.

6        I mean, these are documents that they have, but I'm

7  pointing them out to you.  In their zeal -- I get it, you want

8  to stop something, you know, you want to send a message, you

9  want to hold people accountable.  But you can't put on a case

10  against a man and say, oh, yes, he was -- a woman was brought

11  here in July 2006 when you know from your own analysis she was

12  wiring money in February 2006.  That's not right.  That's a

13  loss of -- you have lost yourself.  You have lost yourself.

14        So, on behalf of my client, Abel Romero-Melendez, I

15  thank you for your time today.  I don't -- this is difficult.

16  I would love to have a jury duty once, but when they hear I'm a

17  lawyer no one keeps me.

18        I know you are taking your obligation seriously, and I

19  ask for the only verdict you can give my client, that is not

20  guilty on counts one, two, three, and four.  18, yes, he is

21  guilty.  But that's what beyond a reasonable doubt looks like.

22  He is here; he is guilty.

23        But you can't convict him on people who never

24  testified.  You can't convict him on people who obviously have

25  made -- who have lied to you.  It's wrong.  Thank you.

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1      THE COURT:  I gather lunch is here, ladies and

2  gentlemen.  Enjoy it.

3      THE CLERK:  All rise.

4      (Jury exits.)

5      THE COURT:  Okay.

6      MR. GOLD:  What time, judge?

7      THE COURT:  Be back at like 1:25, just in case they

8  eat fast.  Is that okay, 1:25?  You want the extra five

9  minutes?

10      (Lunch recess.)

11      (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1        A F T E R N O O N    S E S S I O N

2            (In open court.)

3            (Defendants not present; jury not present.)

4            THE COURT:  What I am considering and invite you to

5    tell me what you think is I think one of the three alternates

6    can't even stay tonight, but there are two who presumably can.

7            I am considering holding the alternates in the event

8    that we lose a juror.  This is going to be keeping the

9    alternates in a separate place, bringing them in for any

10   readback, and advising them that if they ever replace a juror,

11   telling the jury to start deliberating again.

12           MR. HUGHES:  That seems to make sense to me, judge,

13   especially with the health issue.

14           THE COURT:  Exactly.  Okay.  So everybody is on board

15   with that?

16           MS. KELLMAN:  Yes, judge.

17           (Defendants present.)

18           (Through the interpreter.)

19           THE COURT:  When I read the jury charge does anybody

20   mind if I drop reading the indictment and drop reading the

21   statutes and just go right to the elements?

22           MS. HAJJAR:  Yes.

23           MS. ARGO:  We are fine with that.

24           MR GOLUB:  No problem, judge.

25           MS. KELLMAN:  That will save an hour.

MICHELE NARDONE, CSR -- Official Court Reporter

Rebuttal – Hajjar

1          (Pause.)

2          THE CLERK:  All rise.

3          (Jury enters.)

4          THE COURT:  Please be seated.  Ms. Hajjar.

5          MS. HAJJAR:  Thank you.

6          Good afternoon.  As you heard, because the government

7   bears the burden of proof in this case, we have one last

8   opportunity to have the final word.  I'm going to try to move

9   efficiently and address as many of defense counsel's arguments

10  that you heard yesterday afternoon and this morning.

11          Now, over the past two weeks, you heard clear,

12  straightforward, overwhelming evidence as to every charge,

13  which you heard about in detail in the government's closing

14  argument.  Evidence beyond a reasonable doubt as to each and

15  every count and each and every defendant.  What you heard from

16  defense counsel, both yesterday and today, was really an

17  attempt to distract you from that evidence, distract you from

18  the powerful testimony that you heard.

19          In fact, some of the arguments that defense counsel

20  made really doubled down on what the defendants told the

21  victims when they were abusing them.  No one will believe you.

22  That's what the defendants said:  No one will believe you if

23  you go to the police.  You don't have any proof.  That's what

24  the defendants said to Delia.  That's what the defendants said

25  to Daisy.  That's what they said to Maria.

Rebuttal – Hajjar

1    You heard these women testify about their lives,

2  living in Queens in forced prostitution; that they had sex with

3  men who were twice their age, 15, 20 men per shift, how they

4  were beaten, how they were raped, how they gave all their money

5  to the defendants.  The truth came out at this trial.  The

6  defendants, the Melendez-Rojas family, trafficked women by

7  smuggling them into the United States and forcing them to work

8  as prostitutes.

9    Now, the defendants in this case, they don't want you

10 to listen to what the victims have to say.  They want you to

11 ignore what you heard from the witness stand.  And the defense

12 that was presented in this case really boils down to what the

13 defendants said day in and day out, no one is going to believe

14 you.

15    But that's not the case you heard over the past two

16 weeks.  You heard these women in their own voices, and we know

17 you listened carefully to the voices of these victims.  We know

18 you listened carefully to all the evidence in this case, and we

19 appreciate that; and now you get to make the decision about

20 whether you are going to believe these women, whether you are

21 going to hold the defendants accountable for what they did.

22 You get to make that choice.

23    Now, as I said and as defense counsel has said, they

24 have no burden.  The burden rests solely on us, the government,

25 and we welcome that burden.  But that doesn't mean you have to

Rebuttal - Hajjar

1    accept defense counsel's arguments to you, that you accept

2    their suggestions to you, you accept their invitations.  You

3    have to evaluate that against the actual evidence in the case,

4    which is the sworn testimony of the victims and the witnesses

5    that you heard and all of the other evidence that was admitted

6    in this case.

7              Now, defense counsel, they are all experienced and

8    they are all competent lawyers.  But you have to ask

9    yourselves:  What am I really being asked to do?  Because

10   defense counsel, they want you to believe that Maria, that

11   Daisy, that Delia, that Fabiola, that Veronica, they were all

12   working in prostitution voluntarily, they wanted to stay here

13   and they wanted to work in prostitution and they chose that

14   life for themselves and New York was a wonderful land of

15   opportunity for them.

16             To hear defense counsel describe it, it's like we

17   haven't been in the same courtroom at all.  The arguments

18   completely ignore the actual testimony that you heard in this

19   case.  Because you heard from Maria, and you heard what she

20   said about the first night she was working in prostitution, how

21   she had sex with over 30 men, how disgusted she felt, how she

22   wanted to run away, and how Jose Osvaldo told her that that was

23   a good first time for her and she would have to do it again the

24   next day.  It's on page 465 of the trial transcript.

25             Fabiola testified about Rosalio threatening her and

MICHELE NARDONE, CSR -- Official Court Reporter

Rebuttal – Hajjar

1    threatening her family; and you heard the same from Delia, you

2    heard the same from Daisy, from Veronica, and from Diana.   The

3    threats, the violence, the beatings, the rapes.   The testimony

4    was crystal clear.   The defendants forced these women to work

5    in prostitution, and they worked together to make it happen.

6          Now, defense counsel, they want you to ignore the

7    evidence and, in doing so, they have made a lot of arguments to

8    you that puts the blame on the victims.   Daisy, Veronica,

9    Maria, Delia, Fabiola, they should have known better.   They

10   couldn't have possibly wanted any other lives for themselves.

11   They knew what they were getting into; that these women chose

12   to do this, and the defendants had nothing to do with it.

13         Mr. Gold even described Delia as a businesswoman and

14   his client as a baby.   She made all the decisions.   It was all

15   her choice.

16         And you should reject these arguments.   I'm not going

17   to go through every single one, but I do want to highlight a

18   few of them.   If I could use the ELMO.

19         Because Mr. Golub yesterday spoke about Maria, and he

20   told you she was lying; and he referenced a portion of her

21   cross-examination that he said illustrated when Maria's sad

22   story fell apart, I think is the phrasing he used.   So I want

23   to look at that portion of Maria's cross-examination.

24         This is at transcript 552 to 553.

25         Line 5, on 552:  Okay.  So he wanted you to work out

MICHELE NARDONE, CSR –– Official Court Reporter

Rebuttal - Hajjar

1  and he also wanted you to eat healthy; is that correct.

2          Answer:  He would tell me what to eat because he

3  didn't want me to be ugly and fat.

4          A little further on, line 25:  Now, did you share a

5  bed with him every night?

6          Answer:  Yes.

7          Question:  And you had regular sexual, regular sexual

8  relations; is that correct?

9          Answer:  We had sex.  It wasn't always when I wanted

10 to.

11         Question:  But it wasn't as though he said, I'm

12 repelled by you and never had sex with you and he kicked you

13 out of the bed and said sleep on the floor, nothing like that

14 ever happened; is that correct?

15         Answer:  When we slept in the same bed he would make

16 me.  He would force me to take off my clothes.  He wanted to

17 have sex with me.  He didn't let me sleep on the floor.

18         Question:  Okay.  So it doesn't sound like somebody

19 that was repelled by your appearance, if he wanted to take your

20 clothes off so he can see you naked and have sex with you.

21 Would you agree with me?

22         Answer:  He just wanted to have sex.

23         I just want to remind you, members of the jury, that

24 this is the actual testimony that Mr. Golub is relying on when

25 he says that Maria's story fell apart, fell apart on probing,

MICHELE NARDONE, CSR -- Official Court Reporter

Rebuttal - Hajjar

1   fell apart when he was cross examining her.  And I ask you to

2   look at the actual testimony in this case, the actual evidence,

3   because that's what you have to rely on when you are making

4   your deliberations, the actual evidence.

5          Just because a lawyer says it, doesn't make it so.

6   That goes for me too, which is why I'm showing you portions of

7   this testimony, showing you what the victims actually said.

8          Now, I want to just show you one other example,

9   Mr. Dunn's cross-examination of Fabiola.  This is a theme that

10  came up again and again in this case.  This is at transcript

11  684 and 685, the bottom line 18.

12         Question:  You saw a lot of clients, right?

13         Answer:  Yes.

14         Question:  You said you saw anywhere from 15 to 30

15  clients a day; is that right?

16         Answer:  Yes.

17         Question:  And you worked every day of every month

18  that you were there, correct?

19         Answer:  Yes.

20         Of all these people that you saw, were there ever any

21  nice men that happened to be clients?  Did you ever see or meet

22  any nice men that were clients?

23         Now, at this portion of the cross-examination, members

24  of the jury, Fabiola had already testified that a client had

25  bit out a piece of her flesh from her cheek, she already

MICHELE NARDONE, CSR -- Official Court Reporter

Rebuttal - Hajjar

1  testified that she was raped at gunpoint by a client, she had

2  already testified that she had been choked so hard that the

3  neighbors had to break down the door to get her away from a

4  client who was choking her.

5        So the suggestion by defense counsel that she should

6  or could have turned to one of these men, these clients, for

7  help is completely out of touch.  It doesn't make any sense,

8  and it's belied by everything you saw and heard about what

9  these women had to go through, who these men really were and

10  what they did to them.

11        And you heard again and again defense counsel suggest

12  to you, as Mr. Gold did again this morning, that these women

13  had opportunities to escape or go to the police.  And because

14  you heard it so often I'm going to address that as best I can.

15        Because I want to make one thing clear at the outset.

16  You will hear Judge Ross instruct you on the law, but I expect

17  that you can read the jury instruction on sex trafficking all

18  day and all night and you won't see any mention of opportunity

19  to escape.  That's not an element of the crime.  It does not

20  matter when and if the victims were able to escape and how they

21  did so.  It just is irrelevant to your consideration of that

22  question.

23        But you did hear about their attempts to escape, and

24  you heard what happened to them when they did.  You heard from

25  Diana, who told you she tried to escape many times and what

MICHELE NARDONE, CSR -- Official Court Reporter

1  happened to her when she failed, when she was brought back,

2  that she was brutally beaten and raped in front of the other

3  members of that household.  And you heard from Delia, that she

4  did go to the police and she did give them her notebooks.

5       And all of this mention of the police, again and

6  again –– Mr. Gold brought it up again this morning –– use your

7  common sense.  Is it really any surprise to any of you that a

8  young woman, alone in the United States, isolated from her

9  family, who doesn't speak English, is told that she can't trust

10  the police, is told that she is going to be arrested and

11  deported?

12       Is it really any surprise to any of you that she

13  wouldn't go to her local NYPD precinct and say –– and ask for

14  help and report what was happening to her?  Of course not.

15       And you heard Maria's testimony that the police in

16  Mexico were corrupt; that the government was corrupt.  She

17  didn't trust them.  Of course these women didn't believe the

18  police would help them.  But, more importantly than that, just

19  because someone is afraid, just because someone doesn't trust

20  the police, and just because someone doesn't have the strength

21  to ask for help or the ability, doesn't mean they are not

22  worthy of your belief.

23       Because that was the defendants' plan all along.

24  That's how they made these women feel –– that they couldn't go

25  for help; that they didn't have any support; that they couldn't

MICHELE NARDONE, CSR –– Official Court Reporter

Rebuttal - Hajjar

1  turn to their families -- through threats and through fear, and

2  that's why it worked for so long.  You heard six victim

3  witnesses testify about conduct that spanned over ten years.

4  It worked because they were terrified.

5      I'm going to address some of Mr. Hueston's arguments

6  today concerning Abel Romero-Melendez.  Now, Mr. Hueston

7  mentioned that, and he talked a lot about the crimes that Abel

8  is not charged with.  But it is your job to focus on the crimes

9  with which he is charged; and he is charged, among other

10  crimes, with conspiracy to commit sex trafficking, sex

11  trafficking of a minor, conspiracy to transport minors to

12  engage in prostitutions, and sex trafficking of Diana.  And he

13  is every bit as guilty of those crimes as his codefendants are.

14      Now, Diana, you heard from her.  She had trouble

15  testifying.  It was very painful for her, I think quite

16  obviously.  She testified when she first arrived, she lived in

17  an apartment on Martense Avenue in Queens with Karina, who

18  worked for Rosalio and Magdaleno.  And sometime after that, she

19  testified, Abel and Cristina arrived at the apartment and began

20  to live with them.

21      Now, Mr. Hueston mentioned there was a wire record

22  that showed that Cristina Sanchez Sanchez, the person that

23  Diana knew as Estephanie, sent Abel money at some time prior to

24  that.  So, in other words, sent money from the United States to

25  Mexico in February 2006.  That's not inconsistent with Diana's

MICHELE NARDONE, CSR -- Official Court Reporter

Rebuttal - Hajjar

1    testimony at all.

2           All she said was at some time after her arrival Abel

3    and Cristina started to live with them.  And she knew that

4    prior to that Abel had been in Mexico; and so the -- the fact

5    that Cristina sent money to Abel in Mexico is entirely

6    consistent with what she testified to.  There is no

7    inconsistency there.

8           Now, Diana also testified that Abel participated in

9    everything that happened at that house, everything that

10   happened on Martense Avenue.  He was there counting condoms, he

11   was there taking money, he was there when Diana was punished

12   for, as she said, doing the wrong thing.  She was punished by

13   being beaten and punished by being raped.

14          I want to remind you of some of that testimony.  This

15   is on page 1264.  Diana described Estephanie to the jury, the

16   woman described as Cristina Sanchez Sanchez, and she describes

17   her as very young, very quite; and, at one point, she testified

18   that she saw Cristina very upset, she was sobbing.

19          This is the next page, 1265.  She didn't want to go.

20   Diana testified she was crying a lot, and later that day, she

21   said, I saw Abel breaking up the packets of condoms and putting

22   them into just one.

23          Is that similar to the way Karina this packed them and

24   showed you how to pack them?

25          Diana replied:  Yes.  She looked sad to me.

MICHELE NARDONE, CSR -- Official Court Reporter

Rebuttal – Hajjar

1        Now, Mr. Hueston spoke a lot about purported

2   inconsistencies about the timing of Abel's arrival in the

3   United States and when the rape that Diana described occurred;

4   but he didn't show you the redirect on this point.  This is on

5   page 1342.  She was very clear.

6        Diana, you testified earlier today about a rape that

7   occurred in front of other people you were living with.  Do you

8   remember that?

9        Answer:  Yes.

10       Question:  Did it happen before or after Abel arrived

11  in the United States?

12       Answer:  That was after Abel arrived.

13       Question:  Was it just once, or were there several

14  occasions where you were raped?

15       It was several times.

16       Abel participated in everything that went on in that

17  house.  And why?  Why?  Why did this happen?  Why was she raped

18  in front of Karina and Estephanie?  To show them what happens

19  if they tried to escape, if they hid money, if they did any of

20  the things that Diana was punished for.

21       Abel was Miguel and Rosalio's younger cousin, their

22  protege.  He was learning what to do to the women that he

23  brought in, and you heard about Cristina Sanchez Sanchez and

24  you heard about her working for the defendant.  You heard

25  testimony from multiple witnesses about her working for Abel in

MICHELE NARDONE, CSR –– Official Court Reporter

Rebuttal - Hajjar

1    the years that followed.  Because he followed in their

2    footsteps.  He did the same things that he was taught to do.

3           Now, Mr. Hueston described this as the Diana gambit,

4    that Diana was lying, he says.  Ask yourself:  What possible

5    motive did Diana have to lie to you?  Defense counsel wants you

6    to believe that these women were master manipulators; that they

7    all got on the witness stand and lied to you; that their

8    testimony was manufactured.  But you saw them testify with your

9    own eyes, you saw their demeanor.

10          And think about what it takes to do that:  To come

11   into this big, grand courtroom and to testify about the

12   absolute worst moments in your life; the times you were taken

13   advantage of, sexually, emotionally, physically; about the

14   times you were tricked or duped into having abortions.  Think

15   about the courage that it takes to do something like that.  Not

16   only to do that, but then to be asked questions aggressively by

17   defense counsel about these worse moments, these horrible

18   moments, and ask yourself if they are doing it because they

19   think they are getting something from the government.

20          The witnesses told you.  Maria, Delia, Daisy,

21   Veronica, Fabiola, they all told you they haven't been promised

22   a visa.  They haven't been promised anything.

23          Defense counsel keeps mentioning asylum.  At least

24   three defense counsel mentioned asylum.  Look at the

25   transcripts.  The word "asylum" doesn't come up once.  It comes

MICHELE NARDONE, CSR -- Official Court Reporter

Rebuttal – Hajjar

1  in a cross-examination of a witness, in which the witness said

2  no to do you ever apply for asylum.  There is no evidence in

3  the record that this is a benefit that these victims were

4  receiving from government.

5       Daisy told you why she was testifying.  She told you.

6  She said she wanted to tell you what happened so other people

7  wouldn't have to suffer what she went through.

8       Veronica, you heard from her yesterday.  As

9  Ms. Kellman said, she is spunky.  You heard what she said in

10  response to that question, and this is on page 1444 and 1445.

11       I am talking about this because of what was done to

12  me, not because of the documents, ma'am.  Even if I had to go

13  back to Mexico so that Miguel and his family pay for what they

14  did to me, I would do it anyway.

15       I'm going to move to some of the arguments that

16  Mr. Gold made this morning.  Now, Mr. Gold spent a lot of time

17  on Delia, and it's true that Delia struggled to remember some

18  details of her life with the defendants.

19       I want to point you to an early portion of Mr. Gold's

20  cross-examination of Delia.  This is where the

21  cross-examination begins.  The transcript is page 866.  This is

22  where cross-examination begins; and, early on, on page 874, he

23  asked Delia the following questions.

24       Now, you indicated that your home life prior to

25  meeting Francisco, that your home life was pretty awful,

MICHELE NARDONE, CSR -- Official Court Reporter

Rebuttal — Hajjar

1   correct?

2           That's correct.

3           You had been raped by your father and by your uncle?

4           That's correct.

5           And, in fact, you ran away from them?

6           Yes.

7           It goes on.  The next page, 875.

8           Now, the very first night you spent when you went back

9   with him to his family, he raped you, didn't he?

10          Answer:  Well, we had sex that night, but he did

11  something that I didn't want.

12          Question:  And you told him you didn't want.

13          Answer:  Yes, that's correct.

14          Question:  And he forced you to do?

15          Answer:  Exactly.

16          Question:  That's rape, isn't it?

17          Answer:  Yes.

18          And after the first night that he raped you, the

19  following morning, did you go to his mother and say, hey, your

20  son just raped me?

21          Answer:  I didn't say anything to her.

22          Question:  In fact, you didn't say anything to

23  anybody, did you?

24          Answer:  Who was I go to tell?  I didn't tell anybody

25  then.

MICHELE NARDONE, CSR —— Official Court Reporter

Rebuttal - Hajjar

1      The bottom of this page, Mr. Gold asks her why she
2  didn't run out in the street screaming, arrest this man, he
3  raped me.
4      At the time your father and your uncle raped you, did
5  you know you were being raped then?
6      I didn't know that.
7      Now, everyone responds to cross-examination
8  differently and responds to stress differently, and you know
9  that from your common sense and you know that because you saw
10  the victims on the witness stand answer questions differently.
11  You saw that some of these women were able to talk about these
12  traumatic moments and some, like Diana, struggled.  They
13  struggled to speak openly about what had happened to them,
14  these moments of trauma.
15      And that's because these people are human beings.
16  They are being cross examined about the worst moments in their
17  lives.  And what Delia was being asked to talk about right
18  away, right off the bat, is whether she knew she was being
19  raped by her father and her uncle as a child.  It's not
20  surprising that Delia had a hard time remembering the details
21  of her life living in Queens with Francisco.  It's not
22  surprising at all.
23      Delia was very clear, though, about what she did
24  remember:  What she was doing working as a prostitute and who
25  she was doing it for, Francisco, who was following in his

MICHELE NARDONE, CSR -- Official Court Reporter

Rebuttal - Hajjar

1  uncle's footsteps.  She remembered being abused, she remembered

2  being afraid, she remembered being forced to engage in

3  prostitution again and again and again.

4          How do you know she is telling the truth?  Because her

5  testimony is corroborated by the physical evidence and the

6  other testimony that you heard.

7          You heard from Daisy.  Daisy lived with Delia, and

8  Daisy testified that Delia worked as a prostitute for Francisco

9  and Francisco kept telling her that she didn't bring him enough

10  money; and she also testified that Delia appears to be 16 or 17

11  years old.  That's on pages 231 and 261 of the transcript.

12          Maria also testified about how Francisco recruited

13  Delia.  Fabiola lived with Delia too, and Fabiola also said

14  that Delia worked in prostitution for Francisco and she was

15  about 16 years old at the time.  That's the transcript 708 --

16  709.

17          Veronica.  Mr. Gold made a lot about this.  He said

18  that she only knew her as Katerina and by no other name, and

19  that's somehow suggests that this was all made up because Delia

20  didn't give her her real name.

21          (Continued on the next page.)

22

23

24

25

MICHELE NARDONE, CSR -- Official Court Reporter

Rebuttal – Hajjar

1      (In open court.)

2          MS. HAJJAR:  First of all, if wasn't Katerina, it was

3   Catherine.  And the reason why she gave her the name Catherine

4   is established by many of the other victim witnesses in this

5   case.  That was her work name, that was the name she gave when

6   she was working in prostitution, Catherine.  That's what the

7   other witnesses knew her by, so it's perfectly consistent with

8   their testimony.  It only underscores, it doesn't undermine,

9   what Delia told you.  These witnesses, they're all different

10  women.  They're all testifying independently, but they're

11  testifying consistently about the same events taking place over

12  years.  Where they lived, who they lived with, who they worked

13  for.  And why?  Because that's the thing about the truth:  It's

14  simple, it fits together, it's consistent.  All of these

15  witnesses told you that Delia was working in prostitution for

16  Francisco because that's what happened.  That's the truth.

17          And I just want to address one other thing as it

18  relates to both Count Ten and Count Four.  So that's the sex

19  trafficking of Delia and the sex trafficking of Diana.  You

20  heard more than sufficient proof that Diana and Delia were

21  forced to work in prostitution.  I'm not going to back and

22  explain and show you all the testimony all over again.  You

23  heard it in detail in my colleague's closing argument.

24          But what I want to highlight is that for these counts,

25  the Government does not have to prove the defendants actually

Rebuttal – Hajjar

1  used force, fraud, or coercion to make Diana or Delia work in

2  prostitution.  All that's required is that they knew, or in the

3  case of Delia, they recklessly disregarded how old she was.

4  And that's because a minor cannot consent to be prostituted,

5  cannot consent to be sexually exploited.

6       And these facts, these elements were effectively

7  conceded by Mr. Gold in his summation.  He conceded Delia was

8  14.  He concede Delia was working as a prostitute.  He conceded

9  that Francisco made money off of her and she sent that money to

10  his family.  He even conceded that Francisco hit her.

11       Now, Mr. Gold showed you wire summary charts and he

12  asked, Well, why isn't it in the chart that because Delia

13  started working in October 2010 he said why aren't there any,

14  you know, wire transfer records reflecting payments to Mexico?

15  First of all, she started working in October of 2010, late in

16  that year, but also who is paying the rent?  Who is buying the

17  designer clothes that Francisco is wearing?  Who is buying the

18  food?  There's only one breadwinner in this household, and the

19  breadwinner was Delia, Francisco was not making any income.

20  And yet, I really urge you to look at the wire transfer records

21  because Francisco is sending thousands of dollars to Mexico.

22  And where is that money coming from?  It's off the back of

23  Delia.  It's what she's doing, it's her work that's generating

24  money.  It's that money that's being sent to Mexico.  She's the

25  only breadwinner there.

Rebuttal - Hajjar

1  Now, I'm going to just briefly address reasonable

2  doubt because it was emphasized by all defense counsel in their

3  closings.  And you'll hear Judge Ross instruct you on that

4  standard.  It's reasonable doubt, it's the same burden of proof

5  that's used in every criminal trial in this district in the

6  country.  And that's why we didn't just call one witness, two

7  witnesses, three witnesses, four witnesses.  You heard from six

8  victim witnesses and their testimony was consistent with each

9  other.  And it was consistent with the wire records, the border

10 crossing records, and the physical evidence that you saw in

11 this case.  We presented all of this evidence to you so you can

12 be confident in your decision because we've met that burden

13 here.

14  This case is about the victims.  It's about the women

15 that you heard from.  It's about their courage coming in here

16 and telling you a group of strangers, about the horrible things

17 that happened to them.  The victims have been waiting years for

18 this day to finally have their voices heard so their suffering

19 wouldn't be in vain.  Many of them were upset on the witness

20 stand and it was difficult testimony to listen to.  But as hard

21 as it was for them, as hard it was for us, it was worse for

22 them.  It was worse for them to relive and to experience on the

23 witness stand.

24  Very soon this case is going to be in your hands.  I'm

25 almost done talking and I'm going sit down in a moment, and

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Rebuttal – Hajjar

1    before I do that I want to thank you for paying such close

2    attention to the evidence in this case.  Every case is

3    important but not every case is hard and not every case is

4    close.  This isn't a close case.

5         The Melendez-Rojas family, the defendants you see

6    before you.  They smuggled women into this country.  They

7    worked together to force them to work as a prostitutes and they

8    profited off of them.  It was all for their benefit and their

9    family's benefit.  And now, it's time for you to hold these

10   defendants accountable for what they did; for the pain they

11   caused and the damage they did to these women who will be

12   holding that with them for the rest of their lives.  Find them

13   guilty because it's what the evidence shows and find them

14   guilty because it's what justice demands.

15        Thank you.

16        THE COURT:  Ladies and gentlemen, now that the

17   evidence in the case has been presented and the attorneys for

18   the Government and for the defendants have concluded their

19   closing arguments, it's my responsibility to instruct you as to

20   the law that governs the case.  My instructions will be in

21   three parts.

22        First, I will instruct you regarding the general rules

23   that define and govern the duties of the jury in a criminal

24   case.

25        Second, I'll instruct you as to the legal elements of

Jury Charge

1   the crimes charged in the indictment -- that is, the specific

2   elements that the Government must prove beyond a reasonable

3   doubt for you to find a defendant guilty.

4        Third, I will instruct you as to some general rules

5   regarding your deliberations following these instructions.

6        To begin with, as you know, it is your duty to find

7   the facts from all the evidence in the case.  You are the sole

8   judges of the facts.  It is for you and you alone to pass upon

9   the weight of the evidence, to resolve such conflicts as may

10  have appeared in the evidence, and to draw such inferences as

11  you deem to be reasonable and warranted from the evidence.

12  With respect to any question concerning the facts, it is your

13  recollection of the evidence that controls.

14       You must apply the law in accordance with my

15  instructions to the facts as you find them.  While the lawyers

16  may have commented on some rules of law, you must be guided

17  only by what I instruct you about the law.  You should not be

18  concerned about the wisdom of any rule of law that I state

19  regardless of any opinion you may have about what the law may

20  be -- or should be -- it would be a violation of your oaths as

21  jurors to base your verdict upon any other view of the law

22  other than the one given to you in these instructions.

23       As I've said, the fact that the prosecution is brought

24  in the name of the United States government does not entitle

25  the Government to any greater consideration than the

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Jury Charge

1   defendants.  By the same token, the Government is entitled to

2   no less consideration.  The parties -- the Government, and the

3   defendants -- are equal before this court, and they're entitled

4   to equal consideration.  Neither the Government nor the

5   defendants are entitled to any sympathy or favor.

6        The indictment as I have said filed against these

7   defendants is the means by which the government gave notice to

8   the defendants of the charges against them and brought them

9   before the Court.  The indictment is an accusation and nothing

10  more.  The indictment is not evidence.  You are to give to no

11  weight in arriving at your verdict.  The defendants, in

12  response to the indictment, pleaded "not guilty."  A defendant

13  is presumed to be innocent unless the Government proves his

14  guilt beyond a reasonable doubt.  That presumption alone,

15  unless overcome, is sufficient to acquit a defendant.  That

16  presumption is overcome only if you, the jury, decide

17  unanimously that the Government has proven a defendant guilty

18  beyond a reasonable doubt.

19       Since the law presumes a defendant to be innocent, the

20  burden of proving a defendant's guilt beyond a reasonable doubt

21  is on the Government throughout the trial.  A defendant never

22  has the burden of proving his innocence or producing any

23  evidence at all.  If the Government does not meet its burden of

24  proving beyond a reasonable doubt that a defendant is guilty,

25  you must find that defendant not guilty.

Jury Charge

1    Proof "beyond a reasonable doubt" does not mean proof

2    beyond all doubt.  It is not necessary for the Government to

3    prove the guilt of a defendant beyond all possible doubt.  The

4    test is one of reasonable doubt.

5    A reasonable doubt is a doubt based upon reason and

6    common sense.  The kind of doubt that would make a reasonable

7    person hesitate to act.  Proof beyond a reasonable doubt must

8    therefore be proof of such a convincing character that a

9    reasonable person would not hesitate to rely on and act upon it

10   in the most important of his or her own affairs.  A reasonable

11   doubt, however, is not a doubt that arises out of whim or

12   speculation.  A reasonable doubt is not an excuse to avoid the

13   performance of an unpleasant duty.

14   If, after a fair and impartial consideration of all

15   the evidence in the case, you can honestly say you have such a

16   doubt based on all the evidence or lack of evidence in the case

17   as would cause prudent persons to hesitate to act in matters of

18   importance in their own lives then you have a reasonable doubt.

19   In that event, it is your duty to acquit the defendant.

20   If, on the other hand, after a fair and impartial

21   consideration of the evidence, you can honestly say that you

22   have such an abiding belief in the guilt of a defendant that

23   you would be willing to act upon a similarly strong conviction

24   in the most important matters of your own lives then you have

25   no reasonable doubt, and, in that circumstance, you should

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Jury Charge

1    convict.

2           I'll now instruct you as to what evidence is and how

3    you should consider it.  The evidence which you are to consider

4    in deciding the facts in this case comes in several forms:

5           Sworn testimony of witnesses, both on direct and

6    cross-examination regardless of who called the witness is

7    evidence.

8           Exhibits that have been received into evidence by the

9    Court are evidence.

10          Facts to which the lawyers have agreed or stipulated

11   are evidence.  A stipulation is an agreement among the parties

12   that a certain fact is true.  You should regard such agreed

13   facts as true.

14          You've also heard evidence concerning a variety of

15   investigative techniques including evidence recovered from a

16   search which occurred during the course of the Government's

17   investigation of the case.  The search was lawful, and the law

18   enforcement officers who conducted the search acted in

19   accordance with the law.  I instruct you that any evidence

20   presented to you was obtained legally and can be considered by

21   you.

22          Certain things were not evidence and are to be

23   disregarded by you in deciding the facts:

24          Arguments or statements by lawyers are not evidence.

25          Questions put to the witness is not evidence.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Jury Charge

1    Objections to questions or offered exhibits are not

2    evidence.  In this regard, I instruct you that the attorneys

3    have a duty to their clients to object when they believe

4    evidence should not be received.  Therefore, you should not be

5    influenced by the objection or by the Court's ruling on it.  If

6    the objection was sustained, ignore the question and any answer

7    that followed.  If the objection was overruled, treat the

8    answer like any other answer.

9    Obviously, anything that you may have seen or heard

10   outside this courtroom is not evidence.

11   Nothing I have said or done should be used by you in

12   inferring innocence or guilt.  I have no view of the guilt or

13   innocence of the defendants.

14   There are, generally speaking, two types of evidence

15   from which you may properly find the truth of the facts.  One

16   is direct evidence such as the testimony of an eyewitness who

17   saw the event firsthand, or directly.  The other is indirect or

18   circumstantial evidence.  This is the proof of a chain of

19   circumstance pointing to the existence or nonexistence of

20   certain facts.

21   A simple example of circumstantial evidence would be

22   the following:  If you came into court on a bright sunny day

23   and then.  After several hours in a courtroom with the window

24   shades drawn, you saw people entering, one wearing a wet

25   raincoat and the next shaking a wet umbrella, you might infer

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Jury Charge

1   from those circumstances without going outside or even look at

2   out at window, that it had rained while you were here in court.

3   You would have no direct evidence, but you might reasonably

4   infer that it had rained.  This is not speculation or a guess,

5   this is an inference based on evidence.

6          So in a trial, you are permitted to draw, from facts

7   you find to have been proven, such reasonable inferences or

8   conclusions as seem justified in light of your experience and

9   common sense.  The law makes no distinction between direct and

10  circumstantial evidence.  You may have consider both.  What the

11  law does require is that, before a defendant is convicted of a

12  crime, the jury be satisfied of his guilt beyond a reasonable

13  doubt based on its assessment of all the evidence in the case.

14         You've heard evidence about the involvement of certain

15  other people in the crimes charged.  You may not draw any

16  inference, favorable or unfavorable, towards the Government or

17  the defendants from the fact that other persons are not on

18  trial before you.  That these other individuals are not on

19  trial is not your concern.  You should neither speculate as to

20  the reason these people are not on trial before you nor allow

21  their absence as parties to influence in any way your

22  deliberations in the case.  Your concern is solely with the

23  defendants on trial.

24         Your verdict must be based solely upon the evidence

25  developed at trial, or lack of evidence.  It would be improper

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Jury Charge

1    for you to consider, in reaching your decision as to whether

2    the Government sustained its burden of proof, any sympathy or

3    favor for one side or the other or any personal feelings that

4    you may have about the defendants' race, religion, national

5    origin, ethnic background, gender or age.

6              (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Jury Charge

1          (In open court.)

2          THE COURT (CONTINUING):  All persons are entitled to

3    the presumption of innocence.

4          It's equally improper for you to allow any feelings

5    that you might have about the nature of the crimes charged to

6    interfere with your decision-making process.  To repeat, your

7    verdict must be based exclusively upon the evidence or lack of

8    evidence relating to the crimes charged in the case.

9          The question of possible punishment is of no concern

10   to the jury, and it should not in any sense enter into or

11   influence your deliberations.  The duty of imposing sentence

12   rests exclusively upon the Court.  Your function is to weigh

13   the evidence in the case and determine solely upon the basis of

14   the evidence whether or not a defendant is guilty beyond a

15   reasonable doubt of the crimes charged against him not

16   indictment.

17         You're heard testimony of several witnesses and

18   watched the introduction of other evidence.  The fact that one

19   party called more witnesses and introduced more evidence than

20   another does not mean that you should necessarily find facts in

21   favor of the side offering the most witnesses.

22         There are several persons whose names you have heard

23   during the course of the trial but who did not appear here to

24   testify.  I instruct you that each party has an equal

25   opportunity or lack of opportunity to call any of these

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1    witnesses.  Therefore, you should not draw any inference or

2    reach any conclusion as to what they would have testified to

3    had they been called.  Their absence should not affect your

4    judgment in any way.  You should, however, also remember my

5    instruction that the law does not impose on a defendant in a

6    criminal case the burden or duty of calling any witnesses or

7    producing any evidence.

8         Additionally, the law does not require that all things

9    mentioned during the course of the trial be produced as

10   exhibits.  The law further does not require that any particular

11   investigative technique be used by law enforcement authorities

12   to uncover and prosecute crime.  Law enforcement techniques are

13   not your concern.  Your concern is to determine whether or not,

14   based upon all the evidence or lack of evidence presented in

15   the case, the Government has proven that a defendant is guilty

16   beyond a reasonable doubt.

17        There was testimony at trial that the attorneys for

18   the Government interviewed witnesses when preparing them for

19   trial.  You should not draw any unfavorable inference from that

20   testimony.  To the contrary, the attorneys for both sides were

21   obliged to prepare this case as thoroughly as possible and

22   would have been derelict in the performance of their duties if

23   they had failed to interview witnesses before the trial began.

24        As I mentioned earlier, you are the sole judges of the

25   credibility of the witness and the weight that the testimony

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1    deserves.  In determining whether a witness speaks the truth,

2    you may consider the appearance and conduct of the witness, the

3    manner in which the witness testified, the character of the

4    testimony given, and any evidence contrary to the testimony

5    given.  You should carefully scrutinize all of the testimony

6    given, the circumstances under which each witness has

7    testified, and any other matter in evidence which tends to

8    indicate whether to believe a witness.  Consider each witness's

9    bias, prejudice, hostility, interest, and partisanship with

10   respect to the prosecute or defense of the case and the

11   witness's demeanor while on the stand.

12          Inconsistencies or discrepancies in the testimony of a

13   witness or between the testimony of different witnesses may or

14   may not cause you to discredit the witness's testimony.  Two or

15   more persons witnessing an incident or a transaction may see or

16   hear it differently.  An innocent misrecollection, like failure

17   of recollection, is not uncommon.  In weighting the effect of

18   the discrepancy, consider whether it pertains to a matter of

19   importance or to an unimportant detail and whether it results

20   from innocent error on the one hand, or intentional falsehood

21   on the other.

22          The testimony of a witness may be discredited by

23   showing that the witness previously made statements which are

24   inconsistent with the witness's present testimony.  It is your

25   job to determine the weight, if any, to be given all or part of

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1  the testimony of a witness who has been impeached by such

2  statements.  If you find that a witness made such a statement,

3  you may consider that in your assessment of the witness's

4  credibility.  In other words, you may consider whether or not

5  you believe the witness or except his or her testimony at trial

6  in light of the prior statement.  In making this determination,

7  you should consider the importance of the matter to which the

8  statement related.  If you find that the matter was relatively

9  trivial, you may decide not to attach much significance to the

10 inconsistency.

11       On the other hand, if the matter to which the prior

12 inconsistent statement related is important, you may decide to

13 cast a substantial doubt on the witness's credibility.  You may

14 also consider whether the witness had an explanation for the

15 inconsistency, and whether that explanation appealed to your

16 common sense.

17       Defendants have elected not to testify in this case.

18 Under our constitution, a defendant in a criminal cause has no

19 obligation to testify or present any evidence because as I have

20 discussed, it is the Government's burden to prove his guilt

21 beyond a reasonable doubt.  A defendant is never required to

22 prove his innocence, nor is he required to prove any evidence

23 at all.  You may not draw any adverse inference against a

24 defendant because he did not take the witness stand.  You must

25 not consider this fact in any way during the course of your

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1 deliberations.

2      In this case, you have heard the testimony of law

3 enforcement agents.  The testimony of these witnesses should be

4 evaluated in the same way as the testimony of any other

5 witness.  The fact that a witness is in law enforcement does

6 not justify affording that witness's testimony any more or less

7 credence than the testimony of any other person.  You should

8 evaluate the testimony of law enforcement witnesses not same

9 manner as you would the testimony of any other witness using

10 all of the tests of credibility as I have discussed with you.

11 It is your decision after review of all of the evidence whether

12 to accept the testimony of a law enforcement witness and to

13 give it whatever weight, if any, it deserves.

14      In this case the Government has introduced what are

15 known as demonstrative exhibits, which include charts,

16 diagrams, and the like.  These demonstratives exhibits were

17 shown to you in order to make the other evidence more

18 meaningful and to aid you in considering the evidence.  They

19 are no better than the testimony or the documents upon which

20 they are based and are not themselves independent evidence.

21 Therefore, you are to give no greater consideration to these

22 demonstrative exhibits than you would give to the evidence upon

23 which they are based.  It is for you to decide whether these

24 exhibits correctly present the information contained from the

25 testimony of the exhibits on which they are based.  You are

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1    entitled to consider these demonstrative exhibits if you find

2    they are of assistance to you in analyzing and understanding

3    the evidence.

4            The defendants are formally charged in the superseding

5    indictment, which I will simply call "the indictment."  As I

6    instructed you at the beginning of this case, an indictment is

7    a charge or accusation.  The indictment in this case contains

8    16 separate counts.  You will be called upon to render a

9    separate verdict on each count as to each defendant.  You must

10   consider each count separately as to each defendant who is

11   charged in it, and must return a verdict based only upon the

12   evidence as it relates to that specific count and that specific

13   defendant.  Whether you find a defendant guilty or not guilty

14   as to one count, should not affect your verdict as to any of

15   the other charged counts.

16           Before I explain the elements of the charge, I have

17   already noted that the indictment alleges certain acts occurred

18   in and about and between certain dates.  If the indictment

19   charges that a specific act occurred on a certain date and the

20   evidence indicates that it may have occurred on another date in

21   time, the law requires only the substantial similarity between

22   the dates and times alleged in the indictment and the dates and

23   times established by testimony or exhibits.

24           I will now instruct you as to the legal elements of

25   the crime charged.  During these instructions you will hear me

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1    use the words "knowingly and intentionally."  A person acts

2    knowingly when he acted intentionally and voluntarily and not

3    because of ignorance, mistake, accident, or carelessness.

4    Whether a defendant acted knowingly may be proven by his

5    conduct and by all of the facts and circumstances surrounding

6    the case.  A person acts intentionally when he acts

7    deliberately and purposefully.  That is a defendant's acts must

8    have been the product of his conscious objective decision,

9    rather than the product of a mistake or accident.  These issues

10   of knowledge and intent require you make a determination about

11   a defendant's state of mind, something that can wearily be

12   proved directly.

13           A wise and a careful consideration of all of the case

14   circumstances of the case, however, permit you to make such a

15   determination as to the defendant's state of mind.  Indeed, in

16   your everyday affairs you are frequently called upon to

17   determine a person's state of mind, to preserve his or her

18   words and actions in given circumstances.  You are asked to do

19   the same here.

20           I will now instruct you on the law of conspiracy.  You

21   should understand that a conspiracy is an offense separate from

22   the commission of any offense that may have been committed

23   pursuant to the conspiracy.  That's because the formation of a

24   conspiracy of a partnership for criminal purposes is in and of

25   itself a crime.  If a conspiracy exists, even if it fails to

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1    achieve its purpose, it is still punishable as a crime.   The

2    essence of the charge of conspiracy is an understanding or

3    agreement between or among two or more persons that they will

4    act together to accomplish a common objective that they know is

5    unlawful.

6         The two elements of the crime of conspiracy are as

7    follows:  First, that two or more persons entered into the

8    unlawful agreement charged in the conspiracy count that you are

9    considering.  And second, that the defendant you are

10   considering knowingly and intentionally became a member of the

11   conspiracy.

12        Let me discuss these two elements in a little more

13   detail:  First, as to the existence of the charge of

14   conspiracy, the Government must prove that two or more persons

15   entered into the unlawful agreement that is charged in the

16   count that you are considering.  One person cannot commit the

17   crime of conspiracy alone.  Rather the proof must be convince

18   you that at least two people joined together in a common

19   criminal scheme.  In order for the Government to satisfy this

20   element, you need not find that the alleged members of the

21   conspiracy met together and entered into any express or formal

22   agreement.  Similarly, you need not find that the alleged

23   conspirators stated in words or writing that the scheme was,

24   what its object or purpose was, or every precise detail of the

25   scheme or the means by which its object or purpose was to being

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1    accomplished.  What the Government must prove is that there was

2    a mutual understanding either spoken or unspoken between two or

3    more people to cooperate which each other to accomplish an

4    unlawful act.  You may, of course, find that the existence of

5    an agreement to disobey or disregard the law has been

6    established by direct proof.  However, since conspiracy is by

7    its very nature charactered by secrecy, you may also infer its

8    existence from the circumstances of the case and the conduct of

9    the parties involved.

10           In a very real sense, then, the context -- not context

11   of conspiracy cases, actions often speak louder than words.  In

12   this reckless disregard, you may in determining whether an

13   agreement existed here, consider the actions and statements of

14   all those you find to be participants as proof that a common

15   design existed on the part of the person charged to act

16   together to accomplish an unlawful purpose.

17           The second element requires that if you find a

18   conspiracy existed, you must determine whether the defendant

19   you are considering was a member.  That is, you must determine

20   whether he participated in the conspiracy willfully, with

21   knowledge of its unlawful purpose, and in furtherance of its

22   unlawful purpose.  To act willfully means to act knowingly and

23   purposefully with an intent to do something the law forbids,

24   that is to say with a bad purpose either to disobey or

25   disregard the law.

Jury Charge

1    A defendant's knowledge is a matter of inference from

2 the facts proved.  To become a member of the conspiracy, the

3 defendant you are considering need not have known the

4 identities of any member, nor need he have been apprised of all

5 of their activities.  Moreover, the defendant need not have

6 been fully informed as to all of the details or the scope of

7 the conspiracy in order to justify an inference of knowledge on

8 his part.  The extent or duration of the defendant's

9 participation in the conspiracy has no bearing on the issue of

10 guilt.

11    Each member of the conspiracy may perform separate and

12 distinct acts and may perform them at different times.  Some

13 conspirators may play major roles, while others play minor

14 roles in the scheme.  An equal role is not what the law

15 requires.  In fact, a single act may be sufficient to draw a

16 particular defendant within the scope of the conspiracy.

17 However, I will stress that merely being present at a place

18 where criminal contact is underway, does not make a person a

19 member of a conspiracy to commit that crime.  This is true even

20 if the person knows that a crime is being committed.  Mere

21 knowledge of or acquiesce in the unlawful plan without

22 participation is not sufficient.  Nor does the defendant's mere

23 association with one or more members of the conspiracy

24 automatically make that defendant a member.  A person may know,

25 be friendly with, or work with a criminal without being a

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1   criminal himself.  More is required under the law.  What is

2   required is proof beyond a reasonable doubt that a defendant

3   participated not plan with knowledge of its objective and with

4   the intent to help achieve that unlawful end.

5        The key inquiry is simply whether the defendant you

6   are considering, understanding the conspiracy's unlawful

7   character intentionally assisted in it in order to aid the

8   accomplishment of some unlawful purpose.  If so, he is a

9   knowing and willful participant not unlawful agreement, that is

10  to say, a conspirator.

11       Before turning to the specific crimes charged, I'll

12  also inform you of the principal of aiding and abetting

13  liability.  Under the aiding and abetting statute, it's not

14  necessary for the Government to prove the defendant himself

15  physically committed the crime in order to find the defendant

16  guilty.  If you find beyond a reasonable doubt that a defendant

17  knowingly and intentionally helped another person not

18  submission of the crime, he is as guilty as if he personally

19  committed it.

20       To convict a defendant on the ground that he aided and

21  abetted the commission of a crime charged, the Government must

22  first prove that another person committed the crime.  No one

23  can be convicted of aiding and abetting a criminal act of

24  another if no crime was committed by the other person not first

25  place.  If you do find that a crime was committed, then you

Jury Charge

1    must determine whether the defendant you are considering aided

2    or abetted the commission of that crime by knowingly of the

3    crime and participated not crime by doing some act with the

4    intent to have the crime succeed.

5          In order for the defendant you are considering to be

6    convicted under an aiding and abetting theory, he must have had

7    more than mere knowledge that a crime was being committed and

8    acquiesced not finishing of the crime.  The mere presence of a

9    defendant where a crime is being committed, even coupled with

10   knowledge by the defendant that a crime is being committed or

11   merely associating with others who are committing a crime, is

12   not sufficient to establish aiding and abetting.  The defendant

13   must participate by knowingly and intentionally seeking by some

14   act to make the criminal venture succeed.

15         The charges against the defendants allege that they

16   participated in certain conspiracies.  In that reckless

17   disregard, I admitted into evidence against the defendants the

18   act and statements of other, because these acts and statements

19   were committed by persons who the Government charges were also

20   co-conspirators of the defendants on trial.  The reason for

21   allowing this evidence to be received against the defendants,

22   has to do with the nature of the crime of conspiracy.  A

23   conspiracy is often referred to as a partnership in crime.

24   Thus, as in other types of partnerships when people enter into

25   a conspiracy to accomplish an unlawful end, each and every

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1  member becomes an agent of the other conspirators in carrying

2  out the conspiracy.

3       Accordingly, the reasonably foreseeable acts,

4  declaration, statements, and omissions of any member of the

5  conspiracy in furtherance of the common purpose of the

6  conspiracy are deemed under the law to be acts of all members.

7  Thus, if you find that the defendant who you are considering

8  was a member of a criminal conspiracy charge, then any act done

9  or statements made in furtherance of the conspiracy by persons

10 also found by you to have been members of that conspiracy may

11 be considered against the defendant.  This is so even if such

12 acts were done and statements were made not defendant's absence

13 and without his knowledge.

14      Before you may consider the statements or acts of a

15 co-conspirator in deciding the issue of a defendant's guilty,

16 you must first determine if the acts and statements remained

17 during existence and in furtherance of the unlawful scheme.  If

18 the acts were done or the statements made by someone whom you

19 do not find to have been a member of the conspiracy or if they

20 were not done or said in furtherance of the conspiracy, they

21 may not be considered by you as evidence against the defendant

22 as to that conspiracy.

23      Count 1 of the indictment charges all the defendants

24 with conspiracy to engage in alien smuggling between 2006 and

25 2017.  The defendants are charged with conspiring to transport

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1  and harbor one or more aliens, that is a person who is not a

2  citizen of the United States in violation of federal law.

3       I've already instructed you on the general definition

4  of conspiracy, which is an agreement among two or more people

5  to commit a crime.  I remind you that the crime of conspiracy

6  to violate a federal law is a separate offense from the

7  underlying crime.  It is separate and distinct from the actual

8  violation of alien smuggling, which is the object of this

9  conspiracy and what we call the "substantive crime."

10      In order to find the defendant you are considering

11 guilty of conspiracy in alien smuggling, you must find beyond a

12 reasonable doubt that two or more persons agreed to commit the

13 crime of alien smuggling and that the defendant you are

14 considering knowingly and intentionally became a member of the

15 conspiracy.  The Government does not have to prove that the

16 defendant actually committed the crime of alien smuggling.

17 What the Government must prove is that the defendant

18 voluntarily entered into a conspiracy, the purpose of which was

19 to commit alien smuggling.

20      The relevant provision of federal law prohibits two

21 categories of criminal acts.  First, it prohibits a person from

22 transporting or moving an alien within the United States

23 knowing or in reckless disregard of the fact that the alien is

24 not United States in violation of law and in furtherance of the

25 alien's violation of the immigration laws.

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1           Second, it prohibits a person from concealing,

2    harboring, or shielding from protection an alien within the

3    United States knowing or in reckless disregard of the fact that

4    the person is not United States in violation of the law, and to

5    facilitate the alien's ability to remain not United States,

6    that is to make the alien's remaining not United States

7    illegally substantially easier or less difficult.  The statute,

8    therefore, sets forth two different ways that the Government

9    can prove the underlying crime of alien smuggling because the

10   first two elements are the same.  I'll discuss the first.

11          The first element requires that an alien enter o

12   remain in the United States in violation of law.  An alien is a

13   person who is not a natural born or naturalized citizen.

14          The second element is that the person knew or acted in

15   reckless disregard with the fact that such alien came to,

16   entered, or remain not United States in violation of law.  In

17   other words, to be guilty of alien smuggling conspiracy, a

18   person must either know that the alien in question came to,

19   entered, and remained not United States illegally or he must

20   have acted with reckless disregard of the facts concerning the

21   alien's status.  I previously instructed you on knowledge, and

22   you should apply that instruction here.  For purposes of this

23   instruction, the phrase "reckless disregard of the facts" means

24   deliberate indifference to facts that, if considered and

25   weighed in a reason manner, indicate the highest probability

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1    that the alleged alien was, in fact, an alien and was not

2    United States unlawful.

3         As for the third and fourth elements of the crime of

4    alien smuggling, the Government may prove them in one of two

5    ways:  The first way is to prove that a person transported or

6    moved the alien within the United States in furtherance of the

7    alien's violation of the immigration laws.

8         The second way is to prove that the person concealed,

9    harbored, shielded the alien from detection within the

10   United States to facilitate the alien's ability to remain not

11   United States.  I'll discuss these in turn.

12        The Government may establish the third element of the

13   crime of alien smuggling that the proof that the person

14   transported the alien within the United States and acted

15   willfully in furtherance of the alien's violation of the

16   immigration laws.  Willful conduct in furtherance of the

17   alien's illegal presence not United States means that there

18   must be a direct and substantial relationship between the

19   transportation and furthering the alien's unlawful presence not

20   United States.

21        Transportation of an illegal alien is not by itself a

22   violation of law if it is merely incidental to the alien's

23   presence not United States.  The transportation is illegal only

24   when it is in furtherance of the alien's unlawful presence.  In

25   determining whether there was a direct and substantial

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1    relationship between the transportation and furthering the

2    alien's unlawful presence not United States, you should

3    consider all relevant evidence, including the time of the

4    transportation, place, distance of the transportation, and the

5    overall impact of the transportation.

6           The Government may establish the third element of the

7    crime of alien smuggling if it proves that the person

8    concealed, harbored, or shielded an alien from detection within

9    the United States to facilitate the alien's ability to remain

10   not United States.  To harbor a person means to provide shelter

11   for that person.  To shield from detection means to act in a

12   way that prevents the authorities from learning of the fact

13   that an alien is not United States illegally.  You need not

14   find that the person acted secretly or that the harboring of

15   the alien is clandestine.  The Government must prove that the

16   person's actions of harboring, concealing, or shielding an

17   alien from detection substantially facilitated the alien's

18   ability to remain not United States illegally.  To

19   substantially facilitate an alien remaining not country means

20   to make that alien's remaining in the United States illegally

21   substantially easier or less difficult.

22          As I already instructed you, conspiracy is a crime

23   even if it fails to achieve its purpose.  Thus, to prove

24   Count 1, the Government does not have to prove that any

25   defendant actually committed the crime of alien smuggling.

David R. Roy, RPR, CSR, CCR
Official Court Reporter

1    Rather, if you find beyond a reasonable doubt that the

2    defendant you're considering knowingly and intentionally agreed

3    to commit the crime of alien smuggling, then you should find

4    that defendant guilty of Count 1.

5         If you find the defendant guilty of conspiracy to

6    commit alien smuggling under Count 1, you must then determine

7    if the Government proved beyond a reasonable doubt that the

8    defendant acted for the purpose of private financial gain.  The

9    phrase "private financial gain" should be given its ordinary

10   and nature meaning.  Private financial gain is profit or gain

11   in money or property specifically for a particular person or

12   group.  There is no requirement that the defendant actually

13   received some financial gain.  Although, of course, you may

14   consider evidence that the defendant did receive financial gain

15   in deciding whether he acted for that purpose.

16        Count 2 charges all of the defendants with conspiracy

17   to transport minors to engage in prostitution between

18   August 2006 and April 2014.  I have already instructed you on

19   the general definition of conspiracy.  You should apply that

20   definition here.  I remind you that the crime of conspiracy to

21   violate federal law is a separate offense from the underlying

22   crime.  In order to find the defendant you are considering

23   guilty of conspiracy to transport minors to engage in

24   prostitution, you must find beyond a reasonable doubt that two

25   or more persons agreed to transport minors to engage in

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1    prostitution, and that the defendant you are considering

2    knowingly and intentionally became a member of that conspiracy.

3    The Government does not have to prove that the defendant

4    actually committed the crime of transporting minors to engage

5    in prostitution.

6         I will now define the elements of transporting a minor

7    for the purpose of prostitution.  They are as follows:  First,

8    that the defendant knowingly transported an individual in

9    interstate or foreign commerce.

10        Second, that the defendant transported that individual

11   with the intent that she would engage in prostitution.

12        And third, that the individual would be less than 18

13   years old at the time of the acts alleged in the indictment.

14        The first element requires that the defendant

15   knowingly transported an individual in interstate or foreign

16   commerce.  To act knowingly means to act voluntarily and

17   intentionally and not because of accident, mistake, or other

18   innocent reason.  Interstate or foreign commerce simply means

19   movement between one state or another, or between the

20   United States and a foreign country.  The defendant must have

21   knowingly transported an individual in interstate commerce.

22   This means that the Government must prove that the defendant

23   knew both that he was transporting an individual, and that he

24   was transporting the individual in interstate or foreign

25   commerce.  The Government does not have to prove that the

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1  defendant personally transported the individual across the

2  state line or from a foreign country to the United States.  It

3  is sufficient to satisfy this element that the defendant would

4  actively engaged in the making of the travel arrangements such

5  as by purchasing the tickets necessary for the individual to

6  travel as planned.

7       The second element requires that the defendant

8  transported the individual with the intent that she would

9  engage in prostitution.  In order to establish this element,

10  it's not necessary for the Government to prove that engaging in

11  prostitution was the sole purpose for crossing the state line

12  or foreign border.  A person may have several different

13  purposes or motives for such travel, and each may prompt in

14  varying degrees the act of making the journey.  The Government

15  must prove beyond a reasonable doubt, however, that a

16  significant or motivating purpose of the travel across a state

17  line was that the individual would engage in prostitution.  In

18  other words, that illegal activity must not have been merely

19  incidental to the trip.

20       Direct proof of a person's intent is almost never

21  available.  It would be a rare case where it would be shown

22  that a person wrote or stated that as of a given time he

23  committed an act with that particular intent.  Such direct

24  proof is not required.  The ultimate fact of intent, though

25  subjective, may be established by circumstantial evidence based

Jury Charge

1   upon a defendant's outward manifestations, his words, his

2   conduct, his acts, and all the surrounding circumstances

3   disclosed by the evidence and the rationale or logical

4   inferences that may be drawn from them.  Whether or not a minor

5   consented to engage in prostitution is irrelevant.  The consent

6   or voluntary participation of a minor is not a defense to the

7   charge.

8           The third and last element that the Government must

9   prove beyond a reasonable doubt is that the individual was less

10  than 18 years old at the time of the acts alleged not

11  indictment.  The Government need not prove that the defendant

12  knew that the individual was less than 18 years old.  If you

13  find that the Government proved beyond a reasonable doubt the

14  defendant you are considering knowingly and intentionally

15  agreed with others to transport one or more minors in

16  interstate or foreign commerce to engage in prostitution, then

17  you should find that defendant guilty of counts 2.  As I

18  already instructed you, a conspiracy is a crime even if it does

19  achieve its purpose.  The Government does not have to prove

20  that the defendant or a co-conspirator actually committed the

21  crime of transporting a minor to engage in prostitution, but

22  the Government must prove that the defendant voluntarily

23  entered a conspiracy for the purpose of which was to transport

24  a minor to engage in prostitution.

25          Count 3 of the indictment charges all of the

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1  defendants with conspiracy to engage in sex trafficking and/or

2  sex trafficking of minors.  I have already instructed you on

3  the general definition of conspiracy, which I said is an

4  agreement among two or more persons to commit a crime.  Here

5  the defendants are charged with conspiracy to commit the crime

6  of sex trafficking and/or trafficking of minors, which I will

7  refer to as the underlying crime.

8         In order to find the defendant you are considering

9  guilty of conspiracy to commit sex trafficking and/or sex

10  trafficking of minors, you must find that two or more persons

11  agreed to commit the crime of sex trafficking, and that the

12  defendant you are considering knowingly and intentionally

13  became a member of the conspiracy.  The Government does not

14  have to prove that the defendant or a co-conspirator actually

15  committed the crime of sex trafficking and/or sex trafficking

16  of minors, what the Government must prove is that the defendant

17  voluntarily entered a conspiracy, the purpose of which was to

18  commit sex trafficking and/or sex trafficking of minors.

19         I will now explain the elements of the crime of sex

20  trafficking and/or sex trafficking of minors that the

21  defendants are charged with conspiring to commit between

22  January of 2009 and July 2017.  Those are as follows:  First,

23  that the defendant or a co-conspirator knowingly transported,

24  recruited, or enticed, harbored, provided, obtained, or

25  maintained a person by any means; or that the person knowingly

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1  benefited financially or by receiving something of value from

2  participating in a venture that recruited, enticed,

3  transported, provided, obtained, or maintained a person.

4        Second, that the defendant knew or recklessly

5  disregarded that force, fraud, or coercion would be used with

6  respect to such person or that such person was under the age of

7  18 years.

8        Third, that the defendant knew that such person would

9  be engaged in a commercial sex act.

10        And fourth, that the defendant's conduct or that of

11  its co-conspirator would enter and affect interstate or foreign

12  commerce.

13        I will now further define these elements.  The first

14  element the Government must prove is that the defendant you are

15  considering or a co-conspirator knowingly recited, enticed,

16  harbored, transported, provided, obtained, or maintained a

17  person; or that the defendant or a co-conspirator knowingly

18  benefited financially or by receiving something of value from

19  participating in a venture that did one of these things.

20        The statute sets forth two different ways that the

21  Government can prove this element.  The first is by proving

22  that a defendant himself was a co-conspirator engaged in at

23  least one of a list of prohibited trafficking activity.  And

24  the second is by proving that the defendant took part in a

25  venture that engaged in at least one of those trafficking

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1    activities, and that the defendant benefited financially or by

2    receiving a thing of value from that venture.

3         The Government does not have to prove both means of

4    establishing this element.  Proof beyond a reasonable doubt of

5    one or the other is sufficient.  But in order to find the

6    defendant guilty of Count 3, all 12 of you must agree that the

7    same means of establishing this element has been proven.

8         The first way the Government may satisfy the first

9    element is by proving that the defendant you are consideration

10   himself or a co-conspirator knowingly recruited, enticed,

11   harbored, transported, provided, obtained, or maintained a

12   person.  In considering whether the defendant you're

13   considering did any of these things, I instruct you to use the

14   ordinary everyday definition of these terms.  To harbor a

15   person means to provide shelter for that person.  To obtain

16   someone refers to acquiring, controlling, or possessing that

17   person even for a short period of time.  To maintain someone

18   means to upkeep someone or put care or work into them.

19        I will now explain the second alternative way to

20   satisfy the first element.  To satisfy this element the second

21   way, the Government need not prove that the defendant you are

22   considering himself engaged in the trafficking activities of

23   recruiting, enticing, harboring, transporting, providing, or

24   obtaining a person.  The Government need only prove that there

25   was a venture that engaged in these activities, that the

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1    defendant participated in some way in that venture, and that

2    the defendant benefited financially, or by receiving a thing of

3    value from that venture.

4            In considering whether the defendant participated in

5    such a venture, I instruct you that a venture is defined as any

6    group of two or more individuals associated, in fact, whether

7    or not a legal entity.  So if two or more people associated

8    with one another, you may find that those two people formed a

9    venture.

10           (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Jury Charge

1                    (In open court.)

2                    THE COURT:  You may find that the defendant you are

3        considering participated in the venture if the defendant in any

4        way took part in that venture.  The defendant may be but need

5        not be one of the people who formed the venture.  Likewise, the

6        defendant need not be an organizer or a main participant in the

7        venture, and need not have participated throughout the length

8        of the venture.  It is enough if the defendant took some part

9        in or played some role in the sex tracking venture for any

10       period of time while it was still ongoing to further the

11       venture.

12                   It is sufficient if the defendant played any role

13       intended to further the venture, even if that role was minor

14       and even if that role was not related to the actual recruiting,

15       enticing, harboring, transporting, providing or obtaining a

16       person for commercial sex acts that the venture engaged in.

17                   Now, as I've stated, the defendant must also benefit

18       financially or by receiving a thing of value from the venture.

19       You may find that this requirement is satisfied if defendant

20       received any form of profit, benefit, value or advantage, no

21       matter how minor from the venture.  Of course, if you find that

22       defendant himself recruited, enticed, harbored, transported,

23       provided or obtained, you need not consider whether the

24       defendant benefited from doing so.  You need only consider

25       whether the defendant benefited, if you find defendant's

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1   involvement in sex trafficking was through participating in the

2   trafficking venture rather than the trafficking activity

3   itself.

4          The statute also requires the Government to prove that

5   the defendant acted knowingly.  So the Government must prove

6   that defendant acted knowingly in either engaging in the

7   tracking activity or in joining a venture that he knew engaged

8   in trafficking activity.

9          I have already instructed you regarding what it means

10  to act knowingly.  You should apply that instruction here.

11         The second element the Government must prove beyond a

12  reasonable doubt is that the defendant you are considering knew

13  or was in reckless disregard of the fact that force, fraud or

14  coercion would be used with respect to the victim or that the

15  defendant you are considering knew or acted in reckless

16  disregard of the fact that the victim was under the age of 18.

17         The Government does not have to prove both parts of

18  this element for you to find the defendant you are considering

19  guilty of Count 3.  Proof beyond a reasonable doubt of either

20  part of this element is enough.  But in order to find a

21  defendant guilty of Count 3, all 12 of you must agree that the

22  same part of the element has been proved.

23         Again, the statute sets forth several ways that the

24  Government can prove this element.  The first way the

25  Government may prove the second element is that the defendant

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1    you are considering knew or was in reckless disregard of the

2    fact that force, fraud or coercion would be used with respect

3    to the victim.

4            The term "force" means any form of power, violence or

5    physical pressure directed against the person.  "Fraud," as I

6    just used the term, means that the defendant or a

7    co-conspirator knowingly made a misstatement or omission of a

8    material fact to entice the victim.  A material fact is one

9    that a reasonable person would expect to rely on when making a

10   decision.

11           Coercion means, A, the threat of serious harm or

12   physical restraint against a person; B, any scheme, plan or

13   pattern intended to cause a person to believe that failure to

14   perform an act would result in serious harm to, or physical

15   restraint against a person; or C, the abuse or threatened abuse

16   of law or legal process.

17           A "threat" is a serious statement expressing an

18   intention to inflict harm at once or in the future, as

19   distinguished from idle or careless talk, exaggeration or

20   something said in a joking manner.

21           The statement is a threat if it was made under such

22   circumstances that a reasonable person hearing the statement

23   would understand it as a serious expression of intent to cause

24   harm.  In addition, the defendant must have made the statement

25   intending it to be a threat or with the knowledge that the

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1   statement would be viewed as a threat.

2        The term "serious harm" includes both physical and

3   nonphysical types of harm, including psychological, financial

4   or reputational harm that is sufficient under all of the

5   surrounding circumstances to compel a reasonable person of the

6   same background and in the same circumstances to perform or

7   continue to perform commercial sexual activity in order to

8   avoid incurring the harm.

9        In determining whether the defendant or a

10  co-conspirator made a threat of serious harm, you should

11  consider the victim's particular station in life, physical and

12  mental condition, age, education, training, experience and

13  intelligence.

14       A threat of serious harm must be sufficient in kind or

15  degree to completely overcome the will of an ordinary person

16  having the same general station in life as that of the victim,

17  causing a reasonable belief that there was no reasonable choice

18  except to engage in a commercial sex act as directed by

19  defendant or a co-conspirator.

20       "Coercion" can also mean that the defendant engaged in

21  a course of behavior intended to cause the victim to believe

22  that if she did not engage in a commercial sex act as directed

23  by the defendant or a co-conspirator, any person, including the

24  victim or someone close to her, would suffer serious harm.

25  Coercion can also mean to use threats of legal action, whether

Jury Charge

1   administrative, civil or criminal in any manner or for any

2   purpose for which the law was not designed in order to coerce

3   someone into working against that person's will.

4        To satisfy this element, the Government must prove

5   that force, fraud or coercion as I just defined those terms,

6   was used and that the defendant you are considering knew or was

7   in reckless disregard of the fact that it would be used against

8   a victim.

9        Whether or not the defendant had this knowledge is a

10  question of fact to be determined by you on the basis of all

11  the evidence.  An act is done knowingly if it's done purposely

12  and deliberately, not because of accident, mistake, negligence

13  or other innocent reason.  If you find that the evidence

14  establishes beyond a reasonable doubt that the defendant

15  actually knew that coercion would be used, then this element is

16  satisfied.

17       Even if the evidence does not establish actual

18  knowledge, this element is satisfied if you find that the

19  Government has proved beyond a reasonable doubt that the

20  defendant acted with reckless disregard of the facts concerning

21  the use of coercion.

22       The phrase, "reckless disregard of the facts," means

23  deliberate indifference to facts that, if considered and

24  weighed in a reasonable manner indicate the highest probability

25  that the victim was coerced to engage in a commercial sex act.

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1    I will now explain the second alternative way to

2 satisfy the second element.  To satisfy this element the second

3 way, the Government must prove that the defendant you are

4 considering knew or acted in reckless disregard of the fact

5 that the victim was under the age of 18.  The Government must

6 prove that the defendant you are considering knew or acted in

7 reckless disregard of the fact that the victim was under the

8 age of 18 years in several ways.

9         First, that the defendant actually knew that the

10 victim was under the age of 18 years; second, that the

11 defendant was in reckless disregard of the fact that the victim

12 was under the age of 18 years; or third, that the defendant had

13 a reasonable opportunity to observe the victim.

14        If you find that the defendant you are considering had

15 a reasonable opportunity to observe the victim, the Government

16 need not prove that the defendant knew or recklessly

17 disregarded the fact that the victim was under the age of 18.

18 Whether or not a minor can consented to engage in a commercial

19 sex act is irrelevant.  The consent or voluntary participation

20 of a minor is not a defense to this charge.

21        The third element the Government must prove is that

22 the defendant you are considering knew that the victim would be

23 engaged in a commercial sex act.  A commercial sex act is any

24 act of which anything of value -- excuse me -- is any sex act

25 of which anything of value is given to, or received by any

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1    person because of such sex act.

2          It is not required that the victim actually performed

3    a commercial sex act, as long as the Government has proven that

4    the defendant recruited, enticed, harbored, transported,

5    provided, obtained or maintained the victim for purposes of

6    engaging in commercial sex acts.

7          A thing of value need not involve a monetary exchange

8    and need not have any financial component.  The phrase "any sex

9    act" should be given its plain meaning and may include any act

10   performed with another for sexual gratification.

11         Lastly, the fourth element that the Government must

12   prove beyond a reasonable doubt is that the conduct of the

13   defendant or that of a co-conspirator was in or affecting

14   interstate or foreign commerce.  Interstate or foreign commerce

15   simply means the movement of goods, services, money and

16   individuals between any two or more states or between the

17   United States and a foreign country.

18         To satisfy this element, the Government must prove

19   that the defendant's conduct affected interstate commerce in

20   any way, no matter how minimal.  You do not have to find that

21   the defendant's conduct actually affected interstate commerce,

22   if you find that the defendant's conduct would have affected

23   interstate commerce if the defendant had successfully and fully

24   completed his actions.  The Government does not have to show

25   that the defendant actually knew his actions affected or would

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1 affect interstate commerce.

2          If you find that the Government proved beyond a

3 reasonable doubt that the defendant you are considering

4 knowingly and intentionally agreed with others to commit the

5 crime of sex tracking and/or sex tracking of minors, then you

6 should find that defendant guilty of Count 3.

7          As I already instructed you, a conspiracy is a crime,

8 even if it does not achieve its purpose.  The Government does

9 not have to prove that the defendant or a co-conspirator

10 actually committed the crime of sex tracking.  What the

11 Government must prove is that the defendant voluntarily entered

12 into a conspiracy, the purpose of which was to commit sex

13 trafficking.

14          Count 4 charges that the defendants, Jose Miguel

15 Melendez Rojas, Rosario Melendez Rojas, and Abel Romero

16 Melendez with committing sex tracking and sex tracking of a

17 minor, that is, Diana, between August 2006 and March 2007.

18          I previously instructed you regarding the law on sex

19 trafficking and sex trafficking of minors under Count 3;

20 However, because this count in the indictment charges that the

21 crime occurred during an earlier time period than that charged

22 in Count 3, the elements of sex trafficking and sex trafficking

23 of minors are slightly different.  I will, therefore, instruct

24 you on the law that you should consider under this count.

25          To prove this crime, the Government must prove beyond

LISA SCHMID, CCR, RMR
Official Court Reporter

1  a reasonable doubt the following four elements:  First, that

2  the defendant knowingly transported, recruited, enticed,

3  harbored, provided or obtained a person by any means; second,

4  that the defendant knew that force, fraud or coercion would be

5  used with respect to such person or that such person was under

6  the age of 18 years; third, that the defendant knew that such

7  person would be engaged in a commercial sex act; and fourth,

8  that defendant's conduct was in or affecting interstate or

9  foreign commerce.  I'll now further define these elements.

10       The first element that the Government must prove is

11 that the defendant knowingly transported, recruited, enticed,

12 harbored, provided or obtained a person.  To "harbor" a person

13 means to provide shelter for that person.  To "obtain" someone

14 refers to acquiring, controlling or possessing that person,

15 even for a short period of time.  I've already instructed you

16 regarding what it means to act knowingly.  You should apply

17 that instruction here.

18       The Government may prove the second element in either

19 of two ways.  It may prove beyond a reasonable doubt that the

20 defendant knew that force, fraud or coercion would be used with

21 respect to Diana or that the defendant knew that Diana was

22 under the age of 18.

23       The Government does not have to prove both of these

24 parts of this element -- both parts of this element for you to

25 find the defendant you are considering guilty of Count 4.

Jury Charge

1   Proof beyond a reasonable doubt of either part is enough, but

2   in order to find the defendant you are considering guilty of

3   this crime, all twelve of you must agree that the same part of

4   the element has been proved.  As I instructed you in Count 3,

5   whether or not a minor consented to a engage in a commercial

6   sex act is irrelevant.  The consent or voluntary participation

7   of a minor is not a defense to the charge.

8          The third element that the Government must prove is

9   that the defendant knew that the victim would engage in a

10  commercial sex act.  I have previously defined the term

11  "commercial sex act" under Count 3.  You should apply that

12  instruction here.

13         Lastly, the fourth element that the Government must

14  prove beyond a reasonable doubt is that the defendant's conduct

15  was in or affecting interstate commerce.  This definition is

16  the same as previously described, and you must apply those

17  instructions here.

18         You may also find that the defendant you are

19  considering guilty of Count 4, if the Government has proven

20  beyond a reasonable doubt that he has aided and abetted sex

21  trafficking or sex trafficking of a minor, that is, Diana, in

22  determining whether the defendant is guilty as an aider and

23  abettor, you must follow the general instructions on aiding and

24  abetting that I have already given to you.

25         Count 5 charges the defendants Jose Miguel Melendez

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1   Rojas, Jose Osvaldo Melendez Rojas, and Rosalio Melendez Rojas

2   with committing sex trafficking of Veronica between 2007 and

3   2013.  I previously instructed you regarding the elements of

4   the crime of sex trafficking; however, because Count 5 in the

5   indictment charges the sex trafficking of Veronica, who is not

6   a minor, I will also instruct you on the law that you should

7   consider under this count.

8           To find a defendant you are considering guilty of sex

9   trafficking as to Veronica, you must find that the following

10  elements has been proven beyond a reasonable doubt:  First, the

11  defendant knowingly transported, recruited, enticed, harbored,

12  provided or obtained a person by any means or that the

13  defendant knowingly benefited financially or by receiving

14  something of value from participating in a venture that

15  recruited, enticed, transported, provided or obtained a person;

16  second, that the defendant knew that force, fraud or coercion

17  would be used with respect to such person; third, that the

18  defendant knew that such person would engage in commercial sex

19  act; and fourth, that the defendant's conduct was in or

20  affecting interstate or foreign commerce.

21          I previously explained the definition -- excuse me.  I

22  have previously explained and defined these terms under Count

23  4, and you should apply those instructions here.

24          Of course, because Veronica is not a minor, in

25  considering the second element, you should apply only the prong

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1    relating to force, fraud or coercion, and not the prong

2    relating to the fact that the person was under 18.

3          You may also find the defendant you are considering

4    guilty of Count 5 if Government has proven beyond a reasonable

5    doubt that he aided and abetted the sex trafficking of

6    Veronica.  In determining whether the defendant is guilty as an

7    aider and abettor, you must follow the general instructions on

8    aiding and abetting that I have already given you.

9          Count 6 charges defendants, Jose Osvaldo Melendez

10   Rojas, Rosalio Melendez and Rosalio Melendez Rojas with

11   committing sex trafficking of Fabiola between April of 2009,

12   and September of 2015.

13         I've just instructed you regarding the elements of the

14   crime of sex trafficking, but since Count 6 in the indictment

15   charges that the crime occurred during a later time period,

16   then that charge in Count 5, the elements of sex trafficking

17   are slightly different.  I will, therefore, instruct you on the

18   law that you should consider under this count.

19         To find the defendant you are considering guilty of

20   sex trafficking of Fabiola, you must find that the following

21   elements have been proven beyond a reasonable doubt:  First,

22   that the defendant knowingly transported, recruited, enticed,

23   harbored, provided, obtained or maintained a person by any

24   means, or that the defendant knowingly benefited financially or

25   by receiving something of value from participating in a venture

Jury Charge

1    that recruited, enticed, transported, provided, obtained or

2    maintained a person; second, that the defendant knew or

3    recklessly disregarded that force, fraud or coercion would be

4    used with respect to such person; third, that the defendant

5    knew that such person would be engaged in a commercial sex act;

6    and fourth, that the defendant's conduct was in or affecting

7    interstate or foreign commerce.

8            I've previously explained and defined these terms and

9    you should apply those instructions here.  Of course because

10   Fabiola was not a minor, in considering the second element, you

11   should apply only the prong relating to force, fraud and

12   coercion, and not the prong relating to the fact that the

13   person was under the age of 18.

14           You may also find the defendant you are considering

15   guilty of Count 6 if the Government has proven beyond a

16   reasonable doubt that he aided and abetted the sex trafficking

17   of Fabiola.  In determining whether the defendant was guilty as

18   an aider and abettor, you must follow the general instructions

19   on aiding and abetting that I've already given you.

20           Count 7 charges the defendants, Jose Osvaldo Melendez

21   Rojas and Rosalio Melendez Rojas with committing alien

22   smuggling of Fabiola between April 2009 and September 2015.

23           These two defendants are charged with alien smuggling

24   by encouraging or inducing an alien, that is, a person who is

25   not a citizen of the United States to violate the law.

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1    In order to prove the defendant you are considering

2  guilty of Count 7, you must find that the following elements

3  have been proven beyond a reasonable doubt:  First, that the

4  defendant you are considering encouraged or induced an alien to

5  come to, enter or reside in the United States in violation of

6  law.

7    I've previously instructed you on the meaning of

8  "alien."  To "encourage" means to instigate, convince, help or

9  advise an alien to come to the United States or stay in this

10  country.  To "induce" means to bring about a fact caused or

11  influence an alien to come to the United States or stay in this

12  country.

13    Second, that the defendant knew or acted in reckless

14  disregard of the fact that the alien he encouraged or induced

15  would come to, enter or reside in the United States, in

16  violation of law.  In other words, the defendant must either

17  know that Fabiola would come to and enter or reside in the

18  United States illegally or he must have acted in reckless

19  disregard of such facts.

20    As I've previously instructed you that the phrase

21  reckless disregard of the facts means deliberate indifference

22  to facts that if considered and weighed in a reasonable manner

23  indicate the highest probability that Fabiola was, in fact, an

24  alien and would be in the United States unlawfully.

25    You may also find the defendant you are considering

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1   guilty of Count 7 if the Government has proven beyond a

2   reasonable doubt that he aided and abetted alien smuggling of

3   Fabiola.  In determining whether the defendant is guilty as an

4   aider and abettor, you must follow the general instructions

5   that I've already given you about that.

6          If you find the defendant guilty of alien smuggling

7   under Count 7, you must then determine whether the defendant

8   acted for the purpose of private financial gain.  I've already

9   instructed you on the meaning of that phrase, which is a profit

10  or gain in money or property, specifically for a particular

11  person or group.

12         Count 8 charges defendants, Jose Osvaldo Melendez

13  Rojas and Francisco Melendez Rojas with committing sex

14  trafficking of Maria Rosalba between May 2010 and February of

15  2012.

16         To find the defendant you are considering guilty of

17  sex trafficking as to Maria Rosalba, you must find that the

18  following elements have been proven beyond a reasonable doubt:

19  First, that the defendant knowingly transported, recruited,

20  enticed, harbored, provided, obtained or maintained a person by

21  any means, or that the defendant knowingly benefited

22  financially or by receiving something of value from

23  participating in a venture that recruited, enticed,

24  transported, provided, obtained or maintained a person.

25         Second, that the defendant knew or recklessly

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1  disregarded that force, fraud or coercion would be used with

2  respect to such person; third, that the defendant knew that

3  such person would be engaged in a commercial sex act; and

4  fourth, that the defendant's conduct was in or affecting

5  interstate or foreign commerce.  I've previously explained and

6  defined these terms and you should apply those instructions

7  here.

8          Of course, because Maria Rosalba is not a minor, in

9  considering the second element, you should apply only the prong

10 relating to force, fraud and coercion, and not the prong

11 relating to the fact that the person was under the age of 18.

12         You may also find the defendant you are considering

13 guilty of Count 8 if the Government has proven beyond a

14 reasonable doubt that he aided and abetted sex trafficking of

15 Maria Rosalba.  In determining that, you must follow the

16 general aiding and abetting instructions I have already given

17 to you.

18         Count 9 charges defendants, Jose Osvaldo Melendez

19 Rojas and Francisco Melendez Rojas, with alien smuggling of

20 Maria Rosalba between May 2010 and February 2012.  I've already

21 instructed you on the elements of the crime of alien smuggling

22 under Count 7.  You should those instructions here.

23         You may also find the defendant you are considering

24 guilty of Count 9 if the Government has proven beyond a

25 reasonable doubt that he aided and abetted alien smuggling of

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1  Maria Rosalba.  In determining whether the defendant is guilty

2  as an aider or abettor, you must follow the general

3  instructions on aiding and abetting that I've given to you.

4       If you find the defendant guilty of alien smuggling

5  under Count 9, you must then determine whether the defendant

6  acted for the purpose of private financial gain.  I've already

7  instructed you on the meaning of the phrase "private financial

8  gain," which is the profit or gain in money or property

9  specifically for a particular person or group.

10      Count 10 charges the defendants, Jose Miguel Melendez

11 Rojas, Jose Osvaldo Melendez Rojas, Rosalio Melendez Rojas, and

12 Francisco Melendez Perez with committing sex trafficking and

13 sex trafficking of a minor, that is, Delia, between July 2010

14 and April of 2014.  I've already instructed you on the elements

15 of sex trafficking and sex trafficking of a minor.  Under Count

16 3, you should apply those instructions here.  As I instructed

17 you in Count 3, whether or not a minor consented to engage in a

18 commercial sex traffic is irrelevant.  The consent or voluntary

19 participation of a minor is not a defense to the charge.

20      You may also find the defendant you are considering

21 guilty of Count 10 if the Government has proven beyond a

22 reasonable doubt that he aided and abetting sex trafficking of

23 a minor, that is, Delia.  In determining whether the defendant

24 is guilty as an aider and abettor, you must follow the general

25 instructions that I've given you on that.

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1        Counsel 11 charges the defendants, Jose Miguel

2   Melendez Rojas, Jose Osvaldo Melendez Rojas, Rosalio Melendez

3   Rojas, and Francisco Melendez Perez with transportation of a

4   minor, Delia, to engage in prostitution between July 2010 and

5   2014.

6        To establish this crime, you must find that the

7   following elements have been proven beyond a reasonable doubt:

8   First, that the defendant you are considering knowingly

9   transported Delia in interstate or foreign commerce, as alleged

10  in the indictment; second, that the defendant you are

11  considering transported Delia with the intent that Delia would

12  engage in prostitution; and third, that at the time, Delia was

13  less than 18 years old.  I've previously explained and defined

14  the elements of transporting a minor for the purpose of

15  prostitution under Count 2, and you should apply those

16  instructions here.  As I've previously instructed you, whether

17  or not a minor consented to engage in prostitution is

18  irrelevant if consent or voluntary participation of a minor is

19  not a defense to the charge.

20       You may also find the defendant you are considering

21  guilty of Count 11 if the Government has proven beyond a

22  reasonable doubt that he aided and abetted the transportation

23  of Delia to engage in position prostitution.  In determining

24  that, you must follow the instructions that I gave you on

25  aiding and abetting.

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1    Count 12 charges defendants, Jose Miguel Melendez

2    Rojas, Jose Osvaldo Melendez Rojas, Rosalio Melendez Rojas and

3    Francisco Melendez Perez with committed alien smuggling of

4    Delia between July 2010 and April 2014.  I have already

5    instructed you on the elements of the crime of alien smuggling

6    under Count 7.  You should apply those instructions here.

7    You may also find the defendant you are considering

8    guilty of Count 12 if the Government has proven beyond a

9    reasonable doubt that he aided and abetted alien smuggling of

10   Delia.  In determining whether the defendant is guilty as an

11   aider and abettor, you must follow the general instructions on

12   aiding and abetting that I have already given you.

13   If you find a defendant guilty of alien smuggling

14   under the Count 12, you must then determine whether that

15   defendant acted for the purposeful of private financial gain.

16   I've already instructed you on the meaning of the phrase

17   "private financial gain," and you must apply that instruction

18   here.

19   Count 14 charges the defendant, Rosalio Melendez Rojas

20   with committing alien smuggling of Daisy between August 2011

21   and December 2014.  I've already instructed you on the elements

22   of the crime of alien smuggling under Count 7.  You should

23   apply those instructions here.

24   You may also find defendant you are considering guilty

25   of Count 14 if the Government has proven beyond a reasonable

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1   doubt that he aided and abetted alien smuggling of Daisy.  In

2   determining that, you must follow the general instructions that

3   I gave you about aiding and abetting.

4           Are you all right?  Do you want to stand and stretch

5   for a minute?

6           (All jurors respond negatively.)

7           THE COURT:  Okay.  If you find the defendant guilty of

8   alien smuggling under Count 14, you must then determine whether

9   that defendant acted for a purpose of private financial gain.

10  I've already instructed you on that meaning.  You should apply

11  it here.

12          Count 15 charges the defendant, Jose Miguel Melendez

13  Rojas, Jose Osvaldo Melendez Rojas, Rosalio Melendez Rojas and

14  Francisco Melendez Perez with participating in a conspiracy to

15  permit money laundering between 2006 and July of 2017.

16          I've already instructed you on the general definition

17  of conspiracy, which as I said, is an agreement among two or

18  more people to commit a crime.  I remind you that the crime of

19  conspiracy to violate a federal law is a separate offense from

20  the underlying crime.  Conspiracy to commit money laundering is

21  separate and distinct from an actual violation of money

22  laundering, which is the object of a conspiracy, and what we

23  call the substantive crime.

24          In order to find the defendant you are considering

25  guilty of conspiracy to commit money laundering, you must find

Jury Charge

1  that two or more persons agreed to commit the crime of money

2  laundering, and that the defendant you are considering

3  knowingly and intentionally became a member of the conspiracy

4  on.  I'll now instruct you on the elements of the crime of

5  money laundering.

6            To prove this, the Government must prove the following

7  three elements beyond a reasonable doubt:  First, that a person

8  conducted a financial transaction involving property

9  constituting the proceeds of specified unlawful activity,

10  namely, sex trafficking, sex trafficking of minors, or

11  interstate prostitution; second, that the person knew that the

12  property involved in this financial transaction was the

13  proceeds of some form of unlawful activity; and third, that the

14  person acted with the intent to promote carrying on of the

15  specified unlawful activity, or knew that transaction was

16  designed in whole or in part either to conceal or to disguise

17  the nature, location, source, ownership or control of the

18  proceeds of specified unlawful activity.

19            (Continued on the next page.)

20

21

22

23

24

25

LISA SCHMID, CCR, RMR
Official Court Reporter

Jury Charge

1              (In open court.)

2              THE COURT:  The first element that the government must

3      prove beyond a reasonable doubt is that a person conducted a

4      financial transaction involving property constituting the

5      proceeds of specified unlawful activity, namely, sex

6      trafficking, sex trafficking of minors, or interstate

7      prostitution.  The word "conducts" includes initiating,

8      concluding, or participating in initiating or concluding a

9      transaction.

10             A transaction includes, in this case, a transfer of

11     property, specifically currency.  The term "financial

12     transaction" means a transaction involving a financial

13     institution which is engaged in, or the activities of which

14     affect, interstate or foreign commerce in any way or degree --

15     or a transaction which in any way or degree affects interstate

16     or foreign commerce and involves the movement of funds by wire

17     or other means.

18             A transaction involving a financial institution in

19     this case, includes a wire transfer or any payment, transfer,

20     or delivery by or -- by, through, or to a financial institution

21     by whatever means.  A money remitter or wire transfer company

22     is a financial institution.

23             The term "interstate or foreign commerce" means

24     commerce between any combination of states, or between the

25     United States and a foreign country.  The "term monetary

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1  instrument" includes, among other things, coin or currency of

2  the United States or any other country in such form that title

3  thereto passes upon delivery.

4      For conduct prior to May 20 of 2009, the term

5  "proceeds" means any property or any interest in property that

6  someone acquires or retains as profits resulting from the

7  commission of the specified unlawful activity.  For conduct

8  after May 20, 2009, the term "proceeds" means any property

9  derived from or obtained or retained directly or indirectly

10  through some form of unlawful activity, including the gross

11  receipts of such activity.  Under either definition, proceeds

12  can be any kind of property, not just money.

13      The term "specified unlawful activity" means any one

14  of a variety of offenses defined by the statute.  In this case,

15  the government has alleged that the funds in question were the

16  proceeds of sex trafficking, sex trafficking of minors, and/or

17  interstate prostitution.

18      I instruct you that sex trafficking, sex trafficking

19  of minors, and interstate prostitution are specified unlawful

20  activity.  However, it is for you to determine whether the

21  funds were the proceeds that of unlawful activity.

22      In that regard, I have already instructed you

23  concerning the elements of two of the specified unlawful

24  activities, sex trafficking and sex trafficking of minors.

25      You are advised that the elements of the third

MICHELE NARDONE, CSR –– Official Court Reporter

Jury Charge

1  specified unlawful activity, interstate prostitution, are as

2  follows.  First, that the defendant knowingly persuaded,

3  induced, enticed, or coerced a person to travel in interstate

4  or foreign commerce.  Second, that the person traveled in

5  interstate or foreign commerce.  And, third, that the defendant

6  acted with the intent that the person would engage in

7  prostitution.

8         As I have explained, interstate or foreign commerce

9  means simply the movement between one state and another or

10 between the United States and a foreign country.  As I have

11 also explained, an act is done knowingly when it's done

12 voluntarily and intentionally and not because of accident,

13 mistake, or some other innocent reason.

14        The second element that the government must prove

15 beyond a reasonable doubt is that the person knew that the

16 property involved in the financial transaction was the proceeds

17 of some unlawful activity.  The government must show that the

18 person knew that the property involved in the transaction

19 represented proceeds from some form of activity that

20 constitutes a felony under state, federal, or foreign law.

21        The government does not need to show that the person

22 knew that the proceeds were specifically from sex trafficking,

23 sex trafficking of a minor, or interstate prostitution, only

24 that he knew that the proceeds were derived from any illegal

25 activity that was a felony.  I instruct you as a matter of law

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1  that sex trafficking, sex trafficking of a minor, and

2  interstate prostitution are felonies under federal law.

3         The government may prove the third element in either

4  of two ways.  It may prove beyond a reasonable doubt that the

5  person acted with the intent to promote the carrying on of

6  specified unlawful activity, or, that the person knew that the

7  transaction was designed in whole or in part to conceal or

8  disguise the nature, location, source, ownership, control of

9  the proceeds of specified unlawful activity.

10        The government does not have to prove both parts of

11 this element for you to find that a person committed the crime

12 of money laundering.  Proof beyond a reasonable doubt of one or

13 the other is enough, but all 12 of you must agree that the same

14 part of the element has been proven.

15        I previously instructed you as to what it is to act

16 knowingly and intentionally.  I will not repeat that here.

17        Regarding the first part of the third element, if you

18 find that the defendant acted with the intention or deliberate

19 purpose of promoting, facilitating, or assisting in the

20 carrying on of specified unlawful activity, sex trafficking,

21 sex trafficking of minors, and/or interstate prostitution, then

22 the third element is satisfied.  As I have previously

23 instructed you, interstate prostitution, sex trafficking, and

24 sex trafficking of minors all constitute specified unlawful

25 activity.

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1    With respect to the second part of the third element,

2    if you find that the evidence establishes beyond a reasonable

3    doubt that the defendant you are considering knew the purpose

4    of the particular transaction in issue and that he knew that

5    the transaction was designed either to conceal or to disguise

6    the true origin of the property in question, then this element

7    is satisfied.  However, if you find that the defendant you are

8    considering knew of the transaction but didn't know that it was

9    designed either to conceal or to disguise the true origin of

10   the property in question, you must find that this second way to

11   prove the element has not been satisfied.

12   I remind you that the crime of conspiracy, an

13   agreement to violate the law, as charged in this count of the

14   indictment, is an independent offense.  It's a separate -- it's

15   separate and distinct from the actual violation of any specific

16   law, such as the law prohibiting the crime of money laundering.

17   Accordingly, you may find the defendant you are

18   considering guilty of the offense charged in count 15, even if

19   you find that the crime of money laundering was never actually

20   committed.

21   Count 16 charges the defendants Jose Miguel

22   Melendez-Rojas, Jose Osvaldo Melendez-Rojas, Rosalio

23   Melendez-Rojas, and Francisco Melendez-Perez with distribution

24   of the proceeds of a prostitution business between 2006 and

25   July 2017.  The statute prohibits the use of any facility in

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1  interstate or foreign commerce with intent to distribute the

2  proceeds of any unlawful activity.

3       To find a defendant guilty of this crime, you must

4  find that the four elements -- that the following elements have

5  been proven beyond a reasonable doubt.  First, that the

6  defendant you are considering used or caused someone else to

7  use an interstate facility.  Second, that this use of an

8  interstate facility was done with the intent to distribute the

9  proceeds of unlawful activity.  That is, a business enterprise

10  involved in prostitution offenses; and, third, that after this

11  use of an interstate facility the defendant distributed the

12  proceeds of this same unlawful activity.

13       The first element requires you to find beyond a

14  reasonable doubt that the defendant you are considering used or

15  caused someone else to use an interstate or foreign facility.

16  The defendants Jose Miguel Melendez-Rojas, Jose Osvaldo

17  Melendez-Rojas, Rosalio Melendez-Rojas, and Francisco

18  Melendez-Perez have been charged with using and causing others

19  to use wire transfer services with the intent to distribute the

20  proceeds of a business enterprise involving prostitution, in

21  violation of the laws of the State of New York.

22       If the government has proven these facts beyond a

23  reasonable doubt, then you may find that it has satisfied the

24  first element.  It does not matter whether the defendant knew

25  he was using an interstate facility, nor does it matter whether

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1   the defendant intended to use an interstate facility.  All the

2   government must prove with respect to the first element is that

3   the defendant did in fact use an interstate facility or caused

4   another person to use an interstate facility.

5          The second element requires you to find beyond a

6   reasonable doubt that the interstate facility was used with the

7   intent to distribute the proceeds of an unlawful activity; that

8   is, a business enterprise involving prostitution.  The

9   government does not have to prove that the sole purpose in the

10  use of the interstate facility was to distribute the proceeds

11  of a business enterprise involving prostitution.  It is

12  sufficient that the government proves that one of the

13  defendant's reasons for the use of an interstate facility was

14  to distribute proceeds of a business enterprise involving

15  prostitution.

16         The government must prove that the defendant used an

17  interstate facility with the intent to distribute the proceeds

18  of an activity that the defendant knew was illegal.  The

19  government does not have to prove the defendant knew that use

20  of an interstate facility was illegal.

21         However, the government must prove beyond a reasonable

22  doubt that the defendant knew that the activity he intended to

23  facilitate was illegal.  Thus, if a defendant you are

24  considering used an interstate facility, intending to

25  distribute the proceeds of a business, but did not know the

Jury Charge

1   business was illegal or involved unlawful activity, then you

2   must find that defendant not guilty.

3          Defendants have been charged with using an interstate

4   facility to facilitate prostitution.  The government must prove

5   beyond a reasonable doubt that the activities of the defendant

6   intended -- the activities that a defendant intended to

7   facilitate were in fact unlawful under New York State law.

8          Under that law, a person is guilty of a crime when

9   that person either:  One, knowingly advances or profits from

10   prostitution by managing, supervising, controlling, or owning,

11   either alone or in association with others, a prostitution

12   business or enterprise involving prostitution activities by two

13   or more persons in prostitution; or, two, knowingly advances or

14   profits from prostitution of a person less than 19 years old.

15          So, in order to prove a defendant guilty of count 16,

16   the government must prove beyond a reasonable doubt that the

17   defendant you are considering distributed the proceeds of the

18   activity alleged in the indictment with the intent that each

19   element of this law be completed.

20          First, that in or about and between 2006 and 2017, in

21   the State of New York, the defendant you are considering

22   knowingly advanced or profited from prostitution of another

23   person.  And, second, that the defendant managed, supervised,

24   controlled, or owned, either alone or in association with

25   others, a prostitution business or enterprise involving

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1    prostitution activity by two or more persons in prostitution,

2    or that the person whose prostitution the defendant advanced or

3    profited from was less than 19 years old.

4          Under New York law, prostitution means the act or

5    practice of engaging or agreeing or offering to engage in

6    sexual conduct with another person in return for a fee.

7          Also, under New York law, a person advances

8    prostitution when acting other than as a prostitute or as a

9    patron thereof.  He knowingly causes or aids a person to commit

10   or engage in prostitution, procures or solicits patrons for

11   prostitution, provides persons or premises for prostitution

12   purposes, operates or assists in the operation of a house of

13   prostitution or a prostitution enterprise, or engages in any

14   other conduct designed to institute, aid, or facilitate an act

15   or enterprise of prostitution.

16         Under New York law a person profits from prostitution

17   when acting other than as a prostitute receiving compensation

18   for personally rendered prostitution services, he or she

19   accepts or receives money or other property pursuant to an

20   agreement or understanding with any person whereby he or she

21   participates or is to participate in the proceeds of

22   prostitution activity.

23         It is not a defense to this law that the defendant did

24   not know the age of the person whose prostitution the defendant

25   advanced or profited from, or that the defendant believed the

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1  age of such person to be 19 years or more.

2        The government must prove that the unlawful activity

3  for which the defendant used an interstate facility, that is,

4  prostitution, was a business enterprise.  That is, the

5  government must prove that the unlawful activity was part of a

6  continuous course of criminal conduct and not simply an

7  isolated criminal incident.

8        If you find that the unlawful activity was an isolated

9  incident and was not part of an ongoing course of criminal

10 conduct, you must find the defendant not guilty.  However, to

11 prove that the unlawful activity was a business enterprise, the

12 government does not have to show that the alleged illegal

13 activity was engaged in for a particular length of time, nor

14 must the government prove that such activity was defendant's

15 primary pursuit or occupation or that it actually turned a

16 profit.

17       What the government must prove beyond a reasonable

18 doubt is that the defendant engaged in a continuous course of

19 criminal conduct for the purpose of profit rather than casual,

20 sporadic, or isolated criminal activity.

21       The third element requires you to find beyond a

22 reasonable doubt that after this use of an interstate facility,

23 a defendant distributed the proceeds of this same unlawful

24 activity, that is, a business enterprise involving

25 prostitution.  This act need not itself be unlawful.  However,

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1    this act must come after the use of an interstate facility.

2    Any act that happened before the use of a facility cannot

3    satisfy this element.

4          You may also find the defendant you are considering

5    guilty of count 16 if the government has proven beyond a

6    reasonable doubt that he aided and abetted in the distribution

7    of proceeds of a prostitution business.  In determining that,

8    you must follow the instructions on aiding and abetting.

9          Count 18 charges the Defendant Abel Romero-Melendez

10   with entering, being an alien who had previously been removed

11   from the United States, thereafter entering and was found in

12   the United States without the Attorney General or the Secretary

13   of the United States Department of Homeland Security having

14   expressly consented to such alien's applying for admission.

15         To find the defendant guilty of this crime, you must

16   find the following elements have been proved beyond a

17   reasonable doubt.  First, that the defendant was an alien at

18   the time of the offense charged in the indictment.  Second,

19   that prior to the time of the offense alleged in the indictment

20   the defendant had been deported from the United States.  Third,

21   that the defendant was found in the United States.  And,

22   fourth, that the defendant had not received the express

23   permission of the designated United States official to apply

24   for readmission.

25         The first element that the government must prove

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1    beyond a reasonable doubt is that the defendant was an alien

2    during the time charged, that is, between 2013 and July 2017.

3    I instruct you that the term "alien" means any person who is

4    not a citizen of the United States.

5         American citizenship may be acquired either by birth

6    within the United States or by means of a judicial proceeding

7    known as naturalization.  I instruct you that a person born

8    outside the United States does not become a citizen by means of

9    a long stay in the United States.

10        The second element the government must prove beyond a

11   reasonable doubt is that prior to the time of the offense

12   charged the defendant had been deported from the United States.

13   Deportation means the removal from the United States by

14   immigration authorities.  The element of deportation is

15   established if the government proves that the defendant was in

16   fact deported prior to the time of the offense alleged in the

17   indictment.

18        The third element the government must prove beyond a

19   reasonable doubt is that following defendant's deportation the

20   defendant was found in the United States on or about the date

21   charged in the indictment.  To be found in the United States

22   means to be located in the United States following reentry.

23        While the government must prove beyond a reasonable

24   doubt that the defendant was found in the United States, as

25   charged in the indictment, the government does not have to

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1    prove that the defendant entered the United States.  The

2    government need not prove that the defendant intended to

3    violate the law when he reentered the United States, nor does

4    the government have to prove that the defendant knew that he

5    was not entitled to be in this country.

6         A good-faith or mistaken belief on the part of the

7    defendant that he could lawfully reenter the United States is

8    not a defense and is irrelevant to your deliberations.

9         The fourth and final element of the charge in the

10   indictment that the government must prove is that the defendant

11   did not receive the express consent of the designated United

12   States official to reapply for admission to the United States

13   prior to attempting to return to the United States.  Consent

14   from the designated United States official to enter -- to

15   reenter the United States must be obtained prior to the

16   deported alien's leaving from a place outside the United States

17   and attempting to enter the United States.

18        I instruct you that since March 2003, the United

19   States official designated to grant such consent was the

20   Secretary of the United States Department of Homeland Security.

21        The government need not prove that the defendant knew

22   that he was not entitled to reenter the country without the

23   permission of the designated United States official.  A

24   good-faith or mistaken belief on the part of the defendant that

25   he could reenter the United States without first obtaining the

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1  express consent of the designated United States official is not

2  a defense.

3         I have now outlined for you the rules of law

4  applicable to the charges in this case and the processes by

5  which you should weigh the evidence and determine the facts.

6  In a few minutes, you will retire to the jury room for your

7  deliberations.

8         Traditionally, Juror number 1 acts as foreperson.  In

9  order that your deliberations may proceed in an orderly

10 fashion, you must have a foreperson, but, of course, the

11 foreperson's vote is not entitled to any greater weight than

12 that of any other juror.

13        Your function, to reach a fair conclusion from the law

14 and the evidence, is an important one.  Your verdict must be

15 unanimous.  You must all agree.

16        When you are in the jury room, you may now discuss the

17 case.  It is, in fact, the duty of each of you to consult with

18 your fellow jurors and to deliberate with a view toward

19 reaching agreement on a verdict, if you can do so without

20 violating your individual judgment and your conscience.

21        In the course of your deliberations, no one should

22 surrender conscientious beliefs of what the truth is and what

23 the weight and effect of the evidence is.  Moreover, each of

24 you must decide the case for yourself and not merely acquiesce

25 in the conclusion of your fellow jurors.

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1          Nevertheless, I do ask you to examine the issues and

2     evidence before you with candor and frankness and a proper

3     deference to and regard for the opinions of one another.

4          Remember that the parties and the court are relying

5     upon you to give full and conscientious deliberation and

6     consideration to the issues and evidence before you.  By so

7     doing, you carry out to the fullest your oaths as jurors, well

8     and truly to try the issues of this case and a true verdict

9     render.

10         During your deliberations, you must not communicate

11    with or provide any information about this case to anyone other

12    than your fellow jurors, by any means.  You may not use any

13    electronic device or media, such as telephone, cell phone,

14    smart phone, iPhone, Android, computer, internet, text, instant

15    message, chat room, blog, website such as Google, Facebook,

16    MySpace, LinkedIn, YouTube, Twitter, to communicate with anyone

17    any information about the case or to conduct any research about

18    this case until I accept your verdict.

19         You may not consult dictionaries or reference

20    materials or use any other electronic tool to obtain

21    information about the case or to help you decide the case.

22         In short, do not try to find any information about

23    this case from any source outside what has been presented here

24    at trial until I have accepted your verdict.  To do so -- to do

25    otherwise would violate your oaths as jurors.

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1    If it becomes necessary during your deliberations to

2    communicate with me for any reason, simply send me a note

3    signed by your foreperson or by one or more members of the

4    jury.  No member of the jury should ever attempt to communicate

5    with me or with any court personnel by any means other than in

6    writing.  I will not communicate with any member of the jury on

7    any subject touching on the merits of this case, other than in

8    writing or orally here in open court.

9    If you wish to have some part of the testimony

10   repeated, or to see any exhibits, you may make that request.

11   If you request to see all or some of the exhibits, we will send

12   them into the jury room for you and make them available to you

13   here in open court.

14   If you request to hear certain testimony, or to see

15   the trial transcript regarding any matter, I will call you into

16   the court and have the court reporter read those portions of

17   the testimony to you, or send responsive portions of the trial

18   transcript into the jury room.

19   You can have any of the testimony read back to you or

20   made available to you in transcript form.  I suggest, however,

21   that you be specific in your requests so as to avoid hearing

22   testimony or receiving portions of the trial transcript that

23   you do not need to assist you in your deliberations.

24   If in the course of your deliberations you wish for

25   help as to the law, or if you wish to hear any further

MICHELE NARDONE, CSR -- Official Court Reporter

Jury Charge

1  explanation as to the law, you may send me a note telling me

2  what you would like.

3          Bear in mind, also, you are not to reveal to any

4  person, not even in open court, how the jury stands numerically

5  or otherwise, on the question of whether a defendant is guilty

6  or not guilty until after you have reached a unanimous verdict.

7  Any verdict you reach must be unanimous.

8          When you have reached a verdict, simply send me a

9  note, signed by your foreperson, that you have reached a

10  verdict.  Do not indicate in the note what the verdict is.

11          The verdict form I have prepared indicates the charge

12  as listed in the indictment.  Although I will provide each of

13  you with a copy of the verdict form, please recall that your

14  unanimous verdict must be recorded on the foreperson's verdict

15  form.

16          I will also provide each of you with a copy of these

17  instructions.  Please remember that you must follow these

18  instructions as a whole and should not rely on any one portion

19  and disregard the remaining portions.

20          Before asking you to begin your deliberations, let me

21  consult with counsel to ensure that I haven't neglected

22  anything.

23          (Continued on the next page.)

24

25

MICHELE NARDONE, CSR -- Official Court Reporter

Sidebar

1          (Sidebar conference.)

2          THE COURT:  Anything?

3          MS. KELLMAN:  No.

4          MR. GOLD:  No, judge.

5          MR. GOLUB:  No.

6          MS. HAJJAR:  Your Honor, I think Your Honor read the

7    prior inconsistent statements portion of the charge.

8          THE COURT:  I know.  I don't really think it belongs,

9    but it was a gift.

10          MS. KELLMAN:  It was a gift.  We appreciate that.

11          MR. GOLD:  Judge, are you sending in a copy of the

12   written?

13          THE COURT:  Yes.

14          MR. GOLD:  Okay.

15          THE COURT:  Copies for everybody.

16          MR. GOLUB:  That's fine.

17          (End of sidebar conference.)

18          (Continued on the next page.)

19

20

21

22

23

24

25

USA v. Melendez-Rojas

1    (In open court.)

2    THE COURT:  Dennis, would you please swear the

3  marshal.

4    THE CLERK:  Raise your right hand.

5    (The marshal was sworn.)

6    THE COURT:  I am now going to ask the Jurors numbers 1

7  through 12 to retire for deliberations in the case, and I'm

8  going to ask the three alternates to wait.

9    (The jury retired to commence deliberations at

10  4:05 p.m.)

11    (Alternates jurors remain in courtroom.)

12    THE COURT:  I understand that one of the three

13  alternates -- and I'm not sure which alternate it is -- is not

14  going to be able to deliberate tonight.  Who is that?  Was

15  there anyone who can't deliberate tonight?  Okay.

16    Alternate number 3, I'm going to excuse you and thank

17  you very much.  Dennis will take you out and get your things

18  for you.

19    (Alternate Juror 3 exits courtroom.)

20    THE COURT:  Alternates numbers 1 and 2, I'm going to

21  follow a procedure -- again, because of the virus, and I'm not

22  sure whether or not there will be a verdict this evening --

23  whereby I ask you to stand by and be prepared to replace a

24  juror, should the case go over until Monday and one of the

25  jurors not return.

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas

1        This means you are still bound by the requirement that

2   you not discuss the case with anyone.  All right?  I will ask

3   you -- Dennis will let you know one way or the other whether

4   it's going to be necessary for you to come back on Monday

5   morning at 9:30, if the jury doesn't reach a verdict tonight.

6   I am going to ask you to come back at 9:30 tomorrow morning, if

7   he lets you know.

8        THE CLERK:  Monday morning.

9        THE COURT:  Oh, Monday morning.  Sorry.  Not tomorrow.

10  Monday morning.  Is that clear?

11       ALTERNATE JUROR:  Perfect.

12       THE COURT:  Okay.  That's fine.

13       And should I ask you to become a member of the jury, I

14  will instruct everybody on how to proceed at that time.

15       ALTERNATE JUROR:  Okay.

16       THE COURT:  All right.

17       ALTERNATE JUROR:  All right.

18       THE COURT:  Okay.  So I guess I can say to all of you,

19  have a good weekend.  And, Alternates 1 and 2, we will let you

20  know whether we need you on Monday morning.  Okay?

21       ALTERNATE JUROR:  Yes.

22       ALTERNATE JUROR:  Yeah.

23       THE CLERK:  All rise.

24       (Alternate Jurors 1 and 2 exit courtroom.)

25       THE COURT:  Okay.  Would you all just stay around the

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas

1  floor.

2          MS. KELLMAN:  I didn't hear you.

3          THE COURT:  Would you just stay on the floor?

4          MR. GOLUB:  Sure.

5          MS. KELLMAN:  No problem.

6          (Pause.)

7          MS. KELLMAN:  The marshals are asking whether or not

8  the defendants should go downstairs or stay back here.

9          THE COURT:  I think you might as well bring the

10  defendants downstairs and bring them back on notice.

11          THE MARSHAL:  Okay.

12          (Court in recess awaiting the verdict of the jury.)

13          (In open court.)

14          (Defendants not present; jury not present.)

15          (Court Exhibits 1, 2, and 3 so marked.)

16          THE COURT:  We received Court Exhibit number 1 at 4:10

17  today, asking to step outside for a smoke.  There were four of

18  them, okay, which has been taken care of.

19          MS. KELLMAN:  Oh, okay.  Because I was going to say

20  otherwise they would be freaking out.

21          THE COURT:  Court Exhibit number 2 was received at

22  5:30 -- at 5:00, excuse me -- requesting, one, wire transfer

23  charts; two, telephone record charts; three, border crossing

24  attempts and the charts.  And I understand all of that was sent

25  into them.

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas

1        MS. KELLMAN:  Yes, judge.

2        THE COURT:  Four, pictures and names of defendants;

3    five, pictures and names of witnesses.

4        MS. KELLMAN:  Yes.

5        THE COURT:  And we have now received at 7:08 Court

6    Exhibit 3, Delia's -- quote, Delia's transcript regarding

7    Miguel, direct examination, close quote, signed by Juror

8    number 1.

9        Actually, if there is no issue, maybe I don't need the

10   defendants.

11       MS. KELLMAN:  Yeah, if there is no issue, we won't

12   need them.

13       MR GOLUB:  What about a meal?

14       MS. KELLMAN:  Yeah.  Did you ask them about food?  Did

15   you ask the marshals if they have been fed, if the defendants

16   have been fed?

17       THE COURT:  It didn't occur to me that they weren't.

18       MS. KELLMAN:  Oh, it would be stunning if they had

19   food down there for them.

20       (Court in recess awaiting the verdict of the jury.)

21       (In open court.)

22       (Court Exhibits 4 and 5 so marked.)

23       THE COURT:  I simply want to put on the record that we

24   received, at 9:15 Court Exhibit number 5.  It reads, The jury

25   is ready to deliver a verdict, signed by Juror number 1.

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas

1        We had also received Court Exhibit number 4 from the

2    jury at 8:10 p.m., requesting Daisy's direct examination

3    transcript concerning Rosalio, and Daisy and Fabian's wire

4    transfer records, signed by Juror number 1; and that had been

5    sent into the jury.

6            (Pause.)

7            (Defendants present.)

8            (Through the interpreter.)

9            THE COURT:  Is everyone accounted for?  Can I bring in

10   the jury?

11           MS. KELLMAN:  Yes.

12           (Pause.)

13           (Jury enters.)

14           THE COURT:  Please be seated, ladies and gentlemen.

15           Obviously, we have received all of your notes,

16   including your most recent note that you are ready to deliver

17   the verdict.

18           Let me just ask you generally first:  Is your verdict

19   unanimous?

20           THE FOREPERSON:  Yes.

21           (Jurors responded yes.)

22           THE COURT:  Okay.  Would you give me the foreperson's

23   verdict form.

24           (Clerk received the verdict form.)

25           THE COURT:  All right.  I'm going to return the

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas

1    verdict form to your foreperson.  I'm going to ask that the

2    foreperson -- I see, signed on page 1.  That's fine.

3         I'm going to ask you to return the verdict, but I

4    would like all of you, please, to listen to the answers to the

5    questions, because after the verdict is returned I'm going to

6    poll the jury and ask you whether or not that was your verdict.

7    Okay?

8         So as to count one, alien smuggling conspiracy, as to

9    Defendant Jose Miguel Melendez-Rojas, guilty or not guilty?

10        THE FOREPERSON:  Guilty.

11        THE COURT:  Did he act for the purpose of financial

12   gain?

13        THE FOREPERSON:  Yes.

14        THE COURT:  As to the Defendant Jose Osvaldo

15   Melendez-Rojas, guilty or not guilty?

16        THE FOREPERSON:  Guilty.

17        THE COURT:  Did he act for the purpose of private

18   financial gain?

19        THE FOREPERSON:  Yes.

20        THE COURT:  As to Defendant Rosalio Melendez-Rojas,

21   guilty or not guilty?

22        THE FOREPERSON:  Guilty.

23        THE COURT:  Did he act for the purpose of personal

24   financial gain?

25        THE FOREPERSON:  Yes.

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez–Rojas

1    THE COURT:  As to Defendant Francisco Melendez–Perez,

2  guilty or not guilty?

3    THE FOREPERSON:  Guilty.

4    THE COURT:  And did you find that he acted for the

5  purpose of private financial gain?

6    THE FOREPERSON:  Yes.

7    THE COURT:  As to Defendant Abel Romero–Melendez,

8  guilty or not guilty?

9    THE FOREPERSON:  Guilty.

10    THE COURT:  Did you find that he acted for the purpose

11  of private financial gain?

12    THE FOREPERSON:  Yes.

13    THE COURT:  Turning to count two, conspiracy to

14  transport minors to engage in prostitution, as to Defendant

15  Jose Miguel Melendez–Rojas, guilty or not guilty?

16    THE FOREPERSON:  Guilty.

17    THE COURT:  As to Defendant Jose Osvaldo

18  Melendez–Rojas, guilty or not guilty?

19    THE FOREPERSON:  Guilty.

20    THE COURT:  As to Defendant Rosalio Melendez–Rojas,

21  guilty or not guilty?

22    THE FOREPERSON:  Guilty.

23    THE COURT:  As to Defendant Francisco Melendez–Perez,

24  guilty or not guilty?

25    THE FOREPERSON:  Guilty.

MICHELE NARDONE, CSR –– Official Court Reporter

USA v. Melendez-Rojas

1    THE COURT:  As to Defendant Abel Romero-Melendez,

2    guilty or not guilty?

3    THE FOREPERSON:  Guilty.

4    THE COURT:  Turning to count three, sex trafficking

5    conspiracy, as to Defendant Jose Miguel Melendez-Rojas, guilty

6    or not guilty?

7    THE FOREPERSON:  Guilty.

8    THE COURT:  As to Defendant Jose Osvaldo

9    Melendez-Rojas, guilty or not guilty?

10    THE FOREPERSON:  Guilty.

11    THE COURT:  As to Defendant Rosalio Melendez-Rojas,

12    guilty or not guilty?

13    THE FOREPERSON:  Guilty.

14    THE COURT:  As to Defendant Francisco Melendez-Perez,

15    guilty or not guilty?

16    THE FOREPERSON:  Guilty.

17    THE COURT:  As to Defendant Abel Romero-Melendez,

18    guilty or not guilty?

19    THE FOREPERSON:  Guilty.

20    THE COURT:  Turning to count four, the sex trafficking

21    of Diana, as to Defendant Jose Miguel Melendez-Rojas, guilty or

22    not guilty?

23    THE FOREPERSON:  Guilty.

24    THE COURT:  Do you find that the defendant knew that

25    means of force, fraud, or coercion would be used to cause Diana

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas

1    to engage in one more commercial sex acts?

2              THE FOREPERSON:  Yes.

3              THE COURT:  Do you find that defendant knew that Diana

4    had not attained the age of 18 years and would be caused to

5    engage in one more commercial sex acts?

6              THE FOREPERSON:  Yes.

7              THE COURT:  As to Defendant Rosalio Melendez-Rojas,

8    guilty or not guilty?

9              THE FOREPERSON:  Guilty.

10             THE COURT:  Do you find that the defendant knew that

11   means of force, violence, or coercion would be used to cause

12   Diana to engage in one or more commercial sex acts?

13             THE FOREPERSON:  Yes.

14             THE COURT:  Do you find defendant knew that Diana had

15   not attained the age of 18 years and would be caused to engage

16   in one or more commercial sex acts?

17             THE FOREPERSON:  Yes.

18             THE COURT:  As to Defendant Abel Romero-Melendez,

19   guilty or not guilty?

20             THE FOREPERSON:  Guilty.

21             THE COURT:  Do you find that the defendant knew that

22   means of force, fraud, or coercion would be used to cause Diana

23   to engage in one or more commercial sex acts?

24             THE FOREPERSON:  Yes.

25             THE COURT:  Do you find that the defendant knew that

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas

1   Diana had not attained the age of 18 years and would be caused

2   to engage in one or more commercial sex acts?

3          THE FOREPERSON:  Yes.

4          THE COURT:  As to Defendant Jose Miguel

5   Melendez-Rojas, guilty or not guilty?

6          THE FOREPERSON:  Guilty.

7          THE COURT:  As to Defendant Jose Osvaldo

8   Melendez-Rojas, guilty or not guilty?

9          THE FOREPERSON:  Guilty.

10          THE COURT:  As to Defendant Rosalio Melendez-Rojas,

11   guilty or not guilty?

12          THE FOREPERSON:  Guilty.

13          THE COURT:  Turning to count six, the sex trafficking

14   of Fabiola, as to Defendant Jose Osvaldo Melendez-Rojas, guilty

15   or not guilty?

16          THE FOREPERSON:  Guilty.

17          THE COURT:  As to Defendant Rosalio Melendez-Rojas,

18   guilty or not guilty?

19          THE FOREPERSON:  Guilty.

20          THE COURT:  As to count seven, alien smuggling of

21   Fabiola, as to Defendant Jose Osvaldo Melendez-Rojas, guilty or

22   not guilty?

23          THE FOREPERSON:  Guilty.

24          THE COURT:  Do you find that the defendant acted for

25   the purpose of private financial gain?

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez–Rojas

1       THE FOREPERSON:  Yes.

2       THE COURT:  As to Defendant Rosalio Melendez–Rojas,

3  guilty or not guilty?

4       THE FOREPERSON:  Guilty.

5       THE COURT:  Do you find that the defendant acted for

6  the purpose of private financial gain?

7       THE FOREPERSON:  Yes.

8       THE COURT:  Turning to count eight, sex trafficking of

9  Maria Rosalba, as to Defendant Jose Osvaldo Melendez–Rojas,

10  guilty or not guilty?

11       THE FOREPERSON:  Guilty.

12  Q   As to Defendant Francisco Melendez–Perez, guilty or not

13  guilty?

14       THE FOREPERSON:  Guilty.

15       THE COURT:  Turning to count nine, alien smuggling of

16  Maria Rosalba, as to Defendant Jose Osvaldo Melendez–Rojas,

17  guilty or not guilty?

18       THE FOREPERSON:  Guilty.

19       THE COURT:  Did you find that the defendant acted for

20  the purpose of private financial gain?

21       THE FOREPERSON:  Yes.

22       THE COURT:  As to Defendant Francisco Melendez–Perez,

23  guilty or not guilty?

24       THE FOREPERSON:  Guilty.

25       THE COURT:  Do you find that the defendant acted for

MICHELE NARDONE, CSR –– Official Court Reporter

USA v. Melendez-Rojas

1   the purpose of private financial gain?

2        THE FOREPERSON:  Yes.

3        THE COURT:  As to Defendant Jose Miguel

4   Melendez-Rojas, guilty or not guilty?

5        THE FOREPERSON:  Guilty.

6        THE COURT:  Do you find that the defendant knew or

7   recklessly disregarded that means of force, fraud, or coercion

8   would be used to cause Delia to engage in one or more

9   commercial sex acts?

10       THE FOREPERSON:  Yes.

11       THE COURT:  Do you find the defendant knew or

12  recklessly disregarded that Delia had not attained the age of

13  18 years and would be caused to engage in one or more

14  commercial sex acts?

15       THE FOREPERSON:  Yes.

16       THE COURT:  As to Defendant Jose Osvaldo

17  Melendez-Rojas, guilty or not guilty?

18       THE FOREPERSON:  Guilty.

19       THE COURT:  Do you find that the defendant knew or

20  recklessly disregarded that means of force, fraud, or coercion

21  would be used to cause Delia to engage in one or more

22  commercial sex acts?

23       THE FOREPERSON:  Yes.

24       THE COURT:  Do you find that the defendant knew or

25  recklessly disregarded that Delia had not attained the age of

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas

1  18 years and would be caused to engage in one or more

2  commercial sex acts?

3        THE FOREPERSON:  Yes.

4        THE COURT:  As to Defendant Rosalio Melendez-Rojas,

5  guilty or not guilty?

6        THE FOREPERSON:  Guilty.

7        THE COURT:  Do you find that the defendant knew or

8  recklessly disregarded that means of force, fraud, or coercion

9  would be used to cause Delia to engage in one more commercial

10  sex acts?

11        THE FOREPERSON:  Yes.

12        THE COURT:  Do you find that the defendant knew or

13  recklessly disregarded that Delia had not attained the age of

14  18 years and would be caused to engage in one or more

15  commercial sex acts?

16        THE FOREPERSON:  Yes.

17        THE COURT:  As to Defendant Francisco Melendez-Perez,

18  guilty or not guilty?

19        THE FOREPERSON:  Guilty.

20        THE COURT:  Do you find that the defendant knew or

21  recklessly disregarded that means of force, fraud, or coercion

22  would be used to cause Delia to engage in one or more

23  commercial sex acts?

24        THE FOREPERSON:  Yes.

25        THE COURT:  Do you find that the defendant knew or

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez–Rojas

1    recklessly disregarded that Delia had not attained the age of

2    18 years and would be caused to engage in one or more

3    commercial sex acts?

4              THE FOREPERSON:  Yes.

5              THE COURT:  Turning to count 11, the transportation of

6    a minor to engage in prostitution, as to Delia, as to Defendant

7    Jose Miguel Melendez–Rojas, guilty or not guilty?

8              THE FOREPERSON:  Guilty.

9              THE COURT:  Jose Osvaldo Melendez–Rojas, guilty or not

10   guilty?

11             THE FOREPERSON:  Guilty.

12             THE COURT:  As to Rosalio Melendez–Rojas, guilty or

13   not guilty?

14             THE FOREPERSON:  Guilty.

15             THE COURT:  As to Francisco Melendez–Perez, guilty or

16   not guilty?

17             THE FOREPERSON:  Guilty.

18             THE COURT:  Turning to count 12, alien smuggling of

19   Delia, as to Defendant Jose Miguel Melendez–Rojas, guilty or

20   not guilty?

21             THE FOREPERSON:  Guilty.

22             THE COURT:  Did the defendant act for the purpose of

23   private financial gain?

24             THE FOREPERSON:  Yes.

25             THE COURT:  As to Jose Osvaldo Melendez–Rojas, guilty

MICHELE NARDONE, CSR –– Official Court Reporter

USA v. Melendez-Rojas

1        or not guilty?

2                    THE FOREPERSON:  Guilty.

3                    THE COURT:  Do you find that the defendant acted for

4        the purpose of private financial gain?

5                    THE FOREPERSON:  Yes.

6                    THE COURT:  As to Defendant Rosalio Melendez-Rojas,

7        guilty or not guilty?

8                    THE FOREPERSON:  Guilty.

9                    THE COURT:  Do you find the defendant acted for the

10       purpose of private financial gain?

11                   THE FOREPERSON:  Yes.

12                   THE COURT:  As to the Defendant Francisco

13       Melendez-Perez, guilty or not guilty?

14                   THE FOREPERSON:  Guilty.

15                   THE COURT:  Do you find that the defendant acted for

16       the purpose of private financial gain?

17                   THE FOREPERSON:  Yes.

18                   THE COURT:  Count 14, alien smuggling of Daisy, as to

19       Defendant Rosalio Melendez-Rojas, guilty or not guilty?

20                   THE FOREPERSON:  Guilty.

21                   THE COURT:  Do you find that the defendant acted for

22       the purpose of private financial gain?

23                   THE FOREPERSON:  Yes.

24                   THE COURT:  Count 15, the money laundering conspiracy,

25       as to Defendant Jose Miguel Melendez-Rojas, guilty or not

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas

1    guilty?

2              THE FOREPERSON:  Guilty.

3              THE COURT:  As to Defendant Jose Osvaldo

4    Melendez-Rojas, guilty or not guilty?

5              THE FOREPERSON:  Guilty.

6              THE COURT:  As to Defendant Rosalio Melendez-Rojas,

7    guilty or not guilty?

8              THE FOREPERSON:  Guilty.

9              THE COURT:  As to Defendant Francisco Melendez-Perez,

10   guilty or not guilty?

11             THE FOREPERSON:  Guilty.

12             THE COURT:  Count 16, the distribution of proceeds of

13   a prostitution business, as to Defendant Jose Miguel

14   Melendez-Rojas, guilty or not guilty?

15             THE FOREPERSON:  Guilty.

16             THE COURT:  As to Defendant Jose Osvaldo

17   Melendez-Rojas, guilty or not guilty?

18             THE FOREPERSON:  Guilty.

19             THE COURT:  As to Defendant Rosalio Melendez-Rojas,

20   guilty or not guilty?

21             THE FOREPERSON:  Guilty.

22             THE COURT:  As to Defendant Francisco Melendez-Perez,

23   guilty or not guilty?

24             THE FOREPERSON:  Guilty.

25             THE COURT:  Finally, count 18, illegal reentry, as to

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez–Rojas

1    Defendant Abel Romero-Melendez, guilty or not guilty?

2            THE FOREPERSON:  Guilty.

3            THE COURT:  Juror number 1, is that your verdict?

4            JUROR:  Yes.

5            THE COURT:  Juror number 2?

6            JUROR:  Yes.

7            THE COURT:  Juror number 3?

8            JUROR:  Yes.

9            THE COURT:  4?

10           JUROR:  Yes.

11           THE COURT:  5?

12           JUROR:  Yes.

13           THE COURT:  6?

14           JUROR:  Yes.

15           THE COURT:  7?

16           JUROR:  Yes, yes.

17           THE COURT:  Okay, I'm sorry.  8?

18           JUROR:  Yes, Your Honor.

19           THE COURT:  9?

20           JUROR:  Yes.

21           THE COURT:  10?

22           JUROR:  Yes.

23           THE COURT:  11?

24           JUROR:  Yes.

25           THE COURT:  12?

USA v. Melendez-Rojas

1    JUROR:  Yes.

2    THE COURT:  Ladies and gentlemen, I cannot begin to

3    thank you for your extraordinary jury service in this case.  It

4    has been very intense.  I have never tried a case using longer

5    trial days than I did in this case.

6    Your willingness to stay tonight, everything that you

7    have done, you paid attention to every witness and all the

8    documents, every note that you sent in, you know, was clearly

9    requesting relevant, important information.  You worked your

10   way through and made determinations.

11   You have so amazingly done your duty as jurors, I, we,

12   all thank you very much.

13   Have a wonderful weekend and be well.  Thank you so

14   much.

15   That I will take.  Thank you.

16   (Jury exits at 9:39 p.m.)

17   THE COURT:  I will mark this as Court Exhibit

18   number 6.

19   (Court Exhibit 6 so marked.)

20   THE COURT:  Because Dennis -- you can sit.  Please be

21   seated.

22   Because Dennis is not here, I think the best way to

23   handle the sentencing dates is to say that he will let you know

24   when the sentencing date will be.  It's usually a few months

25   out, to give plenty of time for the presentence report to be

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas

1  prepared.

2          MS. KELLMAN:  Judge, can we ask the court to deem the

3  Rule 29(c) motions made as of today, and we can set a briefing

4  schedule, at least as to me?

5          THE COURT:  The only thing about that is that we now

6  have this completely in our heads.  So I can deal with any

7  motions that you --

8          MS. KELLMAN:  But, usually, I mean my practice is

9  usually to make a motion and then brief it, if there is

10  something to brief.

11          We have the court reporter.  So if the court would

12  deem the motion made, and then we will supplement with papers.

13          THE COURT:  All I'm saying if you don't brief this for

14  three weeks or four weeks, I'm going to have forgotten the

15  case.

16          So what I would like to do is I will deem it made

17  today; but I would like to have a briefing schedule, if there

18  are going to be motions, that's a relatively short period of

19  time from now.

20          MS. KELLMAN:  Perhaps we can work something out with

21  the government on Monday and get back to the court.

22          THE COURT:  Okay.  But I want to get it completely

23  briefed, say within the next ten days to two weeks.  Okay?

24          MS. KELLMAN:  Okay.

25          THE COURT:  I'm sorry to do that to you, but it's just

MICHELE NARDONE, CSR -- Official Court Reporter

1833

                    USA v. Melendez-Rojas

1    that I forget the facts.

2            MS. KELLMAN:  We attach the transcripts.

3            THE COURT:  I'm sure you will, but I think it's easier

4    to get it out of the way closer to trial rather than waiting

5    closer to sentence.

6            MS. KELLMAN:  Right.

7            THE COURT:  So, yes, you can do that, but I would

8    appreciate it.

9            MS. KELLMAN:  They are deemed made?

10           THE COURT:  Yes, they are deemed made.

11           MR GOLUB:  Thank you, judge.

12           MR. DUNN:  Thank you.

13           MS. KELLMAN:  Thank you, judge.

14           THE COURT:  Okay.  Have a good night.

15           (Trial concluded at 9:42 p.m.)

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas

I N D E X

Summation – Gold                    1634

Summation – Hueston                 1694

Rebuttal – Hajjar                   1723

Jury Charge                         1743

COURT EXHIBITS

1, 2, and 3                         1817

4, 5                                1818

6                                   1832

o O o

MICHELE NARDONE, CSR –– Official Court Reporter